IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| NOLEEN PAUGH and DONALD PAUGH, as heirs of Coby Lee Paugh, and TRISTEN CALDER, as personal representative of the estate of Coby Lee Paugh,<br>        Plaintiffs,<br>v.<br>UINTAH COUNTY, KORI ANDERSON, DAN BUNNELL, KYLE FULLER, TYLER CONLEY, RICHARD GOWEN, and JUSTIN RIDDLE,<br>        Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:17-cv-01249 JNP-CMR<br><br>District Judge Jill N. Parrish<br><br>Magistrate Judge Cecilia M. Romero |

This matter is before the court on a Motion for Summary Judgment (the "Motion") filed by defendants Uintah County, Deputy Kori Anderson, Deputy Dan Bunnell, Deputy Kyle Fuller, Deputy Tyler Conley, Corporal Richard Gowen, and Deputy Justin Riddle (collectively, "Defendants"). *See* ECF No. 68. Plaintiffs Noleen Paugh and Donald Paugh, as heirs of Coby Lee Paugh ("Decedent" or "Paugh"), and Tristen Calder, as personal representative of Paugh's estate (collectively, "Plaintiffs"), bring this suit under 42 U.S.C. § 1983 for alleged constitutional violations that resulted in Paugh's death while he was detained in the Uintah County Jail ("UCJ" or the "Jail"). Plaintiffs assert that Anderson, Bunnell, Fuller, Conley, Gowen, and Riddle (the "individual defendants") violated Paugh's constitutional rights by failing to provide him with adequate medical care for his alcohol withdrawal condition and that these failures occurred as the result of Uintah County's constitutionally deficient policies, customs, and training. Having considered the parties' briefs and argument advanced at a hearing on August 3, 2020, the court denies in part and grants in part Defendants' Motion for Summary Judgment.

# I.    BACKGROUND[1]

This case arises from the tragic death of Coby Lee Paugh in the Uintah County Jail. Paugh long struggled with chronic alcoholism and addiction, as well as attendant encounters with the criminal justice system in Vernal, Utah. Paugh's alcoholism was known to local law enforcement, UCJ officials, and medical staff at the Ashley Regional Medical Center ("ARMC"), the local hospital. On March 10, 2015, Paugh "pleaded guilty to an alcohol-related offense, and was ordered to be on supervised probation and not consume alcohol for a period of six months." Am. Compl. ¶ 21. But after consecutive days of excessive alcohol consumption in late July, Paugh recognized his addiction was out of control and he decided to break his drinking streak by turning himself in for unlawful intoxication. Early in the morning on July 24, 2015, Vernal Police took Paugh into custody and he volunteered for a breathalyzer test that registered a blood-alcohol concentration of .324, far exceeding the legal driving limit and verging dangerously on alcohol overdose levels.

## A.    MEDICAL CLEARANCE AT ARMC

Vernal Police officers first transported Paugh to the ARMC emergency room to obtain medical clearance for his admission to UCJ. Paugh arrived at ARMC at approximately 1:30 a.m. on July 24 and began receiving treatment from Dr. Aaron Bradbury. Dr. Bradbury examined Paugh and concluded that he was experiencing "Alcohol Abuse-Continuous, Alcohol (ETOH) Overdose." ECF No. 85–2 at 137. Paugh did not receive any medication treatment at that time, but Dr. Bradbury ordered a prescription for thirty 25mg capsules of Chlordiazepoxide, commonly known as Librium, to be taken "2 capsules by mouth every 2 hours as needed for withdrawl [sic] (max 300mg in 24 hours)." ECF No. 98–1 at 1; *see also* ECF Nos. 85–2 at 139; 85–3 at 16. Dr.

---

[1] The court recites the record facts in the light most favorable to Plaintiffs as non-movants, resolving all factual disputes and drawing all reasonable inferences in their favor. *See Estate of Booker v. Gomez*, 745 F.3d 405, 411–12 (10th Cir. 2014).

Bradbury described Librium as "a long-acting benzodiazepine that could be used to help mitigate alcohol withdrawal symptoms." ECF No. 85–3 at 16.

Finding that Paugh was "stable," Dr. Bradbury discharged him from ARMC at 2:10 a.m. *Id.* at 23. Upon discharge, Dr. Bradbury provided the arresting officers with written and oral instructions that Paugh should follow up with a private physician or be brought back to the hospital "as needed" if he experienced "[w]orsening of [his] condition." ECF No. 85–2 at 139; *see also* ECF No. 85–3 at 23–24. Dr. Bradbury recorded this in his internal chart, noting that Paugh was "currently stable and safe for incarceration," but "if he develops withdrawal symptoms he will have to be returned to the hospital for management." ECF No. 85–3 at 97. For example, Dr. Bradbury knew that discharged patients at risk of alcohol withdrawal can "[a]bsolutely" have their condition dangerously deteriorate "over the next 24 to 48 hours" after stopping drinking, including resulting in death. *Id.* at 9, 12. Dr. Bradbury also stated that Paugh "was definitely [at] higher risk" of experiencing severe alcohol withdrawal and expected that upon discharge, Jail officials would regularly "observe[] and monitor[]" Paugh for signs of "gradually" worsening alcohol withdrawal, such as "vomiting," becoming "pale" or "sweaty," "[u]ncontrolled shaking or movement (tremors)," having "a seizure" or "a fever," becoming "lightheaded or faint," or experiencing "confusion," "lack of coordination," or increased anxiety and restlessness. *See id.* at 10, 14; 85–2 at 142–143. In short, Dr. Bradbury stated that upon discharging Paugh, he conveyed to the arresting officers that if Paugh's alcohol withdrawal condition "got any worse they'd have to bring him back" to ARMC. ECF No. 85–3 at 15.

## B.   BOOKING IN JAIL ON JULY 24

At approximately 2:20 a.m., the arresting officers brought Paugh to be booked into UCJ for two misdemeanor counts: Intoxication and Unlawful Alcohol Purchase by Interdicted Person. *See* ECF Nos. 68–2 at 2, 85–2 at 135. At that time, Bunnell, Anderson, and Riddle were working

3

the night shift that ended at 6:00 a.m., but only Anderson and Bunnell observed or dealt with Paugh entering the Jail. July 24th was Anderson's first night being the "officer in charge" of UCJ, which meant she was "running the jail" that night. ECF No. 85–2 at 28, 32–33. Anderson attested that in July 2015, she had been a corrections officer for approximately eight months and she had "asked not to be in charge that night anyways because" she was still in training and she "knew [she] wasn't ready." *Id.* at 26–28. She stated that she "told two supervisors that" and asked them to "[p]lease choose somebody else," including offering Bunnell to be in charge instead, to which she was told to "[s]uck it up." *Id.* at 27–28.

Bunnell was the "designated medical officer" during this shift, meaning he was responsible for "pass[ing] out medications," ECF No. 85–2 at 34, but he did not otherwise have any medical training, *see id.* at 89. Bunnell personally knew Paugh and about his alcoholism from when Bunnell was a patrol officer and because Bunnell lived close to where Paugh resided. *Id.* at 85–86. Anderson and Bunnell received Paugh's discharge instructions from the arresting officers and placed the instructions in Paugh's file in the booking area. *See id.* at 36, 87. Anderson and Bunnell were both aware that Paugh was heavily intoxicated with a .324 blood-alcohol concentration, had just been to ARMC, and had received a prescription for Librium. *Id.* at 33–36, 84–85. Anderson also attested that it was her "understanding . . . that if there was [sic] red flags" of alcohol withdrawal—meaning "[i]f his condition worsened . . . in any way"—the staff "needed to get [Paugh] to the hospital." *Id.* at 35.

Bunnell placed Paugh in a dark detox cell ("detox cell #1") near the booking area where Paugh laid down to sleep. *See id.* at 34, 85. The cell is solid "cinderblock and a glass door and windows." *Id.* at 97. Around 2:40 a.m., Bunnell inputted some initial booking information for Paugh into the computer system but, per Jail custom, he waited until Paugh became sober before

4

completing the booking process and conducting the Jail's mental and medical health screening questionnaire. *See id.* at 35, 86–87. Neither Bunnell nor Anderson recalled checking on Paugh between placing him in detox cell #1 around 2:40 a.m. and when their shifts ended at approximately 6:00 a.m. *See id.* at 36, 87, 90. When Bunnell and Anderson ended their shifts, Bunnell looked into Paugh's cell and decided to still wait to complete the medical screening because Paugh was asleep. *Id.* at 90. Anderson observed Paugh during this shift but did not personally interact with him. *See id.* at 36. Additionally, no Jail staff member with medical training observed or otherwise examined Paugh during this shift, in part because in July 2015, the only available nurse on staff, Nurse Kathleen Smith, was away on maternity leave. *See, e.g.*, ECF Nos. 85–2 at 34, 121; 85–3 at 107, 137. Further, even if Nurse Smith was not on maternity leave, the Jail had a policy of working night shifts without medical staff. *See* ECF No. 85–2 at 44.

### C.   DAY SHIFT ON JULY 24

At 6:00 a.m. on July 24, 2015, Gowen, Conley, and Fuller began their twelve-hour day shift. Gowen was the scheduled shift supervisor and Fuller was the designated medical officer. *See* ECF Nos. 72 at 2; 85–2 at 120. When transferring duties through a process called the "pass-along," the night shift did not fully inform the day shift about Paugh's alcohol withdrawal condition or Dr. Bradbury's discharge instructions for Paugh to return to the hospital in the event his condition worsened. *See, e.g.*, ECF 85–2 at 84, 86–89, 90, 109, 120, 125. The night shift also did not inform the day shift that Paugh had an unfilled prescription for Librium to treat his alcohol withdrawal. *See id.* at 126. Gowen, Conley, and Fuller knew that Paugh was highly intoxicated, had seen a doctor at ARMC, and he was stable enough to be booked into the Jail. *See id.* at 5, 12, 109, 123–24; 85–3 at 109. Around 6:30 a.m., Conley checked on Paugh and served him breakfast, but Paugh did not eat it. *See* ECF Nos. 85–2 at 109; 85–3 at 113. Around 8:00 a.m., Conley opened detox cell #1 and talked to another inmate sharing Paugh's cell. *See* ECF No. 81–2 at 22.

Eventually, Gowen, Conley, and Fuller reviewed at least part of Paugh's medical file or otherwise learned that Paugh was experiencing alcohol withdrawal. Gowen and Conley also became aware that Dr. Bradbury had written a prescription for Librium as part of his discharge instructions to prevent Paugh's alcohol withdrawal from worsening. Around 11:00 a.m., Fuller served Paugh lunch and juice. ECF No. 85–2 at 120. Knowing that Paugh was experiencing alcohol withdrawal and seeing that Paugh had shakiness in his hand, *see id.* at 123, 128, Fuller instructed Paugh to drink fluids and stay hydrated, *id.* at 120. After serving lunch, Fuller learned from Conley at approximately 11:30 a.m. that Paugh's prescription for Librium was still unfilled. *Id.* at 125. Around this time, Fuller left the jail to fill the prescription. *Id.*

At 11:30 a.m., about nine hours after Paugh was brought into Jail, Conley began completing the booking and screening process with Paugh. ECF No. 85–2 at 109. Paugh took a booking photo and began answering a medical and mental health screening questionnaire, *see* ECF No. 85–3 at 44–45, but Paugh had to stop to run back to detox cell #1 to vomit, *see* ECF No. 85–2 at 109. Conley asked if Paugh was alright and "Paugh stated that he would probably be fine for awhile [sic]." ECF No. 85–3 at 188. Conley then continued the booking process.

In responding to the screening questionnaire, Paugh affirmatively indicated to Conley that he: was "currently going through withdrawals" from alcohol, was in "lots of pain from three broken ribs," had other medical problems from seizures, was feeling "restlessness/anxiety," and suffered from alcoholism. ECF No. 85–3 at 44–45. Gowen was also present in the booking area while Conley conducted the screening questionnaire. *Id.* at 111. Despite Jail policy to do so, *see* ECF No. 69–3 at 6, neither Conley, Gowen, nor any other Jail staff member contacted medical professionals about Paugh's affirmative answers to the screening questionnaire, *see* ECF Nos. 85–

2 at 110; 85–3 at 110–111. Before Conley returned Paugh to his cell, Conley also fingerprinted Paugh and said he could make a telephone call, which Paugh declined to do. ECF No. 85–2 at 109.

Around lunchtime between 11:00 a.m. and 12:00 p.m., Gowen observed Paugh and saw that both of his hands and his forearms were shaking. ECF No. 85–3 at 109. Gowen also stated that he knew Paugh had "retched," or dry-heaved, "two or three times" over a period of "two or three hours." *Id.* at 111. Gowen stated that he looked over at Paugh's cell from his desk periodically throughout the shift and recalled that Paugh "was sleeping the majority of the time" in the cell, although Gowen recognized that the light being off in the cell caused reduced visibility. *Id.*

In the midafternoon, Fuller returned to the Jail from filling Paugh's prescription for Librium in town, turned on the lights in Paugh's cell, and gave Paugh some medication at approximately 1:40 p.m. *See* ECF Nos. 85–2 at 127; 85–3 at 93; 81–2 at 23. Fuller observed that Paugh's "hands shook" during this encounter and that he "obviously [had] seen him shake" at times during the day. ECF No. 85–2 at 9, 129. After giving Paugh a dose of medication, Fuller recognized that Dr. Bradbury's discharge instructions indicated that two Librium capsules "needed to be given either every two hours or as needed," which conflicted with the Jail's standard protocol to give medications three times daily at "7:00 [a.m.], 12:00 [p.m.], and 5:00 [p.m.]." ECF No. 85–2 at 120. To receive guidance on whether Fuller had to deviate from the standard protocol for Paugh's Librium, Fuller called Physician Assistant Logan Clark, who is contracted by the Jail to provide remote medical assistance for inmate treatment. *See* ECF No. 69 at 3.

Clark and Fuller spoke about Paugh's condition to determine the proper Librium dosage and intervals. *See* ECF Nos. 85–2 at 129; 85–3 at 62. Fuller told Clark that he did not observe Paugh with any symptoms of withdrawal, failing to disclose that he had seen Paugh's hands shaking. *See* ECF Nos. 85–2 at 129' 85–3 at 62–66. On this call, Clark was also not informed of

Paugh's affirmative answers on the screening questionnaire with Conley, or that Paugh had vomited at least once and was dry heaving throughout the day. *See* ECF No. 85–3 at 62–63. Based on Fuller's description and Clark's understanding that Paugh was showing no alcohol withdrawal symptoms, Clark instructed Fuller to change Paugh's Librium dosage from two capsules every two hours "as needed" up to 300mg/day (Dr. Bradbury's instructions) to a dosage of one capsule three times daily (conforming with the Jail's typical medication protocol). *Id.* at 64. Fuller recalled that he wrote Clark's new dosage instructions on the Librium prescription packaging. *Id.* at 94.

At approximately 4:00 p.m., Gowen served dinner trays to the Jail inmates, including Paugh. *Id.* at 93, 111. Gowen recalled speaking with Paugh, who stated that "he had not hit his peak yet" for his alcohol withdrawal symptoms and was "feeling sick and nauseous." *See id.* at 95, 114, 118. Gowen also observed on multiple instances that Paugh had tremors, both of his hands and forearms were "visibly shaking," he had "puked throughout the day" and was "dry-heaving," Gowen "heard him retching" several times, and he was overall "really sick from detoxing while at . . . the jail." *See id.* at 95, 111–112, 114, 118.

Around 5:00 p.m., Fuller began providing evening medications to the inmates. ECF No. 85–2 at 131. However, before he reached Paugh's cell, Fuller responded to the needs of a different inmate who had fallen off his bed. *See id.* Instead of continuing to distribute medications, Fuller asked Conley to take over those responsibilities, including giving Paugh's second Librium dose. *Id.* But neither Conley nor any other member of the Jail staff gave Paugh his Librium during this shift, and Fuller never confirmed that Paugh received his medication. *See id.* at 112, 131; 85–3 at 96.

At approximately 5:30 p.m., Conley[2] picked up Paugh's dinner tray, and observed that he "could see Inmate Paugh shaking pretty bad." ECF No. 85–3 at 188; *see also* 85–2 at 12, 111. Conley also noted that Paugh said his withdrawal "ha[d] not peaked yet." ECF No. 85–3 at 188; *see also* 85–2 at 13, 111. Despite Paugh having an appetite, Gowen also observed that Paugh had not eaten much throughout the day. *See* ECF Nos. 85–3 at 95, 113, 118. During this entire shift, Paugh was not observed by any person with medical training or otherwise had his alcohol withdrawal symptoms evaluated using medical protocols. ECF Nos. 85–2 at 115, 133; 85–3 at 108–09.

### D.   NIGHT SHIFT ON JULY 24

The July 24 night shift began at 6:00 p.m. Anderson, Bunnell, Riddle, and Deputy Tony Alarid were working that night. Anderson was again the shift supervisor and Bunnell was the designated medical officer in the booking area close to where Paugh was still held in detox cell #1.[3] During the pass-along between the day shift and night shift, Gowen stated that he informed Anderson about Paugh's alcohol withdrawal symptoms and his expectation that Anderson would "get up" to check on Paugh in the detox cell "as often as she can" to ensure that Paugh was "breathing and in no distress." ECF No. 85–3 at 113–14. Anderson stated that Gowen did not communicate this expectation, but did inform her that Paugh "had started his prescription" for

---

[2] There is a discrepancy in the record concerning whether Conley or Gowen picked up Paugh's dinner tray and observed him at that time on July 24 because both officers claim to have done so. *See* ECF Nos. 73 ¶ 13; 72 ¶ 12. But summaries of Jail video recordings indicate that Conley picked up Paugh's dinner tray. *See* ECF Nos. 85–2 at 15; 85–3 at 93; 81–2 at 24.

[3] Bunnell stated that it was his responsibility to pass out medications during the night shift on July 24, *see* ECF No. 85–2 at 94–96, and Anderson affirmed that Bunnell was in charge of giving medications during this shift, *see id.* at 37. But Fuller said that he did his pass-along of medical information to Alarid. *See id.* at 121. For purposes of this Motion, the court assumes that Bunnell was the designated medical officer for the July 24 night shift, at least for the area in which Paugh was detained.

Librium, "had slept a lot of the day," "he had thrown up once" or "had been throwing up," and "had eaten some food." *See* ECF No. 85–2 at 36–37, 41. Bunnell stated that no officers gave him an update on Paugh's condition during the pass-along, but he also did not ask for any update. *See id.* at 93.

Around 7:00 p.m., Bunnell and Anderson were working nearby Paugh's cell and Paugh asked them about his next round of medication. *Id.* at 10, 37, 40, 92. Paugh informed Anderson and Bunnell that he had not received his evening dose of Librium during the dinner medical rounds and he was feeling sick from his alcohol withdrawal. *Id.* at 37–38, 92–93. Anderson attested that the Jail's custom in the event of a missed medication round was to give the medication the following round, so staff "could give [inmates] their dinner meds at bedtime meds." *Id.* at 37. Anderson and Bunnell both observed that Paugh was shaking during this interaction, and Bunnell recalled that Paugh looked "pale" and "didn't look like he was feeling well." *Id.* at 41, 93.

An hour later at approximately 8:00 p.m., Bunnell gave Paugh a second dose of medication, although he had some uncertainty whether to give Paugh two capsules or one. ECF Nos. 85–2 at 95–96; 85–3 at 93, 95. Bunnell did not call medical staff to resolve the dosage uncertainty or to address that Paugh had not received any medication between approximately 1:40 p.m. and 8:00 p.m. ECF No. 85–2 at 96. Bunnell believed that he gave Paugh two capsules of medication following Dr. Bradbury's original prescription instructions. *Id.* at 95–96. At this time, Bunnell again observed that "Paugh was shaking," continued to be "pale," and that Paugh told Bunnell "he was detoxing." ECF No. 85–2 at 8. Anderson also saw that Paugh's "hands were shaking" during this encounter and although she knew Bunnell went to give medication to Paugh, she did not see what Bunnell administered to Paugh specifically. *Id.* at 40–41.

Between 9:45–10:00 p.m., Bunnell got up from his desk and stood nearby detox cell #1, where he briefly spoke to Paugh. ECF Nos. 85–2 at 93, 97; 85–3 at 93, 96; 81–2 at 26. Bunnell again observed that Paugh "was shaking," "had the chills," and Paugh informed Bunnell that "he was getting the chills then hot again." *See* ECF Nos. 85–2 at 8, 104; 85–3 at 96. Anderson also came over to detox cell #1 and recognized that Paugh needed to be moved to a different cell because he "was starting to feel sick," had cold chills, had "told [Anderson] he was nauseous," and seemed "shaky" from withdrawal symptoms. *See* ECF No. 85–2 at 11, 38, 41–42. Bunnell gave Paugh an extra blanket and Bunnell and Anderson moved Paugh from detox cell #1 to a different cell in the booking area ("booking cell #3") "because he was shaky and nauseated," and wanted to be "mov[ed] . . . into a cell alone while he was sick." ECF Nos. 85–2 at 38, 96–97; 85–3 at 96. Anderson and Bunnell immediately turned off the lights in Paugh's cell where he laid down and they remained off the rest of the night. ECF No. 85–2 at 40, 97. Booking cell #3 was on Bunnell's "side of the booking area." *Id.* at 38.

After moving Paugh, Anderson believed that Paugh vomited at some point "when he was in booking cell 3" and recalled hearing Paugh "cough[ing]," "sneez[ing]," and sounds from when he was "trying to get phlegm out of [his] throat to spit" throughout the night. *Id.* at 38, 41; 85–3 at 96. She stated that she saw Paugh stand up once, and Bunnell also stated that he "saw Paugh standing and heard him clear his throat," although their testimony is uncertain about the precise timing. *See* ECF Nos. ECF Nos. 85–2 at 8, 38; 85–3 at 96. Bunnell recalled that he also heard Paugh loudly "coughing and spitting" and sounds that suggested he was "spitting up mucus" during the night. ECF Nos. 85–2 at 8, 97, 104. Anderson recognized that if inmates were not standing in their cell, then officers in the booking area could not see them on the ground and "how they are rolling over or something like that." ECF No. 85–2 at 40. Bunnell also asserted that if it

11

appeared inmates were "sleeping, [then] there's not necessarily a need to go walk around" and check on individual cells in the booking area. *Id.* at 99.

Bunnell started feeling ill with a stomach problem around 2:00 a.m. and decided he needed to go home for the night. *Id.* at 93. Before Bunnell left, he looked into Paugh's cell and saw that Paugh "was in there," but he did not speak to Paugh or otherwise check on Paugh's alcohol withdrawal condition at that time. *Id.* at 93, 98. Riddle then took over Bunnell's duties at the booking desk closest to booking cell #3. *See id.* at 49, 60–61; *see also* ECF No. 85–3 at 96. Riddle had worked at the Jail for less than two months and was still in training. ECF No. 85–2 at 55. Riddle was not informed by Bunnell or Anderson that Paugh was withdrawing from alcohol, nor did he review Paugh's medical files. *Id.* at 61–62. Riddle was at a desk across from booking cell #3 and Anderson had her back to that cell for the rest of the shift. *Id.* at 49. At this time, Paugh had either lost consciousness or fallen asleep, and Riddle stated that he could see Paugh laying down in booking cell #3 when he "glanced" at Paugh's cell from his desk. *See id.* at 64, 68. Riddle did not go over to booking cell #3 to check on Paugh during this shift. *See id.* at 68–69.

Between 10:00 p.m. and 6:10 a.m., Anderson indicated that no staff member "performed an actual physical check on Inmate Paugh" and that she personally "had not actually went [sic] to the cell door and looked inside" between when she moved Paugh to booking cell #3 and when she left the Jail at 6:00 a.m. because officers "didn't need to do that" for inmates held in the booking area. *See* ECF Nos. 85–3 at 96; 85–2 at 16–17, 38–39, 43. Riddle and Anderson both ended their shifts without checking on Paugh in his cell. During this shift, no person with medical training observed Paugh or in any way evaluated his alcohol withdrawal condition.

### E.   DAY SHIFT JULY 25

At 6:11 a.m., Conley was going around the booking area distributing medications and saw that Paugh had been moved from detox cell #1. ECF No. 85–3 at 113. Conley then saw that Paugh

was in booking cell #3 and attempted to wake Paugh, but discovered that Paugh was dead. ECF No. 85–3 at 93. Conley stated he could tell Paugh had been dead for some time because he could see that "[Paugh's] lips were blue" "before [Conley] even opened the [cell] door." ECF No. 85–3 at 112. At that point, Jail management called all the UCJ staff back to the jail and the County initiated an internal investigation concerning Paugh's death. *See* ECF Nos. 85–3 at 2; 85–2 at 92.

### F.  AUTOPSY

A medical examiner from the Utah Department of Heath examined Paugh's body on July 26, 2015, at 10:50 a.m. ECF No. 85–3 at 176. The examiner determined that Paugh's "stomach contain[ed] approximately 275ml of red-orange fluid and no solids" at the time of his autopsy. *Id.* at 179. The examiner found that Paugh's toxicology testing "revealed only a low level of diphenhydramine" in his blood at 88ng/mL, and described diphenhydramine as "an over-the-counter antihistamine." *Id.* at 180. The examiner noted that "[d]espite records showing that [Paugh] was administered [Librium] on two occasions after [his] arrival at the jail, none of this substance, or its metabolite nordiazepam, was detected in his blood." *Id.* Further, "[n]o other intoxicants were present and there was no residual alcohol in [Paugh's] system at the time of his death." *Id.* The medical examiner concluded that Paugh's death "resulted from chronic alcoholism, most likely a complication of withdrawal." *Id.*

### G.  EXPERT TESTIMONY

Plaintiffs attached two declarations and reports from purported expert witnesses Jeff Eiser and Esmaeil Porsa, M.D., to their memorandum in opposition to summary judgment. *See* ECF Nos. 80, 81. Both experts attest to their qualifications and state opinions and facts sworn under penalty of perjury. ECF Nos. 80 at 3; 81 at 4.

### 1.      Eiser Report

Eiser attests that he has "over 29 years of practical work experience in the operation[,] administration[,] and staffing of small, medium and large jail facilities," including his expertise in "prison access to medical and mental health care." ECF No. 81 at 3–4. Eiser states that he rendered his expert opinion on how "contemporary jail industry standards and practices" relate to "the operational procedures and practices of the UCJ while Mr. Paugh was incarcerated and the duties and responsibilities of the UCJ and its administration and staff to take reasonable steps to . . . ensure his access to an adequate medical care." ECF No. 81–2 at 11. Eiser elucidated four correctional facility standards "that existed at the time of the incident:" (1) "the Utah Sheriffs Association Jail Standards;" (2) "the Performance Based Standards for Adult Local Detention Facilities (4th Edition; June 2004);" (3) "the Core Jail Standards (First Edition 2010) promulgated by the American Correctional Association (ACA);" and (4) "the Standards for Health Services in Jails - 2014 promulgated by the National Commission on Correctional Health Care (NCCHC)." *Id.* at 12. Eiser also reviewed numerous documents and exhibits concerning this case and based his opinions on his jail operations expertise, education, and training. *See id.* at 5–8.

Eiser stated that "[a]n inmate suffering from the symptoms of drug intoxication and/or withdrawal has become a very common medical issue for today's local correctional facilities" and "inadequate treatment of newly incarcerated individuals suffering from drug intoxication and/or withdrawal can result in serious illness and even death." *Id.* at 30. Eiser specified that it is common correctional facility practice to place inmates that were at "higher risk" of medical complications in a specific Detox cell. *Id.* Moreover, Eiser averred that "[t]he need to provide adequate monitoring and supervision of Mr. Paugh and his symptoms (at least every 20-30 [minutes] on an irregular schedule) would be considered a basic duty for any jail, regardless of size." *Id.* Eiser also opined that he "found it extremely disturbing that" UCJ "would not even have a policy and/or

procedure on 'intoxication and withdrawal' and how to direct its staff in the basic duty of protecting a detainee . . . suffering from . . . withdrawal" through "mandated monitoring and supervision and . . . immediate access to medical assessment, care and treatment." *Id.* at 32.

Eiser concluded that in committing these purported failures, UCJ also violated the four correctional facility standards that he analyzed. *See id.* at 33–40. In particular, he emphasized the 2014 NCCHC report, which states:

> As a precaution, severe withdrawal syndromes must never be managed outside of a hospital. Deaths from acute intoxication or severe withdrawal have occurred in correctional institutions. In deciding the level of symptoms that can be managed safely at the facility, the responsible physician must take into account the level of medical supervision that is available at all times.

*Id.* at 35. Based on this report and his understanding of standard jail practices, Eiser opined:

> It is shocking that no UCJ supervisor or staff person ever contacted medical personnel to get guidance on attempting or recording of basic vital signs (blood pressure pulse, temperature, etc.) and no one ever asked Mr. Paugh any specific questions about his withdraw[al] symptoms . . . to gain information to share with medical personnel.

*Id.* at 36–37.

### 2.    Dr. Porsa Report

Dr. Porsa attests that he is a trained physician with over twenty years of experience in healthcare and over ten years of experience working in the corrections context as the "Medical Director for Correctional Health . . . providing care to over 6,000 inmates at the Dallas County Jail." ECF No. 80 at 2. Dr. Porsa also is "an Advanced Certified Correctional Healthcare Provider certified by the NCCHC." *Id.* at 3.

Dr. Porsa provides his medical opinion on the seriousness of Paugh's medical need and findings from Paugh's postmortem toxicology report; information on alcohol withdrawal, treatment strategies, and the effects of Librium; the causal relationship between alcohol

withdrawal, UCJ staff's conduct, UCJ policies and practices, and Paugh's death; the degree of medical monitoring that Paugh received while in Jail and standard practices for managing alcohol withdrawal through the CIWA form; and the degree of medical training typically required for proper alcohol withdrawal monitoring in the correctional context. *See* ECF No. 80–2 at 2. Dr. Porsa states that all of his "opinions are based on a reasonable degree of probability given [his] specialized education, training, and experience" in healthcare in the carceral context. *Id.*

In particular, he highlights medical literature showing that "[a]fter suicide (35%) and heart disease (23%), drug and alcohol withdrawal (8.5%) represent the third highest cause of death among local jail inmates" and "in 2015, Utah had the highest mortality rate per 100,000 local jail inmates in the country." *Id.* at 5. Specific to Paugh, Dr. Porsa states that Paugh's medical history shows that be previously had suffered at least one and more likely than not multiple seizures when he went through severe alcohol withdrawal," which "means there is a high likelihood that he suffered multiple seizures while at the jail before he ultimately died from alcohol withdrawal." *Id.* at 6. Concerning Paugh's postmortem toxicology report, Dr. Porsa surmises that "[c]onsidering the extremely long half-life of Librium (24–48 hours)," the fact that the report "shows no traces of Librium in [Paugh]'s body proves that he was not provided Librium while at the jail." *Id.* Dr. Porsa notes that signs of Benadryl were on Paugh's toxicology report, but that Paugh had not taken Benadryl before coming to UCJ, which led Dr. Porsa to hypothesize the probability that Jail staff had "erroneously given Benadryl" to Paugh. *Id.* at 7–8.

Dr. Porsa also criticized that the Jail "only rel[ied] on an off-site independent contractor PA Logan Clark" for medical care while Nurse Smith was on maternity leave, and that it was a "highly predictable consequence" of this practice that someone would die in the Jail from a serious medical need, such as Paugh. *Id.* at 10. Along similar lines, Dr. Porsa states that the failure of Jail

staff to "closely monitor Coby Paugh other than casual observations made in passing,"—evinced by the fact that no staff member at any point used medical protocols for "formal monitoring," "assessed [Paugh's] vital signs," or "contacted the contract PA about the persistence and progression of [Paugh's] withdrawal symptoms"—led to Paugh's death. *Id.* at 17

In sum, Dr. Porsa concludes that, in his medical opinion:

> If [Paugh] had been provided Librium, he would have most likely not died. If [Paugh]'s condition was monitored, he would have most likely not died. If [Paugh] was returned to the hospital for life-saving measure as his condition continued to worsen, he would have most likely not died.

*Id.* at 20.

## H.   ALCOHOL WITHDRAWAL

Alcohol withdrawal is a common medical problem in correctional facilities. *See* ECF Nos. 80–2 at 4; 81–2 at 30. Alcohol use disorder, a precursor to alcohol withdrawal, has "a prevalence among the incarcerated jail population . . . as high as 25%." ECF No. 80–2 at 2. "Withdrawal symptoms may occur hours, if not days, after a heavy, long-term drinker stops or reduces his alcohol consumption—long after his blood-alcohol level zeroes out." *Estate of Simpson v. Gorbett*, 863 F.3d 740, 748 (7th Cir. 2017) (citing applicable medical literature). Serious symptoms "can manifest days after a dependent person stops consuming." *Id.* (same).

Such symptoms may include:

> anxiety, agitation, restlessness, insomnia, tremor, diaphoresis (cold sweats), palpitations, headache, and alcohol craving. and often loss of appetite, nausea, and vomiting. Physical signs include tachycardia (rapid heart rate). hypertension, hyperactive reflexes. and tremor. Additional severe manifestations of alcohol withdrawal such as hallucinations. Seizures, and delirium tremens occur in an estimated 20 percent of patients who experience withdrawal symptoms.

ECF No. 80–2 at 4. These "life threatening symptoms of acute alcohol withdrawal are related to an unmitigated hyperactivity of the central nervous system that results from chronic depressive effects of alcohol." *Id.* at 7. After suicide and heart disease, drug and alcohol withdrawal are the third highest causes of death in local jails nationwide and in Utah, accounting for six percent of Utah Jail deaths between 2013 and 2017. *See id.* at 4; *see also* ECF No. 85–3 at 153.

A common treatment for alcohol withdrawal is to prescribe benzodiazepines such as Librium. *See* ECF Nos. 80–2 at 7; 85–2 at 144; 85–3 at 16, 64. Librium helps to "mitigate" alcohol withdrawal by lessening the "severe symptoms of alcohol withdrawal, the agitation, the anxiety, and probably some of the nausea and vomiting." ECF No. 85–3 at 16. "Librium allows the body to gradually adjust to the precipitous drop in the blood alcohol level when a chronic alcohol dependent . . . suddenly stops drinking alcohol." ECF No. 80–2 at 7. Librium works "by binding to the same receptor sites in the brain as alcohol" and allows the body "to gradually adjust to the lower binding of the receptor sites in the brain." *Id.*

Because alcohol withdrawal symptoms can fluctuate and deteriorate rapidly, it is important for withdrawing persons to be regularly monitored. *See* ECF No. 85–3 at 9, 12. In the corrections context, Dr. Porsa opined that the "Clinical Institutes Withdrawal Assessment Scale for Alcohol (CIWA) is designed for" this monitoring and constitutes the "minimal standard of care." ECF No. 80–2 at 4. CIWA is "used to guide symptom-triggered treatment" and provide an objective evaluative tool for recognizing worsening symptoms. *See id.* at 4–5. Using CIWA to examine an inmate registers "a score that [officers] can report to [medical professionals] that helps [medical professionals] better understand how a patient is to be treated or how they are responding to the treatment." ECF No. 85–3 at 58. Jail officers had access to a CIWA form located in the front cover of the binder used when distributing medications to inmates. *See, e.g.*, ECF Nos. 85–2 at 14; 85–

3 at 57. But no Jail officer or management recalled ever having a policy for using CIWA, being trained to use CIWA, or filling out the form to evaluate an inmate's alcohol withdrawal before Paugh's death, and did not use CIWA to monitor Paugh. *See* ECF Nos. 85–2 at 44 (Anderson), 60 (Riddle), 100–01 (Bunnell), 115 (Conley), 133 (Fuller); 85–3 at 35–36 (Commander Brown), 108–09 & 115–17 (Gowen), 132–33 (Sheriff Norton).

## I.   WRITTEN JAIL POLICIES[4]

UCJ updated its written "Policies and Procedures Manual" on May 1, 2014. ECF No. 69–1 at 1. The policies state that written directives are "required" to guide Jail operations because they "provide the most efficient and uniform means of ensuring that jail supervisors and staff understand the rules, regulations, and standards to which they will be held accountable, and their roles in ensuring the security, safety, and management of the facility." ECF No. 85–2 at 19. These policies are developed by the County Sheriff and Jail Commander. *See* ECF Nos. 85–2 at 72; 85–3 at 130, 137–38. During the times relevant to this litigation, the County Sheriff was Vance Norton and Jail Commander was Irene Brown. Pertinent to this litigation, the Jail had written directives covering inmate cell checks, the process for filing and maintaining medical records, the process for administering prescriptions, staffing and training, and the admissions, booking and medical screening procedures.

### 1.   **Staffing and Training**

Jail policies designate certain healthcare requirements for both medical professional personnel and other officers. For Jail medical personnel, "[c]ertification and licensure are required

---

[4] The court notes that an external investigation by the Duchene County Sheriff's Office indicates that UCJ officers' conduct involving Paugh may have violated the Jail's medication logs and records policies, as well as the individual inmate "head count" policy. *See* ECF No. 85–3 at 97. An internal investigation conducted by Detective Brandon Cottam also specified certain Jail policies that he "noted to be relevant in this investigation" and that he "fe[lt] . . . were violated," including the Jail's "head count" policy. ECF No. 85–2 at 18–21.

by State law" and the policies acknowledge that "[t]he absence of licensed, certified staff may . . . place the county at risk if the unlicensed health care providers harm the prisoners for whom they are providing health care." ECF No. 69–3 at 4. Thus, the Jail mandates that "[h]ealth care personnel working in the jail are required to meet the same certification and license requirements as do health care professionals who provide services to persons not incarcerated." *Id.* These licensed professionals are responsible for "document[ing] a treatment plan for each prisoner requiring treatment." *Id.* at 11.

Jail policies allow for non-certified or unlicensed staff members to be "involved with the delivery of health care services to prisoners," but "only under direct supervision of a certified health care professional, such as a physician, physician's assistant, nurse or nurse practitioner," and "limited to those functions that are well within the limits of their training and expertise." *Id.* at 4. The policies require that all officers receive "basic medical training," which "must be in place at the time an emergency occurs" because "[o]nce the emergency is underway, it is too late to begin learning what and how to deal with it." *Id.* at 23. This basic medical training must include instruction on the "action required for potential emergency situations;" "[s]igns and symptoms of . . . chemical dependency;" CPR; "[s]igns and symptoms of an emergency health condition;" "[m]ethods of obtaining medical care;" and "[p]rocedures for transferring or transporting prisoners to appropriate health care providers." *Id.* Thus, non-certified jail officers responding to emergency situations must provide "first aid, CPR, and crisis intervention," but otherwise are instructed to obtain "emergency transportation to an outside health care provider if an adequate response to a serious health-care emergency is not possible in the jail." *Id.* at 7.

The policies also enable the Jail to designate certain uncertified or unlicensed officers as "Jail Medical Officer" who are overseen by a jail nurse and responsible for maintaining and

inventorying medical equipment and prescriptions, as well as "timely filing" inmate medical treatment information. *Id.* at 27–28.

The policies recognize that although "[n]ot all health care problems are of an emergency nature," "[t]hat does not mean . . . that they should not receive timely attention from health care professionals." ECF No. 69–3 at 8. Rather, the policies require the Jail to develop protocols to "ensure that no prisoners [sic] serious medical needs fail to receive timely attention." *Id.*

### 2. Booking and Screening

Jail policies also delineate the medical procedures for new inmates being booked into the Jail. First, the "booking officer" must "determine[] that the prisoner does not require a medical examination, treatment, or clearance by a licensed physician before being accepted at the jail." ECF No. 69–1 at 4. The booking officer must learn from the transport officer about the "prisoners' medical history" and any current "known medical or mental health conditions." ECF No. 69–2 at 2. Moreover, the "shift supervisor on duty shall have complete authority with regard to determining whether a prisoner brought into the jail requires medical attention," and if the inmate does, the booking officer must take the inmate to the hospital and "obtain a medical clearance prior to the arrestee being accepted and booked into the jail." ECF No. 69–1 at 4. Conditions that may require pre-booking medical attention include "[e]vidence of drug overdose or severe intoxication" as well as "serious injuries, whether visible or invisible." *Id.* at 5.

The Jail's written policies also instruct officers to conduct a medical "screening at admission" of the inmate into Jail. *See* ECF Nos. 69–2 at 5–6; 69–3 at 5. Among other things, the policies recognize that admission screenings are necessary "to initiate appropriate medical procedures" and "ensure timely intervention and care" for inmates with medical needs. ECF No. 69–3 at 5. Booking officers conducting a screening questionnaire must "not skip over any medical or mental health questions, or approach the medical screening process in a lackadaisical manner."

21

ECF No. 69–2 at 5. The officer must ensure that the inmate's "responses are recorded accurately and in detail." *Id.* at 6. Jail policies have specific screening precautions for mental health and suicide, but do not have the same requirements for any medical conditions. *See id.* at 6–7.

Moreover, the Jail requires officers to engage in certain follow-up duties after the initial screening because "failure to have a means of ensuring that follow up occurs defeats the purpose of the screening." ECF No. 69–3 at 6. Jail policy mandates that a "registered nurse, contract physician/physician's assistant, or jail medical staff shall be provided with a copy of all prisoner intake health screening for follow up of any problems identified" during the screening, and provided notice of "[p]risoners answering 'yes' to any medical screening question." *Id.*

### 3.    Inmate Cell Checks

Jail policies require officers to make frequent cell checks of inmates, which the Jail officers have described as "head counts" or "head checks." Under a policy entitled "Living Area Checks," officers must "individually observe[]" inmates "in their living areas at least once each hour, and whenever possible, every 30 minutes." ECF No. 85–3 at 101. These "[r]ounds should be made on an irregular basis" to avoid having inmates "exploit . . . predictability." *Id.* at 100–01. Under a policy entitled "Prisoner Counts," duty officers must conduct "a physical head count of all prisoners . . . in the jail at least once each shift." *Id.* at 102; ECF No. 85–2 at 19. This head count must occur more frequently "[d]uring lock down hours, generally between 2359 and 0600 hours." *Id.* During this time at night, "a physical head count and security check of all prisoners will be conducted at least once each hour" and the officer conducting the head count must "see some portion of the prisoner's skin, in order to verify that the prisoner is present in and cell" and to "visually confirm that the prisoner is breathing and in no distress." *Id.*

### 4. Medical Records and Prescriptions

Jail policy requires staff to maintain "[c]omplete and accurate health care files prepared in a timely manner" involving any "health care delivery" for "each prisoner" to "ensure continuity of care" and "provide health care providers sufficient information to make proper diagnoses and/or treatment orders" ECF No. 69–3 at 1. Relevant to this case, healthcare files must include "initial health screening forms" from the time of admission to Jail; medical "evaluation reports;" and "a chronological health care record" of "all contacts with jail health care providers," including "findings, diagnoses, prescriptions, treatments, and progress reports," as well as pertinent names, dates, and times. *Id.* at 1–2; 69–2 at 5.

Jail protocols also require that "[a]ll prescription medications shall be recorded on a permanent record ***immediately*** at the time they are brought in from the pharmacy." ECF No. 69–3 at 19 (emphasis in original). When medication is given to an inmate, both the administering Jail official and the inmate "shall initial the medication record." *Id.* at 20, 25. The Jail official must also initial the "blister pack," which is the aluminum sheet containing the pills. *Id.* Moreover, Jail policy requires that officers observe the inmate "consume" the medication "within the[ir] sight and under the[ir] direct supervision." *Id.* at 21.

### J.   INFORMAL CUSTOMS AND TRAINING

The Jail maintained a variety of informal customs, widespread practices, or trainings that could also amount to Jail policy.

### 1. Not Providing Medical Staff On Site

First, the Jail had a custom in July 2015 of operating the Jail without any trained or licensed medical staff on site. Before that time, the Jail had a policy of only scheduling on-site nursing staff during the day shift. *See* ECF No. 85–2 at 34, 37, 44, 57, 121; 85–3 at 55. The Jail also contracted

with remote care providers, PA Clark and Dr. Tubbs, to conduct weekly visits on Thursdays and to be available by phone for a Jail officer to call for medical advice. ECF No. 85–3 at 40–41.

By July 2015, Gowen explained that the only nurse on staff

> was Kate Smith, but she was on maternity leave at the time. That's why we had medical officers. They were appointed before that to help her because she was the only nurse, but then when she went on medical leave they were in charge of the medications, try to make sure everything was lined up and correct, still functioning.

ECF No. 85–3 at 107. Nurse Smith left for maternity leave on July 11, 2015. ECF No. 99 at 4. As Fuller detailed, Nurse Smith going on maternity leave led to the "fairly new" policy of titling certain correction officers as the "designated medical officers" for a shift without any specialized training. ECF No. 85–2 at 121.

Before this change in policy took effect, Fuller and other newly designated medical officers "had a brief meeting where we went over some basic . . . functions" with Nurse Smith. *Id.* Fuller further explained the Nurse Smith "just basically went over procedural-type things that we needed to cover while she was gone." *Id.* at 123; *see also id.* at 89 (Bunnell describing aspects of medical officer designation). Thus, the Jail's informal policy of shifting nursing duties to medical officers was "just kind of a designation" without training in medical care. *Id.* at 126. This informal policy of passing off on-site medical duties to correctional officers was implemented despite written directives that "[h]ealth care personnel working in the jail are required to meet the same certification and license requirements as do health care professionals who provide services to persons not incarcerated." ECF No. 69–3 at 4. Sheriff Vance Norton explicitly ratified this informal policy to not have licensed or certified medical staff on site. ECF No. 85–3 at 135–37.

The Jail also had an informal policy of being understaffed more generally. ECF No. 85–2 at 29. As a consequence of this understaffing, Anderson described that of the five officers working

at the Jail the night Paugh died, four of them had less than a year of correctional officer experience. *Id.* at 33.

### 2.      Delaying Medical Screenings

Second, the Jail maintained an informal policy of not conducting a medical screening with incoming inmates who were intoxicated. As Bunnell stated, officers would "wait until [an inmate is] sober to ask them all those questions when you're booking them in." *Id.* at 86. Conley also understood this delay in conducting the screening to be the Jail's informal policy, which is why Conley conducted the medical screening around 11:30 a.m., over nine hours after Paugh was first admitted to the Jail. *See id.* at 110. This informal policy has developed despite written directives to conduct a medical "screening at admission" into Jail "to ensure timely intervention and care." *See* ECF Nos. 69–2 at 5–6; 69–3 at 4

### 3.      Not Conducting Head Counts in the Booking Area

Third, the Jail had an informal policy of not conducting head counts to specifically check on inmates in the booking area. As described above, the Jail's written policy for lockdown hours at night required hourly "head checks" or "head counts" of all inmates, during which officers had to "see some portion of the prisoner's skin" and "visually confirm that the prisoner is breathing and in no distress." ECF No. 85–2 at 19; 85–3 at 101–02. Additionally, the written policies had a more general "Living Area Checks" requirement that officers "individually observe[]" inmates "in their living areas at least once each hour, and whenever possible, every 30 minutes" throughout the day. ECF No. 85–3 at 101. For inmates' medical safety, PA Clark also expected that "certainly patients in a jail can be checked on regularly" and "[i]f their symptoms were worse . . . I would expect that they would be checked on hourly." ECF No. 85–3 at 54; *see also id.* at 72 (stating that "hourly checks would be very helpful" for inmates withdrawing). However, the Jail had a widespread informal policy of not following these directives for inmates in the booking area. *See,*

*e.g.*, ECF Nos. 85–2 at 36, 43, 61, 68, 90, 99, 114; 85–3 at 111. As Anderson summarized, conducting hourly head counts was "not what [she] was taught to do; that regardless of what policy said," her superiors told her, "hey, this is how we do it, is what [she] was taught." *Id.* at 43.

### 4.     Alcohol Withdrawal Training and Evaluation

Fourth, the Jail maintained an informal policy of not providing officers with training or evaluative tools to assess the severity of alcohol withdrawal. PA Clark testified that he had given the Jail staff a CIWA form for monitoring alcohol withdrawal before July 2015. ECF No. 85–3 at 57. Clark emphasized that the CIWA form was essential to detect severe or worsening alcohol withdrawal conditions and expressed his concerns to Jail officials, including the Sheriff, that inmates experiencing alcohol withdrawal were not being properly monitored or evaluated. *Id.* at 57–62. Clark wanted to have the Jail use the CIWA from because he attested that medical professionals "can't make a medical decision about someone's safety without all the information. And [CIWA] is a really important tool . . . to be able to help the patient." *Id.* at 58.

Specifically, Clark's expectation was for "a CIWA to be done morning and night in any general patient. So [Clark] would have, in [Paugh's] case, expected one to have happened when [Paugh] came in, and then one more towards bedtime. And then, obviously, if something changed" in Paugh's condition, "then they would do [a CIWA examination] a little bit more often." *Id.* at 66. He communicated these expectations to Jail staff, supervisors, as well as the Sheriff, and "voiced [his] concern that someone—there would be a bad outcome if [jail officials] did not change their ways" regarding withdrawal monitoring. *Id.* at 59–59, 62. But Clark found that in most cases, including for Paugh, "the CIWA form was never done. And in some cases the CIWA form wasn't followed through. So there would be cases where I would expect to see a CIWA form and never found one." *Id.* at 84. Clark concluded that before July 2015, he "rarely would ever see a CIWA form filled out either from the officers or in a patient's chart." *Id.* Thus, Clark was troubled that

inmates who "were clearly at risk for withdrawal were not even being put on monitoring. And other patients who were being monitored, [the CIWA] was not being filled out or followed." *Id.* at 61; *see also id.* at 58 (affirmed that the CIWA form was not being used correctly even when it was used).

None of Jail's officers had training concerning how to monitor and evaluate alcohol withdrawal, including by using the CIWA form. *See* ECF Nos. 85–2 at 35 (Anderson), 59 (Riddle), 76 (Commander Brown), 100–102 (Bunnell), 114–15 (Conley), 121–22 (Fuller); 85–3 at 115 (Gowen). As a result, Clark saw "minimal to no improvement" between his complaints about the lack of withdrawal monitoring and when Paugh died. *Id.* at 60. Beyond a lack of training, the Jail also did not have any policy or directives, formal or informal, for what protocols officers should follow when an inmate had worsening alcohol withdrawal. *See, e.g.*, ECF No. 85–2 at 19, 73.

### 5. Not Seeking Professional Medical Care

Fifth, the Jail had an informal policy of not seeking professional medical care for inmates, including inmates that officers knew were experiencing alcohol withdrawal. As Fuller candidly stated: "We never called on people who were withdrawing." ECF No. 85–2 at 130. Bunnell also indicated that it was common practice to not call medical professionals for certain medical decisions in the Jail, including when there was uncertainty about an inmate's prescription. *See id.* at 89, 96. Further, despite Jail policy requiring them to do so, both Conley and Gowen understood it was not necessary to call medical professionals when Paugh provided affirmative answers on his medical screening questionnaire. *See* ECF Nos. 85–2 at 110; 85–3 at 110–111. Clark expressed concerns about the lack of contact from Jail officers and staff about inmates with alcohol withdrawal specifically, recalling that "some patients would come in for a few days, leave. I would never even know about them, never know they were on alcohol withdrawal, never see a chart. So I wasn't always aware of a[n inmate with alcohol withdrawal] at the jail." ECF No. 85–3 at 58.

This was despite Clark's efforts to have Jail officers trained to "please call [him]" if the officer was "seeing additional symptoms" of alcohol withdrawal. *Id.* at 54.

### 6.    Not Offering Formalized Training

Sixth, the Jail maintained a de facto policy of not providing formalized training to officers, including officers in supervisory roles, beyond informal "on-the-job" training. As Anderson explained, inadequate training was the norm at the Jail. *See* ECF No. 85–2 at 32. Anderson would even "submit for trainings" by asking permission from Jail management, but her requests for more training "would be denied." *Id.* at 45. Thus, in July 2015, Anderson had been a corrections officer for approximately eight months and she "asked not to be in charge" of shifts because she had not received enough training and she "knew [she] wasn't ready." *Id.* at 26–28. Because Anderson was still on probationary status as a new hire, she knew her "own limitations," stating: "I didn't feel I knew all the procedures. I didn't feel I knew policy well enough. I didn't feel I knew everything well enough to be in charge at that time." *Id.* at 33. She stated that she "told two supervisors" about her hesitations and asked them to "[p]lease choose somebody else" to be shift supervisor, including Bunnell, to which supervisors told Anderson to "[s]uck it up." *Id.* at 27–28.

Moreover, Anderson, like the other Jail officers, had no medical training at all. *Id.* at 34. Instead, Anderson stated that she received Field Training Officer (FTO) instruction that was akin to on-the-job shadowing where a trainee would "show up to work, and hopefully somebody was feeling like training you that day." *Id.* at 29. Trainees received a three-page instruction packet during FTO "that got signed off when the corporals had time," but mandatory instruction sessions were uncommon. *Id.* at 27–30. Overall, Anderson described the training for Jail staff as "kind of more just thrown into the fire" and affirmed that these inadequacies were the norm during the time period leading up to Paugh's death. *Id.* at 29–30.

## II.     LEGAL STANDARD[5]

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has met this burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013) (citation omitted). "At the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter." *Concrete Works of Colo., Inc. v. City & County of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994). Rather, the court must "construe the evidence in the light most favorable to the Plaintiffs as the nonmoving party." *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014) (citation and alteration omitted).

"When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Keith v. Koerner*, 843 F.3d 833, 837 (10th Cir. 2016) (quoting

---

[5] Defendants also contend that the court should dismiss Plaintiffs' Amended Complaint because it "is impermissibly vague," ECF No. 68 at 29, and fails to "state a claim upon which relief can be granted," ECF No. 97 at 15. A defense of failure to state a claim upon which relief can be granted "must be made before pleading if a responsive pleading is allowed." FED. R. CIV. P. 12(b)(6). Defendants answered Plaintiffs' Amended Complaint on January 22, 2018, over two years before filing the instant Motion. *See* ECF No. 14. At that time or beforehand, Defendants failed to challenge the sufficiency of Plaintiffs' pleadings under the *Twombly/Iqbal* plausibility standard. *See id.* at 7–9. Therefore, Defendants' argument that Plaintiffs' Amended Complaint fails to satisfy federal pleading standards is waived.

*Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1312 (10th Cir. 2009)). "If a plaintiff successfully carries his two-part burden, the defendant bears the burden, as an ordinary movant for summary judgment, of showing no material issues of fact remain that would defeat the claim of qualified immunity." *Estate of Booker*, 745 F.3d at 412 (citations and internal quotation marks omitted). In addressing qualified immunity, the court must "still view the facts in the light most favorable to the non-moving party and resolve all factual disputes and reasonable inferences in its favor." *Id.* at 411.

### III.    DISCUSSION

Plaintiffs filed this Section 1983 suit alleging that Anderson, Bunnell, Gowen, Conley, Fuller, and Riddle (the "individual defendants") violated Paugh's constitutional rights by delaying and denying his access to adequate medical care while he was detained in the Jail, which led to Paugh's death. Plaintiffs further allege that these constitutional violations were the result of Uintah County's policies or customs that it maintained with deliberate indifference to a known or obvious risk of constitutional violations. Defendants respond that the individual defendants are entitled to qualified immunity because Plaintiffs did not identify a clearly established right, Paugh did not suffer an objectively serious medical need while in Jail, or the individual defendants did not act with subjective deliberate indifference to his medical needs. Defendants also argue that Plaintiffs have failed to identify a municipal policy or custom that Uintah County maintained with objective deliberate indifference that caused the alleged violations of Paugh's constitutional rights. Moreover, Defendants argue that the court should disregard Dr. Porsa's medical expert report because it is inadmissible and should dismiss plaintiffs Noleen Paugh and Donald Paugh from the lawsuit for lack of standing because they are not the personal representatives of Decedent's estate.

The court address these issues in four sections. First, because Dr. Porsa's expert report is timely and reliable under Rule 702, the court rejects Defendants' objection to its admissibility. However, the court will disregard any portions of Dr. Porsa's report that usurp the court's or the

jury's role in determining deliberate indifference. The court also addresses Defendants' noncompliance with Utah local district rules concerning summary judgment reply briefs. Second, the court dismisses plaintiffs Noleen and Donald Paugh because they lack standing. Third, on the individual liability claims, Plaintiffs have demonstrated that the alleged conduct implicated a clearly established federal right and that Paugh's condition was an objectively serious medical need. But the court concludes that there are genuine disputes of material fact concerning whether Anderson, Bunnell, Conley, Fuller, and Gowen were deliberately indifferent. Taking the disputed facts and inferences in favor of Plaintiffs, a reasonable jury could conclude that Anderson, Bunnell, Conley, Fuller, and Gowen were deliberately indifferent to Paugh's serious medical needs. Finding the opposite to be true for Riddle, the court enters summary judgment in favor of Riddle on the basis of qualified immunity. Finally, the court concludes that genuine disputes of material fact preclude entering summary judgment in favor of Uintah County on Plaintiffs' municipal liability claims. Viewing the disputed facts in favor of Plaintiffs, a reasonable jury could find that Uintah County (a) maintained constitutionally deficient policies, customs, or training concerning monitoring and treating inmates with alcohol withdrawal, (b) that were the moving force behind the specific violations in this case, and (c) were enacted or maintained because of the County's deliberate indifference to a known or obvious risk of constitutional violations.

## A.   EVIDENTIARY OBJECTIONS

The court first addresses the parties' evidentiary objections. Defendants object to Plaintiffs' introduction of expert testimony from Dr. Porsa. But Defendants attached two new declarations to their reply memorandum that may violate DUCivR 56-1(d). For the following reasons, the court concludes that Dr. Porsa's report is admissible. The court also will consider the two new declarations attached to Defendants' reply, but only to the extent that they rebut a claim that a material fact is in dispute.

31

### 1.    Dr. Porsa's Report

Defendants first argue that Dr. Porsa's declaration should not be considered by the court in resolving this Motion because "Dr. Porsa was never disclosed as a witness" and "he should have been disclosed before summary judgment" because "[h]is testimony has not been subject to cross-examination and Defendants have not had any opportunity to depose him." ECF No. 97 at 13. Although Defendants do not make any motion concerning this issue, the court construes Defendants' argument as invoking Federal Rule of Civil Procedure 26, which states that for "Disclosure of Expert Testimony," "a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." FED. R. CIV. P. 26(a)(2)(A).

Defendants' argument conflicts with the parties' November 12, 2019 Stipulated Motion to Amend the Scheduling Order in this case. *See* ECF No. 56. In their stipulated motion, the parties requested that the court set a schedule under which "[t]he deadline for Plaintiffs' expert disclosures and reports is 30 days *after the court decides Defendants' summary judgment motion*" and "[d]epositions of Plaintiffs' experts will be completed within 45 days of Plaintiffs' expert disclosures." *Id.* at 3 (emphasis added). On November 13, 2019, the court entered the governing Second Amended Scheduling Order containing these stipulated deadlines. *See* ECF No. 59. The court "cannot overlook or disregard stipulations which are absolute and unequivocal. Stipulations of attorneys may not be disregarded or set aside at will," and may result in waiver of a party's argument. *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1186–87 (10th Cir. 2018) (citation omitted). Thus, by stipulating to the November 2019 scheduling order in this case, Defendants waived any argument against the timeliness of Plaintiffs' expert witness disclosures.

Second, Defendants object to Dr. Porsa's report because they argue that he "does not have the expert witness qualifications of Federal Rule of Evidence 702" and he "has no personal

knowledge of any of the events" involving Paugh's death. ECF No. 97 at 13. Under Federal Rule

of Evidence 702, an expert witness "may testify in the form of an opinion or otherwise if:"

> (a) the expert's scientific, technical, or other specialized knowledge
> will help the trier of fact to understand the evidence or to determine
> a fact in issue; (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods;
> and (d) the expert has reliably applied the principles and methods to
> the facts of the case.

FED. R. EVID. 702. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court clarified

that the touchstone of admissibility of expert opinion under Rule 702 is reliability. *See* 509 U.S.

579, 589–90 (1993). The Tenth Circuit provides that to examine reliability:

> A district court generally must first determine whether the expert is
> qualified by knowledge, skill, experience, training, or education to
> render an opinion. If the expert is sufficiently qualified, then the
> court must determine whether the expert's opinion is reliable by
> assessing the underlying reasoning and methodology. Although a
> district court has discretion in how it performs its gatekeeping
> function, when faced with a party's objection, the court must
> adequately demonstrate by specific findings on the record that it has
> performed its duty as gatekeeper.

*Warner v. Gross*, 776 F.3d 721, 733 (10th Cir. 2015) (internal citations and quotation marks

omitted) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999)). The court's

analysis "may focus upon [the expert's] personal knowledge or experience." *Kumho Tire Co*., 526

U.S. at 150. While expert opinions "must be based on facts which enable [the expert] to express a

reasonably accurate conclusion as opposed to conjecture or speculation, absolute certainty is not

required." *Goebel v. Denver & Rio Grande W. R. Co*., 346 F.3d 987, 991 (10th Cir. 2003) (citation

and alteration omitted). The party seeking admission of an expert report must merely "show that

the method employed by the expert in reaching the conclusion is scientifically sound and that the

opinion is based on facts that satisfy Rule 702's reliability requirements." *Id.* (citation omitted).

Under this standard, Defendants' objection to Dr. Porsa's report is without merit. Dr. Porsa is qualified to render an opinion because he is a medical doctor with over twenty years of experience in the healthcare industry and ten years of experience providing medical care in a correctional facility, and is "an Advanced Certified Correctional Healthcare Provider certified by the NCCHC." ECF No. 80 at 2–3. Any size difference between UCJ and the jail where Dr. Porsa worked is immaterial because Dr. Porsa renders an opinion on issues that have no relation to facility size, such as the medical details of alcohol withdrawal, effects of Librium, treatment protocols, and causation. His opinion is also reliable, based on sufficient facts, and reliably applied to this case. He has personal knowledge of the facts because he attested to reviewing the voluminous record in this case. *Id.* at 3. Dr. Porsa also stated that all of his "opinions are based on a reasonable degree of probability given [his] specialized education, training, and experience" in healthcare in the carceral context. *See* ECF No. 80–2 at 2. Finally, Dr. Porsa's opinion will be helpful to the jury because his considered medical judgment may assist the jury in making a causation inquiry, and in understanding the effects of alcohol withdrawal and the severity of symptoms, information about Librium, and practices for treating alcohol withdrawal specifically in the carceral context. Thus, the court finds Dr. Porsa's expert report to be reliable under Rule 702 and rejects Defendants' objection to its admissibility.

Third, Defendants object to Dr. Porsa's report because he "attempts to establish the legal standard in this case." ECF No. 97 at 14. Federal Rule of Evidence 704(a) provides that "[a]n opinion is not objectionable just because it embraces an ultimate issue." However, "[g]enerally, an expert may not state his or her opinion as to legal standards nor may he or she state legal conclusions drawn by applying the law to the facts." *Christiansen v. City of Tulsa*, 332 F.3d 1270, 1283 (10th Cir. 2003) (citation omitted). "In no instance can a witness be permitted to define the

law of the case." *Specht v. Jensen*, 853 F.2d 805, 809–10 (10th Cir. 1988) (en banc). Moreover, an expert may only render an opinion that "assists, rather than supplants, the jury's judgment." *United States v. Dazey*, 403 F.3d 1147, 1171–72 (10th Cir. 2005). Thus, the court must disregard expert testimony that "usurps the function of the jury in deciding the facts" or "interferes with the function of the judge in instructing the jury on the law." *Id.* at 1171. Further, "[i]t is axiomatic that an expert, no matter how good his credentials, is not permitted to speculate." *Christiansen*, 332 F.3d at 1283 (quoting *Goebel*, 215 F.3d at 1088).

The court finds that portions of Dr. Porsa's report are speculative and attempt to apply the legal standard of "deliberate indifference"—in both the individual and municipal liability contexts—to the facts of this case to reach an ultimate conclusion concerning the Defendants' liability. Those portions either interfere with the court's role to define the legal parameters within which the jury must exercise its fact-finding function or the jury's role in making those findings. Therefore, the court will strike any of Dr. Porsa's speculations or ultimate conclusions concerning individual or municipal deliberate indifference.

### 2.      Defendants' Reply Declarations and Exhibits

In their reply memorandum, Defendants attempt to support their Motion by submitting new declarations and attached exhibits from Nurse Smith and Jail Commander Irene Brown. *See* ECF Nos. 98, 99. "Rule 56 neither authorizes nor forbids a reply brief by the party moving for summary judgment." *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1164 (10th Cir. 1998). "In the absence of a specific federal rule, the Federal Rules of Civil Procedure permit federal judges to regulate practice 'in any manner consistent with federal law . . . and local rules of the district.'" *Id.* (quoting FED. R. CIV. P. 83(b)). The local rules for this district permit reply briefs, but "[i]n the reply, a moving party may cite only additional evidence not previously cited in the opening memorandum to rebut a claim that a material fact is in dispute. Otherwise, no additional evidence may be cited

in the reply memorandum, and if cited, the court will disregard it." DUCivR 56-1(d). This rule reinforces due process principles, "which require[] that a plaintiff be given an opportunity to respond to an argument or evidence raised as a basis to dismiss his or her claims." *Dr. Robert L. Meinders, D.C., Ltd. v. UnitedHealthcare, Inc.*, 800 F.3d 853, 858 (7th Cir. 2015). Thus, in some circumstances, "[i]ssues not raised in the opening brief are deemed abandoned or waived." *Burke v. Regalado*, 935 F.3d 960, 1014 (10th Cir. 2019) (citation omitted).

Where a reply brief presents new evidence, the court may either (a) "refrain from relying on the new material" or (b) "permit[] a surreply." *Beaird*, 145 F.3d at 1164; *see also Geddes v. United Staffing All. Employee Med. Plan*, 469 F.3d 919, 928 (10th Cir. 2006) (ruling that Tenth Circuit "case law forbids the district court from relying on new arguments or materials to decide a summary judgment motion unless the opposing party is provided an opportunity to respond" (citations omitted)). Here, the best course of action is to disregard any new material filed with Defendants' reply briefing that "does not rebut any claim that a material fact is in dispute." *Thorne Research, Inc. v. Atl. Pro-Nutrients, Inc.*, No. 2:13-CV-784 TS, 2017 WL 11477126, at *1 (D. Utah Jan. 30, 2017) (unpublished) (taking this approach in applying DUCivR 56-1(d)). Therefore, the court will consider Nurse Smith's and Commander Brown's declarations and attached exhibits, as well as the Defendants' reply arguments based on this new material, only to the extent that they rebut the contention that a material fact is in dispute.

## B. STANDING

Defendants argue that Paugh's parents, plaintiffs Noleen Paugh and Donald Paugh, lack standing to sue in their individual capacities. ECF No. 68 at 32–33. Plaintiffs argue that Paugh's parents have standing to sue because they are Paugh's only heirs under Utah law and are proper plaintiffs for the state-law claims in the Amended Complaint. ECF No. 85 at 46–47. The court finds that plaintiffs Noleen Paugh and Donald Paugh lack standing because the state law claims

are only against defendants who have since been dismissed with prejudice and only the personal representative of the estate may sue to enforce the Decedent's rights under Section 1983.

First, Plaintiffs' Fourth and Fifth Causes of Action are state-law negligence claims brought only against Dr. Bradbury, P.A. Clark, and ARMC. *See* Am. Compl. ¶¶ 87–96. Pursuant to stipulation, the court has since dismissed Bradbury, Clark, and ARMC with prejudice. *See* ECF Nos. 52, 54, 55. Thus, plaintiffs Noleen Paugh and Donald Paugh do not have standing based on these now-dismissed state-law claims.

Second, when suing to invoke the constitutional rights of a deceased person under Section 1983,[6] the proper federal remedy "should be a survival action, *brought by the estate of the deceased victim*, in accord with § 1983's express statement that the liability is 'to the party injured.'" *Berry v. City of Muskogee*, 900 F.2d 1489, 1506–07 (10th Cir. 1990) (emphasis added) (citing 42 U.S.C. § 1983). Such a rule follows the "well-settled principle that a section 1983 claim must be based on the violation of plaintiff's personal rights, and not the rights of someone else." *Archuleta v. McShan*, 897 F.2d 495, 497 (10th Cir. 1990). Accordingly, courts in this district have dismissed plaintiffs suing in their individual capacities as heirs to enforce the rights of a decedent. *See George v. Beaver Cty. Bd. of Commissioners*, No. 2:16-CV-1076 TS, 2017 WL 782287, at *2 (D. Utah Feb. 28, 2017) (unpublished); *Webster v. Gower*, No. 2:07-CV-888-DN, 2010 WL 520522, at *4–5 (D. Utah Feb. 8, 2010) (unpublished). Thus, plaintiff Tristen Calder, the personal representative of Paugh's estate, has standing to pursue Plaintiffs' Section 1983 claims, but plaintiffs Noleen Paugh and Donald Paugh do not have standing and are dismissed with prejudice.

---

[6] Heirs of a decedent may have standing in their individual capacities to assert a Section 1983 claim to enforce their substantive due process rights of familial association based on the alleged wrongful death of a decedent. *See, e.g.*, *Estate of B.I.C. v. Gillen*, 710 F.3d 1168, 1175 (10th Cir. 2013) (citing *Trujillo v. Bd. of Co. Commrs. of Co. of Santa Fe*, 768 F.2d 1186, 1190 (10th Cir. 1985)). Because Plaintiffs have not pursued this claim, the court does not address it.

C.   **INDIVIDUAL LIABILITY AND QUALIFIED IMMUNITY**

Plaintiffs allege that the individual defendants in this case—Anderson, Bunnell, Conley, Fuller, Gowen, and Riddle—violated Paugh's constitutional rights by providing him with inadequate medical care for his alcohol withdrawal, which resulted in his death. The government has a constitutional obligation to "provide medical care for those whom it is . . . incarcerat[ing]." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). Plaintiffs seek to enforce this constitutional right through 42 U.S.C. § 1983, which states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

The individual defendants assert they are not liable under Section 1983 because they are entitled to qualified immunity. "Qualified immunity protects government officials from suit [in their individual capacity] for civil damages if their conduct does not violate clearly established statutory or constitutional rights." *Mayfield v. Bethards*, 826 F.3d 1252, 1255 (10th Cir. 2016) (citation omitted). A plaintiff can overcome a defense of qualified immunity by "show[ing] (1) a reasonable jury could find facts supporting a violation of a constitutional right, which (2) was clearly established at the time of the defendant's conduct." *Estate of Booker*, 745 F.3d at 411. The court "may address these requirements in any order," *Mayfield*, 826 F.3d at 1255, but must "view the facts in the light most favorable to the non-moving party and resolve all factual disputes and reasonable inferences in its favor," *Estate of Booker*, 745 F.3d at 411. For the following reasons, the court concludes that only defendant Riddle is entitled to summary judgment based on his qualified immunity defense.

### 1.      Applicable Constitutional Framework

Because the parties dispute the applicable constitutional analysis in this case, the court must first "isolate the precise constitutional violation with which [the defendants are] charged because the choice of amendment matters." *Id.* at 419 (citation, internal quotation marks, and alterations omitted). The pertinent constitutional provisions are the Fourteenth Amendment, which states in relevant part that "[n]o State shall make or enforce any law which shall . . . deprive any person of life, liberty, or property, without due process of law," U.S. CONST. amend. XIV, § 2, and the Eighth Amendment, which prohibits "cruel and unusual punishments," U.S. CONST. amend. VIII. "Determining which amendment applies . . . requires consideration of where the plaintiff finds himself in the criminal justice system." *Estate of Booker*, 745 F.3d at 419 (citation, internal quotation marks, and alterations omitted).

Plaintiffs assert that Paugh, as a pretrial detainee, is protected by the Fourteenth Amendment's guarantee of due process and, under the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), does not need to muster the same proof as a convicted person pressing an Eighth Amendment claim. *See* ECF No. 85 at 45–46. Defendants disagree, arguing that Paugh is not a pretrial detainee because he was a probationer[7] and, in any event, *Kingsley* did

---

[7] The parties use the terms parole and probation interchangeably. *See* ECF Nos. 85 at 44–45; 68 at 4, 8, 31, 34; 97 at 19–20. Although "probation and parole are similar and are often confused, they differ in several important respects." NEIL P. COHEN, THE LAW OF PROBATION & PAROLE § 1:1 (2d ed. July 2020); *see also Samson v. California*, 547 U.S. 843, 850 (2006) (discussing differences between parole and probation and ruling that on the "continuum [of state-imposed punishments], parolees have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment"). The difference in a nutshell is that "[u]nlike parole, which is imposed in addition to imprisonment, probation is meted out in lieu of incarceration." *Doe v. Harris*, 772 F.3d 563, 571 (9th Cir. 2014) (citations, quotations marks, and alterations omitted). As a result of the parties' terminology overlap, the record is somewhat unclear whether Paugh was on probation or parole. Construing the facts in Plaintiffs' favor, however, the court considers Paugh a probationer in reliance on Plaintiffs' statement that Paugh "was ordered to be on supervised probation" after his March 10, 2015 alcohol-related conviction. *See* Am. Compl. ¶ 21. Moreover, for purposes of discerning Plaintiffs' Fourteenth Amendment due process

not disturb binding Tenth Circuit authority that applies the same standard of liability to inadequate medical care claims by both pretrial detainees and convicted persons.

The court concludes that (1) Paugh was a pretrial detainee and Plaintiffs have properly pursued their claims under the Fourteenth Amendment, and (2) although there are strong arguments for applying the Fourteenth Amendment "objective unreasonableness" standard stated in *Kingsley* rather than continuing to borrow the Eighth Amendment's subjective "deliberate indifference" standard for pretrial detainees' medical needs claims, the court is bound by current Tenth Circuit precedent that continues to apply the Eighth Amendment test in this context.

### (i)   Probationer-Detainee Status

First, Plaintiffs have properly invoked their rights under the Fourteenth Amendment because Paugh was a pretrial detainee during his time in custody. The rights of incarcerated persons who "have been charged with a crime but who have not yet been tried on the charge" are governed by the Fourteenth Amendment, which prohibits punishment "prior to an adjudication of guilt in accordance with due process of law." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). Just as newly incarcerated pretrial detainees may challenge aspects of their confinement under the Fourteenth Amendment, so too may probationers or parolees who are incarcerated on a new charge. *See Hamilton v. Lyons*, 74 F.3d 99, 105 (5th Cir. 1996) ("[A] person on parole for one crime who is arrested for a second crime cannot be punished for the commission of the second crime until he is

---

rights, the court discusses Section 1983 cases involving both parolees and probationers because the Supreme Court has observed that there is not "any difference relevant to the guarantee of due process between the revocation of parole and the revocation of probation." *Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973); *see also id.* at 782 n.3 ("[D]espite the undoubted minor differences between probation and parole, . . . revocation of probation where sentence has been imposed previously is constitutionally indistinguishable from the revocation of parole." (citations omitted)); *Curtis v. Chester*, 626 F.3d 540, 545 (10th Cir. 2010) (analyzing Federal Rule of Criminal Procedure 32.1 and equating due process considerations for individuals on supervised release, probation, and parole).

found guilty of the commission of the second crime. In this regard, a parolee may be deemed a 'pretrial detainee' with respect to the second crime charged." (citing *Clark v. Poulton*, 963 F.2d 1361, 1364–65 (10th Cir. 1992))).

Defendants contend that Paugh was incarcerated only because of his status "[a]s a parolee," and therefore "was a convicted inmate and only the Eighth Amendment would apply." ECF No. 68 at 31; *see also* ECF No. 97 at 17. But as Plaintiffs point out, "although [Paugh] was arrested while on parole, he was charged with and booked in Jail on new crimes—unlawful purchase of alcohol by an interdicted person and intoxication." ECF No. 85 at 44. This is supported by the record, which indicates that Paugh was charged with two new misdemeanor offenses and detained on July 24th based on those new charges. *See* ECF Nos. 68–2 at 1–2, 85–2 at 135. Therefore, Paugh was a pretrial detainee with rights governed by the Fourteenth Amendment because he was charged with new offenses and detained prior to an adjudication of guilt on the new offenses.

Even if the court were to accept Defendants' argument that Paugh was only "held in Jail based upon [his] prior conviction" and probationer status, *see* ECF No. 97 at 17, Paugh would still be classified as a pretrial detainee under Tenth Circuit authority. The court recently treated an alleged probation violator as a pretrial detainee to evaluate his failure-to-protect claims. *See Contreras on behalf of A.L. v. Doña Ana Cty. Bd. of Cty. Commissioners*, No. 18-2176, 2020 WL 4045924, at *1, 3 n.2 (10th Cir. July 20, 2020) (Tymkovich, J., concurring) (treating inmate who "was booked . . . for violating terms associated with his probation" as "a pretrial detainee, rather than a convicted prisoner").[8] The court also previously classified a person incarcerated for suspected parole violations as being "in pretrial detention" while examining the proper scope of a

---

[8] Judge Baldock's concurrence also evaluated the probationer-inmate as a pretrial detainee with claims under the Fourteenth Amendment. *See Contreras*, 2020 WL 4045924, at *15.

magistrate judge's jurisdiction under 28 U.S.C. § 636(b)(1)(B). *Clark v. Poulton*, 963 F.2d 1361, 1364–65 (10th Cir. 1992). District courts within the Tenth Circuit and persuasive authorities from sister circuits have done the same for both probationer- and parolee-detainees.[9]

Such a classification is appropriate because irrespective of his probationer status, Paugh has a Fourteenth Amendment right to be free from punishment of any kind "prior to an adjudication of guilt in accordance with due process of law." *Wolfish*, 441 U.S. at 535. In other words, before receiving punishment in the form of incarceration for a potential probation violation, Paugh had a constitutional and a state law right to a revocation hearing. *See Gagnon*, 411 U.S. at 782 (stating due process rights for probationers); UTAH CODE ANN. § 77-18-1(12)(a)(iii) ("Probation may not be revoked except upon a hearing in court and a finding that the conditions of probation have been violated.").[10] Because Paugh died before his probation revocation hearing, he had not been adjudged in violation of his probation terms. Therefore, during his time in custody, Paugh could

---

[9] *See, e.g.*, *Chrisco v. Hayes*, No. 17-CV-00072-MSK-MEH, 2017 WL 5404191, at *4 (D. Colo. Nov. 14, 2017) (unpublished) (citing *Wolfish*, 441 U.S. at 523 for proposition that "[p]retrial detainees include incarcerated individuals . . . awaiting adjudication on pending accusations that they have violated the terms of their probation or parole"); *Salazar v. White*, No. 14-CV-02081-RM-CBS, 2015 WL 13730682, at *1, (D. Colo. July 7, 2015) (finding that the constitutional excessive force claims of a person "incarcerated . . . on a state parole hold" are "properly addressed under Fourteenth Amendment standards"), report and recommendation adopted, No. 14-CV-02081-RM-CBS, 2015 WL 5781650 (D. Colo. Oct. 5, 2015); *see also Ressy v. King Cty.*, 520 F. App'x 554, 554–55 (9th Cir. 2013) (unpublished) (ruling that an individual held on "pre-hearing detention for a probation violation" was a "pretrial detainee" with rights properly assessed under the Fourteenth Amendment); *Martin v. Warren Cty., Kentucky*, 799 F. App'x 329, 334, 337 & n.4 (6th Cir. 2020) (unpublished) (stating that an inmate "began his pretrial detention . . . after he was arrested for a parole violation" but declining to address *Kingsley* issues).

[10] Paugh's status as a pretrial detainee is not dependent on his state law rights because if Paugh were a federal probationer, he would also have a right to a revocation hearing under Federal Rule of Criminal Procedure 32.1, which "codified due process guarantees." *United States v. Jones*, 818 F.3d 1091, 1099 (10th Cir. 2016) (citations, internal quotation marks, and alterations omitted).

not be punished at all for the suspected probation violation and is best considered a pretrial detainee rather than a convicted person for purposes of his inadequate medical care claim.

(ii)        Effect of *Kingsley v. Hendrickson*

Plaintiffs next argue that because Paugh was a pretrial detainee, the applicable Fourteenth Amendment standard asks whether the Jail officials acted with "objective unreasonableness" concerning Paugh's alcohol withdrawal. ECF No. 85 at 46. The Supreme Court adopted this standard for pretrial detainees' excessive force claims in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), and Plaintiffs argue that *Kingsley* also applies to pretrial detainees' inadequate medical care claims. *See id.* at 45–46. Defendants argue that *Kingsley* is confined to its excessive force context and the court must apply the subjective "deliberate indifference" standard derived from the Eighth Amendment analysis in *Farmer v. Brennan*, 511 U.S. 825 (1994), and *Estelle v. Gamble*, 429 U.S. 97 (1976). *See* ECF Nos. 68 at 33–34; 97 at 17–19. The court finds that there are strong arguments for applying *Kingsley* in the pretrial detainee inadequate medical care context and aligning these claims with the objective analysis used for other Fourteenth Amendment pretrial detention claims. But the court is bound by current Tenth Circuit precedent, which dictates that the subjective "deliberate indifference" standard governs this case.

The issue in *Kingsley* was whether "a pretrial detainee" bringing a Fourteenth Amendment excessive force claim "must show that the officers were *subjectively* aware that their use of force was unreasonable, or only that the officers' use of that force was *objectively* unreasonable." 576 U.S. at 391–92. The Court concluded that "the latter standard is the correct one," *see id*. at 392, ruling that pretrial-detainee plaintiffs need not prove that the defendants subjectively acted "maliciously and sadistically to cause harm," *see id.* at 400 (quotation omitted). Thus, in the excessive force context at least, a pretrial detainee must establish that the official acted knowingly,

purposefully, or recklessly (as opposed to negligently), *see id.* at 396,[11] and that the conduct was "objectively unreasonable" rather than subjective "malicious and sadistic" harm, *see id.* at 397.

The Tenth Circuit has historically grafted the Eighth Amendment's subjective deliberate indifference requirement onto Fourteenth Amendment medical care claims by pretrial detainees. *See Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002) ("Although pretrial detainees are protected under the Due Process Clause rather than the Eighth Amendment, this Court applies an analysis identical to that applied in Eighth Amendment cases brought pursuant to § 1983." (quotations omitted)). This doctrinal alignment stems at least in part from the Supreme Court's opinion in *City of Revere v. Massachusetts General Hospital*, in which the Court declined "to define [a defendant's] due process obligation to pretrial detainees . . . who require medical attention" because their rights are "at least as great as the Eighth Amendment protections available to a convicted prisoner." 463 U.S. 239, 244 (1983). But the Court has since done "little to clarify the standards of care due to those who find themselves . . . held by the government after arrest but before conviction at trial." *Blackmon v. Sutton*, 734 F.3d 1237, 1240 (10th Cir. 2013).

*Kingsley* provides strong arguments showing why the grafting of an Eighth Amendment standard onto pretrial detainees' Fourteenth Amendment medical care claims is misplaced. First, as Plaintiffs emphasize, *Kingsley* stated its holding broadly that "a pretrial detainee can prevail by providing only objective evidence that *the challenged governmental action* is not rationally related

---

[11] *Kingsley* ruled that "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." 576 U.S. at 396 (citation omitted). This reinforced the Supreme Court's longstanding rule that Fourteenth Amendment claims require "something more" than mere negligence. *Daniels v. Williams*, 474 U.S. 327, 334 (1986). Thus, Plaintiffs' articulation of the *Kingsley* rule as a bare "objective unreasonableness" test is not fully accurate, and if *Kingsley* were adopted in this context, the standard is better understood as an analysis of an official's "objectively reckless disregard of a serious medical concern." *Estate of Vallina v. Cty. of Teller Sheriff's Office*, 757 F. App'x 643, 647 (10th Cir. 2018) (unpublished).

to a legitimate governmental objective or that it is excessive in relation to that purpose." 576 U.S. at 398 (emphasis added); *see also Colbruno v. Kessler*, 928 F.3d 1155, 1163 (10th Cir. 2019) (reinforcing this broader rule as the holding in *Kingsley*). In articulating this holding, the Court relied on its Fourteenth Amendment general conditions of confinement caselaw that has promulgated an objective standard for pretrial detainee claims. *See* 76 U.S. at 398.[12] The Court's broad statement of its rule and reliance on conditions of confinement cases indicate that an objective standard inheres in Fourteenth Amendment claims beyond the excessive force context.

Second, the reasoning in *Kingsley* also extends broadly to pretrial detainee claims in general rather than exclusively to excessive force claims. To begin with, the Court distinguishes the Fourteenth Amendment and the Eighth Amendment, explaining that "[t]he language of the two Clauses differs, and the nature of the claims often differs." *Id.* at 400. The text and historical understanding of the Eighth Amendment focuses on the appropriateness of intentional punishment, whereas under the Fourteenth Amendment, "pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously or sadistically.'" *Id.* at 400–01 (quoting *Ingraham v. Wright*, 430 U.S. 651, 671–672 n.40 (1977)); *see also id.* at 401 (citing 4 W. Blackstone, Commentaries, for historical understanding of pretrial detention to be "only for safe custody, and

---

[12] The Supreme Court established the standard for pretrial conditions of confinement claims in *Bell v. Wolfish*, which analyzes whether a challenged condition is an impermissible punishment by asking if the condition "is reasonably related [and proportionate] to a legitimate governmental objective." 441 U.S. at 538–39. However, the Tenth Circuit has sometimes also incongruously applied the *Farmer* subjective deliberate indifference standard to individualized conditions of confinement claims. *Compare Colbruno*, 928 F.3d at 1165 ("The Fourteenth Amendment is violated if a pretrial detainee is subjected to 'a restriction or condition . . . not reasonably related to a legitimate goal.'" (quoting *Wolfish*, 441 U.S. at 539)), *Craig v. Eberly*, 164 F.3d 490, 495 (10th Cir. 1998) ("Although the Due Process Clause governs a pretrial detainee's claim of unconstitutional conditions of confinement, the Eighth Amendment standard provides the benchmark for such claims."). In conditions of confinement caselaw generally, "the *Wolfish* test coexists uneasily with the subjective deliberate indifference test." Catherine T. Struve, *The Conditions of Pretrial Detention*, 161 U. PA. L. REV. 1009, 1025–26 (2013) (collecting cases).

not for punishment"). Indeed, pretrial detainees are presumed innocent, and thus are "entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 322 (1982); *accord Wolfish*, 441 U.S. at 535 n.16 ("Due process requires that a pretrial detainee not be punished."). In short, while intentional infliction of punishment is the touchstone of an Eighth Amendment claim, there is no textual or historical reason for extending that to Fourteenth Amendment claims.

Additionally, *Kingsley* reasoned that an objective standard for pretrial detainees' excessive force claims still "adequately protects an officer who acts in good faith" when faced with split-second decisions in jail because negligent conduct is not unlawful. *See id.* at 390–400. That reasoning is even more convincing in the inadequate medical care context, in which many cases will have medical care decisions unfold over several hours (such as this case that spans twenty-eight hours), and officers have more time for "considered thought" and careful decision-making rather than split-second, use-of-force judgment calls. *See id.* at 406 (Scalia, J., dissenting) (making a similar point to distinguish an objective rule in the conditions context from the force context).

Other courts of appeals, including the Second, Seventh, and Ninth Circuits, have analyzed *Kingsley* in a similar fashion to extend the Court's objective analysis to other pretrial detention Fourteenth Amendment claims.[13] On the other hand, the Fifth, Eighth, and Eleventh Circuits have acknowledged the *Kingsley* issue in a footnote and constrained the decision's objective standard

---

[13] *See Hardeman v. Curran*, 933 F.3d 816, 823 (7th Cir. 2019) (conditions of confinement); *Bruno v. City of Schenectady*, 727 F. App'x 717, 720 (2d Cir. 2018) (unpublished) (medical care); *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1120, 1122–25 (9th Cir. 2018) (medical care); *Miranda v. Cty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018) (medical care); *Darnell v. Pineiro*, 849 F.3d 17, 34–35 (2d Cir. 2017) (conditions of confinement); *Castro v. Cty. of L.A.*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc) (conditions of confinement); *see also Banks v. Booth*, No. CV 20-849(CKK), 2020 WL 1914896, at *6 (D.D.C. Apr. 19, 2020) (holding that in the absence of contrary circuit precedent, "pre-trial detainee[s] do not need to show deliberate indifference in order to state a due process claim for inadequate conditions of confinement").

to the excessive force context.[14] The Tenth Circuit has repeatedly recognized the potential import of *Kingsley* beyond pretrial detainees' excessive force claims, but has avoided explicitly ruling on whether the decision adopted an objective analysis for other Fourteenth Amendment claims.[15] As the question has remained unresolved, the Tenth Circuit has continued to apply the Eighth Amendment's subjective deliberate indifference standard to pretrial detainees. *See, e.g.*, *Sawyers v. Norton*, 962 F.3d 1270, 1282 (10th Cir. 2020). Therefore, this court must also do the same, irrespective of the court's views on the breadth of *Kingsley* and the "advantages of the precedent of [other] circuits" in applying an objective analysis to pretrial detainees' medical care claims. *See United States v. Spedalieri*, 910 F.2d 707, 709 n.2 (10th Cir. 1990).

## 2. Clearly Established Right

Turning to the individual defendants' qualified immunity defense, Plaintiffs must demonstrate that the alleged inadequate medical care violated a clearly established right. "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or

---

[14] *See Whitney v. City of St. Louis*, 887 F.3d 857, 860 n.4 (8th Cir. 2018); *Dang v. Sheriff, Seminole Cnty.*, 871 F.3d 1272, 1279 n.2 (11th Cir. 2017); *see also Alderson v. Concordia Parish Corr. Facility*, 848 F.3d 415, 419 n.4 (5th Cir. 2017) (following circuit precedent because the issue was not directly raised); *accord id.* at 424–25 (Graves, J., concurring in part) (arguing for the court to reconsider the subjective standard for pretrial detainees' claims in light of *Kingsley*).

[15] *See, e.g.*, *Sawyers*, 962 F.3d at 1282 n.11; *Burke*, 935 F.3d at 992 n.9; *Perry v. Durborow*, 892 F.3d 1116, 1122 n.1 (10th Cir. 2018); *Clark v. Colbert*, 895 F.3d 1258, 1269 (10th Cir. 2018); *Estate of Vallina*, 757 F. App'x at 646; *Estate of Duke by & through Duke v. Gunnison Cty. Sheriff's Office*, 752 F. App'x 669, 673 n.1 (10th Cir. 2018) (unpublished); *Crocker v. Glanz*, 752 F. App'x 564, 569 (10th Cir. 2018) (unpublished). The Sixth Circuit has similarly acknowledged the potential change in law from *Kingsley*, but has declined to "rule[] on the issue." *Cameron v. Bouchard*, No. 20-1469, 2020 WL 3867393, at *5 (6th Cir. July 9, 2020) (unpublished) (citing *Richmond v. Huq*, 885 F.3d 928, 938 n.3 (6th Cir. 2018)).

the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Poolaw v. Marcantel*, 565 F.3d 721, 733 (10th Cir. 2009) (citation omitted).

But this inquiry does not require a myopic approach by which a plaintiff must show "that the very act in question previously was held unlawful in order to establish an absence of qualified immunity." *Id.* (citation omitted); *see also Davis v. Clifford*, 825 F.3d 1131, 1136 (10th Cir. 2016) ("[T]he qualified immunity analysis involves more than a scavenger hunt for prior cases with precisely the same facts." (citation omitted)). Rather, the question is whether the contours of the right are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (citation omitted); *see also Mata v. Saiz*, 427 F.3d 745, 749 (10th Cir. 2005) ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his [or her] conduct was unlawful in the situation he confronted." (citation omitted)).

In the Tenth Circuit, "there is little doubt that deliberate indifference to an inmate's serious medical need is a clearly established constitutional right." *Mata*, 427 F.3d at 749. Such an unconstitutional "denial of medical attention" may be shown by alleging the defendant committed "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.'" *Olsen*, 312 F.3d at 1315 (quoting *Estelle*, 429 U.S. at 106).

More specifically, it is clearly established that the actions of "prison officials [who] prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment," constitute deliberate indifference. *Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000)); *see also Mata*, 427 F.3d at 751 (holding that a prison health official who serves "'solely . . . as a gatekeeper for other medical personnel capable of treating the condition'

may be held liable under the deliberate indifference standard if she 'delays or refuses to fulfill that gatekeeper role'" (quoting *Sealock*, 218 F.3d at 1211)). Moreover,

> [i]t has been clearly established in this circuit since at least 2006 that a deliberate indifference claim will arise when "a medical professional completely denies care although presented with recognizable symptoms which potentially create a medical emergency . . . and the prison official, knowing that medical protocol requires referral or minimal diagnostic testing to confirm the symptoms, sends the inmate back to his cell."

*Al-Turki v. Robinson*, 762 F.3d 1188, 1194 (10th Cir. 2014) (quoting *Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006)). These "principle[s] also clearly appl[y] to pretrial detainees through the due process clause of the Fourteenth Amendment." *Estate of Booker*, 745 F.3d at 433 (citation and internal quotation marks omitted). Therefore, Plaintiffs have identified a clearly established right.[16]

### 3.    Constitutional Violation

Next the court "considers whether the facts taken in the light most favorable to the plaintiff show that the defendant's conduct violated a constitutional right." *Poolaw*, 565 F.3d at 728 (citations omitted). Plaintiffs can defeat qualified immunity by demonstrating that a reasonable jury could find the individual defendants committed "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Self*, 439 F.3d at 1230 (internal quotation marks omitted). "[C]laims alleging inadequate or delayed medical care . . . involve both an objective and a subjective component." *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001). "The objective prong of the deliberate indifference test examines whether the prisoner's medical condition was 'sufficiently serious' to be cognizable under the Cruel and Unusual

---

[16] At a more granular level, other courts of appeals have also established that jailers who act with deliberate indifference to the health risks for an inmate undergoing alcohol withdrawal have violated the inmate's constitutional rights. *See Harper v. Lawrence Cnty.*, 592 F.3d 1227, 1235 (11th Cir. 2010); *Stefan v. Olson*, 497 F. App'x 568, 576–80 (6th Cir. 2012) (unpublished).

Punishment Clause." *Al-Turki*, 762 F.3d at 1192 (citation omitted). "The subjective prong examines the state of mind of the defendant, asking whether 'the official knew of and disregarded an excessive risk to inmate health or safety.'" *Id.* (quoting *Farmer*, 511 U.S. at 837). The court evaluates the two components in turn.

### (i)    Objectively Serious Medical Need

Plaintiffs "must first produce objective evidence that the deprivation at issue was in fact 'sufficiently serious.'" *Mata*, 427 F.3d at 751 (quoting *Farmer*, 511 U.S. at 834). Plaintiffs can do so in several ways. Most commonly, "[a] medical need is considered sufficiently serious to satisfy the objective prong if the condition has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Sawyers*, 962 F.3d at 1283 (citation omitted). But the serious medical need test can be met both by the "intermediate harm," considering the inmate's symptoms "presented at the time the prison employee has contact with the prisoner" or by the resulting harm, when, for example, "delay by prison employees results in damage to a prisoner's heart" or death, which "undoubtedly" is "sufficiently serious." *Mata*, 427 F.3d at 753. Moreover, a plaintiff can establish that his condition showed the risk of an imminent serious medical need. *See Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999) (citing *Helling v. McKinney*, 509 U.S. 25, 33 (1993), for proposition that the "Eighth Amendment also protects against future harm to an inmate"). How the sufficiently serious medical need is defined will affect whether a defendant's deliberate indifference was the cause of that harm. *See, e.g.*, *Martinez v. Beggs*, 563 F.3d 1082, 1089–90 (10th Cir. 2009) (isolating harm as the ultimate outcome—heart attack and death—rather than the intermediate symptoms). The overall point of this objective analysis "is to 'limit claims to significant, as opposed to trivial, suffering.'" *Id.* (quoting *Mata*, 427 F.3d at 753).

Plaintiffs have demonstrated that Paugh's condition presented an objectively serious medical need under three formulations of this inquiry. First, the seriousness of Paugh's condition was "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *See Sawyers*, 962 F.3d at 1283. Throughout the day on July 24th, Paugh either reported or was observed experiencing tremors, paleness, multiple instances of vomiting,[17] dry-heaving, spitting up mucus, cold chills and other fever symptoms, loss of appetite, restlessness and anxiety, and significant shaking in his hands to the point that it extended through his forearms and the shaking could be seen from a distance. Taken together, even a lay person would recognize that these symptoms required medical attention. *See Mata*, 427 F.3d at 753. Thus, Paugh's "intermediate" symptoms represent an objectively serious medical need.

Second, Plaintiffs have demonstrated that Paugh experienced substantial harm due to the delay in treating his worsening alcohol withdrawal. When "a prisoner claims that harm was caused by a delay in medical treatment, he must 'show that the delay resulted in substantial harm' in order to satisfy the objective prong of the deliberate indifference test." *Al-Turki*, 762 F.3d at 1193 (quoting *Oxendine*, 241 F.3d at 1276). "[T]he substantial harm requirement may be satisfied by lifelong handicap, permanent loss, or considerable pain." *Id.* (quoting *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001)). The Tenth Circuit has repeatedly recognized that delay in

---

[17] There is a genuine dispute of material fact concerning the number of times Paugh vomited while in the Jail. The parties do not dispute that Paugh vomited at least once while completing the screening questionnaire with Conley. *See* ECF No. 85–2 at 109. But Plaintiffs point out that Anderson testified she believed she saw Paugh vomited at some point during the July 24 night shift "when he was in booking cell 3." *Id.* at 41. Additionally, Gowen at one time indicated that Paugh had "puked throughout the day." ECF No. 85–3 at 95. In briefing, Defendants state that Paugh vomited no more than once, *see* ECF No. 97 at 4–5, but then stated during oral argument that Paugh may have vomited up to four times. Taking inferences in Plaintiffs' favor, as the court must, the court concludes that a reasonable jury could find that Paugh vomited multiple times during his detention in Uintah County Jail.

rendering medical care that causes death "is, without doubt, sufficiently serious to meet the objective component" of the inadequate medical care analysis. *Burke*, 935 F.3d at 992 (quoting *Martinez*, 563 F.3d at 1088) (alteration omitted); *see also Estate of Booker*, 745 F.3d at 431 (recognizing that death stemming from a three-minute delay is sufficiently serious). Thus, Paugh has shown an objectively serious medical need from the delay in care that caused his death.

Third, Paugh's symptoms, alcoholism history, and the nature of alcohol withdrawal also communicated a "sufficiently imminent danger" that he would experience an objectively serious medical need "actionable under the Eighth Amendment." *See Helling*, 509 U.S. at 34; *see also id.* at 33–34 (rejecting the argument "that only deliberate indifference to *current* serious health problems of inmates is actionable under the Eighth Amendment" (emphasis added)). Drug and alcohol withdrawal represent the third highest cause of death among local jails both nationwide and in Utah, accounting for six percent of jail deaths in the state between 2013 and 2017. *See* ECF Nos. 80–2 at 4; 80–5 at 153. Paugh was especially at risk of experiencing the "sufficiently imminent danger" of acute alcohol withdrawal because of his extremely elevated .324 blood-alcohol concentration, known chronic alcoholism, his repeated statements that he had not yet reached his peak, and his progressively worsening symptoms throughout the day. *See, e.g.*, *Stefan*, 497 F. App'x at 577 (analyzing similar considerations under a *Helling*-based theory of serious medical need). Indeed, as Dr. Bradbury opined, based on Paugh's history and condition when he left ARMC on July 24, "[h]e had the potential to develop serious risk." ECF No. 85–3 at 10. This was especially true given that Paugh indicated his history of seizures on his medical screening, *see* ECF No. 95–3 at 44, and Dr. Porsa stated that "in all likelihood" Paugh "suffered at least one and more likely than not multiple seizures during the night before he died," ECF No. 80–2 at 11. Thus, Plaintiffs have demonstrated that Paugh's imminent risk of future harm of acute alcohol

withdrawal posed an objectively serious medical need. In sum, Plaintiffs have demonstrated an objectively serious medical need in Paugh's intermediate symptoms, his death that occurred from the delay in care, and imminent risk of future medical need.

### (ii) Subjective Deliberate Indifference

Under the second component of their inadequate medical care claims, Plaintiffs must produce sufficient evidence for a reasonable jury to find that the individual defendants exhibited "deliberate indifference" to Paugh's serious medical needs. This is a subjective standard, which "examines the state of mind of the defendant" and "ask[s] whether 'the official knew of and disregarded an excessive risk to inmate health or safety.'" *Al-Turki*, 762 F.3d at 1192 (quoting *Farmer*, 511 U.S. at 837) (alterations omitted). The state of mind required "is akin to 'recklessness in the criminal law.'" *Self*, 439 F.3d at 1231 (quoting *Farmer*, 511 U.S. at 839). As such, on one end of the spectrum, "deliberate indifference does not require a finding of express intent to harm," *Mata*, 427 F.3d at 752 (citation and alteration omitted), and on the other, "an inadvertent failure to provide adequate medical care does not rise to a constitutional violation," *Estate of Booker*, 745 F.3d at 430 (citation and internal quotation marks omitted).

Deliberate indifference may be established through circumstantial evidence:

> Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.

*Farmer*, 511 U.S. at 842 (citations omitted). "This is so because if a risk is obvious so that a reasonable man would realize it," the court "might well infer that the defendant did in fact realize it." *Mata*, 427 F.3d at 752 (citation, internal quotation marks, and alteration omitted). In making this determination, "the relevant question is the *risk* of substantial harm, not whether the official

knew of the specific medical condition causing the symptoms presented by the prisoner." *Kellum v. Mares*, 657 F. App'x 763, 770 (10th Cir. 2016) (unpublished) (citing *Farmer*, 511 U.S. at 842).

The Tenth Circuit has found deliberate indifference where jail personnel: "(1) recklessly misdiagnosed or ignored medical problems; (2) delayed providing medical treatment; or (3) denied altogether access to medical personnel or medication." *Boyett v. Cty. of Washington*, 282 F. App'x 667, 678 (10th Cir. 2008) (unpublished) (citing *Self*, 439 F.3d at 1232; *Mata*, 427 F.3d at 753). Thus, deliberate indifference may be established "when jail officials confronted with serious symptoms took no action to treat them." *Sawyers*, 962 F.3d at 1283 (citation omitted). This is particularly true where an official who acts as "a gatekeeper for other medical personnel capable of treating [the plaintiff's] condition . . . delays or refuses to fulfill that gatekeeper role due to deliberate indifference." *Sealock*, 218 F.3d at 1211. Under some circumstances, "even a brief delay" in providing access to medical care "may be unconstitutional." *Estate of Booker*, 745 U.S. at 432 (quoting *Mata*, 427 F.3d at 755); *see also id.* at 430–31 (finding that allegations involving a "three-minute delay in seeking medical attention" were sufficient to defeat summary judgment). An official may "fulfill[] their gatekeeper duties by communicating the inmate's symptoms to a higher-up." *Burke*, 935 F.3d at 993 (citation, internal quotation marks, and alterations omitted). Moreover, an official's failure to follow "published requirements for health care" in jail protocols or training "certainly provide[s] circumstantial evidence that a prison health care gatekeeper knew of a substantial risk of serious harm" and is deliberately indifferent for disregarding that risk. *Mata*, 427 F.3d at 757; *see also Estate of Booker*, 745 F.3d at 430 (similarly considering training).[18]

---

[18] However, an official's failure to follow jail medical care protocols or training is "not dispositive" of the deliberate indifference issue. *Estate of Booker*, 745 F.3d at 430 (citation omitted); *see also Ernst v. Creek Cty. Pub. Facilities Auth.*, 697 F. App'x 931, 934 (10th Cir. 2017) (unpublished) (citing *Davis v. Scherer*, 468 U.S. 183, 194 (1984), for proposition that "[s]imply failing to follow jail policies is not a constitutional violation in and of itself.")

To establish a constitutional violation to defeat summary judgment on the basis of qualified immunity, "it is incumbent upon a plaintiff to identify specific actions taken by particular defendants." *Pahls v. Thomas*, 718 F.3d 1210, 1226 (10th Cir. 2013) (citation, internal quotation marks, and emphasis omitted). Thus, the court must "address the claims against each defendant" for their own deliberate indifference separately. *Mata*, 427 F.3d at 755. However, the court states at the outset two reasons for denying qualified immunity relevant to multiple defendants.

First, "[t]he disputed facts regarding [Paugh's] condition" during his nearly twenty-eight hours in Uintah County Jail themselves "preclude summary judgment" for many of the individual defendants. *See Estate of Booker*, 745 F.3d at 431. Concerning Paugh's symptoms, "[d]eposition testimony from the Defendants" as well as other deponents "varies considerably," both among the witnesses and defendants and within a defendant's own statements. *See id.* For example, Conley's deposition testimony states that Paugh "seemed normal and well" during the July 24 day shift. *See* ECF No. 85–2 at 111. But this conflicts both with Conley's own prior testimony that he "could see Inmate Paugh shaking pretty bad" during his shift, *see* ECF No. 85–3 at 188, and Gowen's observations from the same shift that—far from "normal and well"—Paugh had tremors, both of his hands and forearms were "visibly shaking," he had "puked throughout the day," was "dry-heaving," Gowen "heard him retching" several times, and he was overall "really sick from detoxing while at . . . the jail," *see id.* at 95, 111–112, 114, 118.

These factual variations and contradictions in the record extend beyond descriptions of Paugh's symptoms to other important subjects, such as the degree of medical care Paugh did receive; whether the officials knew about and had access to Dr. Bradbury's discharge instructions but disregarded them; what information the officers conveyed about Paugh's condition in pass-alongs between shifts; whether the officers had access to Clark's CIWA evaluation form in the

medical binder and were instructed to use it; the information that officers relayed to Clark in obtaining his medical opinion on Paugh's Librium treatment; the level of visibility into Paugh's cell from the booking desk, especially with the lights off; and the extent of training that officials received concerning health and safety protocols in the Jail when there were no nurses on staff.

In particular, there remains a fact question as to whether Paugh received any Librium at all during his time in Jail. Bunnell and Fuller attest that they gave Paugh his Librium, with Fuller stating he did so around 1:40 p.m. and Bunnell around 8:00 p.m. *See* ECF Nos. 85–2 at 95–96, 127; 85–3 at 93, 95. But Paugh's autopsy shows no traces of Librium in the postmortem toxicology report, *see* ECF No. 85–3 at 176, despite the fact that Librium has an "extremely long half-life" of "24–48 hours," ECF No. 80–2 at 17; *see also* ECF No. 85–3 at 69 (Clark stating that "[t]he metabolite of the Librium actually lasts in your system a very long time" and "you could have it in your system for a couple days"). Moreover, no officer initialed the Librium blister pack to signify they gave Paugh the medication, *see* ECF No. 97–2 at 1–2, despite Jail policy requiring them to do so, *see* ECF No. 69–3 at 20, 25.[19] And every medical professional of record has opined that if Paugh had consumed even one dose of Librium, it would have appeared on his postmortem toxicology report. *See* ECF Nos. 80–2 at 7–8 (Dr. Porsa); 85–2 at 21 (Dr. Bradbury); 85–3 at 69

---

[19] Jail protocols also require that "[a]ll prescription medications shall be recorded on a permanent record ***immediately*** at the time they are brought in from the pharmacy." ECF No. 69–3 at 19 (emphasis in original). When the prescription medication is given to an inmate, both the administering jail official and the inmate receiving their medication "shall initial the medication record." *Id.* at 20, 25. Paugh's medication record may shed light on whether he received Librium while incarcerated, but the parties have not submitted this document into evidence. And although the blister pack has neither Bunnell nor Fuller's initials, it does have Fuller's handwritten note of Clark's over-the-phone dosage instructions. *See* ECF No. 97–2 at 1.

(PA Clark).[20] In short, these "myriad factual disputes preclude summary judgment" for many of the individual defendants. *See Estate of Booker*, 745 F.3d at 433.

Second, it is undisputed that during Paugh's approximately twenty-eight hours experiencing alcohol withdrawal in the Jail, no Jail officer made any attempt to (a) closely monitor or record Paugh's symptoms beyond casual observations; (b) assess Paugh's vital signs by, for example, taking his pulse, blood pressure, or temperature; or (c) contact Clark or any other medical professional about Paugh's worsening symptoms. Taking these undisputed facts and the inferences in favor of Plaintiffs, a reasonable jury could find that all the individual defendants (except for Riddle) were "gatekeepers[s] for other medical personnel capable of treating [Paugh's] condition," but "delay[ed] or refus[ed] to fulfill that gatekeeper role due to deliberate indifference." *See Sealock*, 218 F.3d at 1211. Relatedly, a reasonable jury could find that the individual defendants abdicated their gatekeeper responsibility or otherwise ignored Paugh's medical needs in violation of applicable Jail health protocols. As the Tenth Circuit has repeatedly recognized, "an official's training may undermine his or her claim that he or she was unaware of such a risk" to an inmate's health, *Estate of Booker*, 745 F.3d at 430, and jail health "protocols certainly provide circumstantial evidence that a prison health care gatekeeper knew of a substantial risk of serious harm," *Mata*, 427 F.3d at 757.

---

[20] Moreover, even if Paugh did receive Librium, a reasonable jury could find that several of the individual officers were deliberately indifferent from their lack of attention to the medication. A reasonable jury could determine that, from the outset, the officers failed to timely give Librium to Paugh, ignored Dr. Bradbury's prescription to give Paugh two capsules every two hours as need for withdrawal, changed the recommended dosage based on Clark's opinion without fully informing Clark of the prescription details and Paugh's worsening condition, and gave Paugh at most two doses of Librium (a total of at most 100mg—less than one-third the amount Dr. Bradbury prescribed) over the almost twenty-eight hours that Paugh was in UCJ.

The court now specifies the deliberate indifference evidence and conclusions for each of the individual defendants, "view[ing] the facts in the light most favorable to" Plaintiffs as "the non-moving party and resolv[ing] all factual disputes and reasonable inferences in [their] favor." *See Estate of Booker*, 745 F.3d at 411. The court concludes that only defendant Riddle is entitled to qualified immunity because no reasonable jury could find that Riddle was deliberately indifferent.

### (a)   Anderson's Deliberate Indifference

Anderson was the shift supervisor both nights that Paugh was detained in UCJ, *see* ECF No. 85–2 at 32–33, 42, which meant Anderson was authorized to "to determin[e] whether a prisoner brought into the jail requires medical attention," ECF No. 69–1 at 4. During the July 23–24 night shift, Anderson knew that Paugh was heavily intoxicated with a .324 blood-alcohol concentration, had just been to ARMC for medical care, and received a prescription for Librium to treat his withdrawal. *See id.* at 33–36. Anderson also knew of Dr. Bradbury's discharge instructions. *Id.* at 36. Yet she did not personally check on Paugh at all during this shift, *see id.*, despite being aware of jail policy requiring hourly "head counts" during which officers are required to "see some portion of the prisoner's skin" to "visually confirm that the prisoner is breathing and in no distress," *id.* at 19, 43; 85–3 at 101–02.

During the July 24–25 night shift, Anderson knew from the pass-along with Gowen that Paugh's condition had worsened during the day on July 24, *see id.* at 36–37, 41, as well as Gowen's expectation that Anderson would "get up" to check on Paugh in the detox cell "as often as she can" to ensure that Paugh was "breathing and in no distress," ECF No 85–3 at 113–14. In Anderson's interactions with Paugh during this shift, she observed him shaking at 7:00 p.m. and again at 8:00 p.m. when Bunnell gave him medication, *see* ECF NO. 85–2 at 40–41, and around 9:45 p.m. she

recognized that Paugh needed to be moved to a different cell because he "was starting to feel sick," had cold chills, had "told [Anderson] he was nauseous," and seemed "shaky" from withdrawal symptoms, *see id.* at 11, 38, 41–42. During the hours after moving Paugh, Anderson believed that Paugh vomited at some point "when he was in booking cell 3" and recalled hearing Paugh "cough[ing]," "sneez[ing]," and making sounds from when he was "trying to get phlegm out of [his] throat to spit." *See id.* at 38, 41; 85–3 at 96. Anderson also attested that from Dr. Bradbury's discharge instructions, it was her "understanding . . . that if there was [sic] red flags" from Paugh's alcohol withdrawal—meaning "[i]f his condition worsened . . . in any way"—the staff "needed to get [Paugh] to the hospital." ECF No. 85–2 at 35.

Despite Anderson's awareness of Paugh's deteriorating condition throughout the day, personal observation of his worsening symptoms during her shift, and understanding of her instructions to look for "red flags" and return Paugh to the hospital if "his condition worsened . . . in any way," she never rendered any medical care to Paugh or contacted medical professionals to determine whether Paugh needed treatment. She failed to check on Paugh from about 9:45 p.m. to when she ended her shift at 6:00 a.m., *see id.* at 17, and as shift supervisor, she repeatedly ignored the risks of not ensuring that other Jail staff were monitoring Paugh or had given Paugh his Librium dosage according to his prescription, *see id.* at 36–37, 48–49.

Viewing the facts in favor of Plaintiffs, a reasonable jury could find that Anderson "completely refused to assess or diagnose [Paugh's] medical condition at all by" ignoring his serious medical problems and, in doing so, "completely refused to fulfill her duty as gatekeeper in a potential [alcohol withdrawal] emergency." *See Mata*, 427 F.3d at 758; *see also Burke*, 935 F.3d at 994 (ruling that an official could be deliberately indifferent if they "did not attempt to determine [the inmate's] condition or administer care" and "did not reflect any effort to examine him or

gather vital signs"). Anderson's alleged inaction went against what she understood from Dr. Bradbury's discharge instructions, what Gowen claims he told her during the day-to-night pass-along, and Jail policies that required hourly head counts of inmates and calling medical professionals to provide medical care. Thus, Anderson is not entitled to qualified immunity because, viewing the facts in Plaintiffs' favor, a reasonable jury could conclude that Anderson "knew of and disregarded an excessive risk to inmate health or safety" which caused Paugh to experience avoidable suffering and death. *See Farmer*, 511 U.S. at 837.

### (b)    Bunnell's Deliberate Indifference

Bunnell was the "designated medical officer" during the July 23–24 and July 24–25 night shifts, *see* ECF No. 85–2 at 34, 94–96, meaning he was responsible for "pass[ing] out medications," *id.* at 34, but he did not otherwise have any medical training, *see id.* at 89. Bunnell personally knew about Paugh's alcoholism from interactions with Paugh outside the Jail. *Id.* at 85–86. When Paugh first entered the Jail, Bunnell knew that Paugh was heavily intoxicated with a .324 blood-alcohol concentration and had just been to ARMC for medical care. *See id.* at 84–85, 87. Bunnell also knew that Paugh received a prescription for Librium to treat his alcohol withdrawal and reviewed Dr. Bradbury's discharge instructions for Paugh to return to the hospital or see a doctor if his condition worsened. *See, e.g.*, *id.* at 87–88.

During the first night shift, Bunnell did not check on Paugh between placing him in detox cell #1 at 2:40 a.m. and when Bunnell ended his shift at 6:00 a.m. *See id.* at 87, 90. In so doing, Bunnell ignored Jail protocols to conduct hourly "head counts" of the inmates to "see some portion of the prisoner's skin" and "visually confirm that the prisoner is breathing and in no distress." *Id.* at 19; 85–3 at 101–02. Before Bunnell left the Jail, he looked into Paugh's cell and, after determining that Paugh was sleeping, Bunnell decided not to conduct a medical screening or to

arrange for Paugh to have his Librium prescription filled. *Id.* at 90, 126. Bunnell disregarded these steps despite Jail policy to conduct a medical "screening at admission" of the inmate into Jail "to ensure timely intervention and care." *See* ECF Nos. 69–2 at 5–6; 69–3 at 4. In conducting the pass-along at the end of his shift, Bunnell also failed to fully inform the day shift about Paugh's alcohol withdrawal condition and Dr. Bradbury's discharge instructions for Paugh to return to the hospital if his condition worsened. *See id.* at 84, 86–89, 90, 120, 125.

During the second night shift, Bunnell remained the designated medical officer and was assigned to a desk in the booking area nearby Paugh in detox cell #1. *See id.* at 94–96. In the pass-along from the day to night shift, Bunnell stated that no officers gave him an update on Paugh's alcohol withdrawal condition, but he also did not ask for any update. *Id.* at 93. An hour into Bunnell's shift around 7:00 p.m., Paugh asked Bunnell and Anderson about his next round of medication and informed them that he had not received his evening dosage and was feeling sick from withdrawal. *See id.* at 92–93. At this time, Bunnell observed that Paugh was shaking and recalled that Paugh looked "pale" and "didn't look like he was feeling well." *Id.* at 93.

Bunnell then did other tasks in the booking area and returned to give Paugh his medication about an hour later. ECF Nos. 85–2 at 95–96; 85–3 at 93, 95. When giving Paugh medication, Bunnell again observed that "Paugh was shaking," continued to be "pale," and that Paugh told Bunnell "he was detoxing." ECF No. 85–2 at 8. As noted above, there is a dispute of material fact concerning whether Paugh received any Librium during his time in Jail. *Compare* ECF Nos. 85–2 at 95–96, 127; 85–3 at 93, 95; 97–2 at 1–2, *with* ECF Nos. 80–2 at 17–19; 85–2 at 21, 48, 126, 132–33; 85–3 at 69, 176. If Bunnell did give Paugh Librium, his testimony is inconclusive concerning whether he gave Paugh one or two pills at this time. *See* ECF Nos. 85–2 at 95–96; 85–3 at 93, 95. Bunnell stated he had some confusion about the proper dosage for Paugh, but he chose

not to resolve that confusion by calling medical professionals. *See* ECF No. 85–2 at 96. Bunnell also chose not to make medical professionals aware that Paugh had missed a medication round and had not received any Librium between around 1:40 p.m. and 8:00 p.m. *See id.*

Between 9:45–10:00 p.m., Bunnell got up from his desk and stood nearby detox cell #1, where he briefly spoke to Paugh and observed that Paugh "was shaky and nauseated," and "had the chills," and Paugh informed Bunnell that "he was getting the chills then hot again" and he wanted to be "mov[ed] . . . into a cell alone while he was sick." *See* ECF Nos. 85–2 at 8, 93, 96–97, 104; 85–3 at 93, 96. During this interaction, Bunnell never took Paugh's vitals, tried to assess his condition, or called medical professionals to inform them of Paugh's worsening symptoms. Instead, Bunnell gave Paugh an extra blanket and moved him to booking cell #3, which was on Bunnell's "side of the booking area." ECF No. 85–2 at 38. Bunnell immediately turned off the lights in Paugh's cell where he laid down and the lights remained off the rest of the night. *See id.* at 40, 97. Bunnell recognized that with the lights off in the cell, "you can see shapes in there," but he affirmed that it would be hard to perceive how an inmate is feeling in the dark. *Id.* at 90.

Despite the hourly "head counts" policy, Bunnell again did not check on Paugh during the rest of his shift, ECF No. 85–2 at 17, 90. Rather, Bunnell asserted his view that if it appeared inmates were "sleeping, [then] there's not necessarily a need to go walk around" and check on individual inmates in their cells. *Id.* at 99. From his desk, Bunnell stated that he "saw Paugh standing and heard him clear his throat somewhere between 1:30 [a.m.] and 2:00 [a.m.]" and recalled hearing Paugh loudly "coughing and spitting" and sounds that suggested he was "spitting up mucus." *See* ECF Nos. 85–2 at 8, 97, 104; 85–3 at 96.

Bunnell started feeling ill with a stomach problem around 2:00 a.m. and decided he needed to go home for the night. ECF No. 85–2 at 93. Before Bunnell left, he peered into Paugh's cell and

saw that Paugh "was in there," but he did not speak to Paugh, see him move, or otherwise check on his alcohol withdrawal condition at that time. *See id.* at 93, 98. When Riddle took over Bunnell's duties at the desk closest to booking cell #3, Bunnell did not inform Riddle that Paugh was withdrawing from alcohol and did not relay any information about Paugh's worsening condition or Dr. Bradbury's discharge instructions. *Id.* at 61–62. This was despite Bunnell's understanding from the discharge paperwork that Paugh must be transported to the hospital if he experienced "any worsening of [his condition]," and Bunnell knew that, for example, "if [an inmate] threw up once that would be a worsening of condition . . . because [the inmate is] getting sick from withdrawing from alcohol." *Id.* at 88–89. But Bunnell candidly stated that, notwithstanding his lack of any medical training, he decided not to follow Dr. Bradbury's discharge instructions or convey them to Riddle because "of all the thousands of drunks that we deal with, they all have hangovers and they all get better." *Id.*

Together, this evidence is sufficient for a reasonable jury to find that Bunnell knew Paugh was seriously ill and needed urgent medical treatment, but that he disregarded this obvious, substantial risk to Paugh's health. Because Bunnell understood that Paugh's worsening condition meant he was supposed to go to the hospital, his decision to override that instruction, not monitor Paugh, not pass along the information to Riddle, and not call medical personnel or "summon an ambulance" demonstrates that Bunnell "disregarded that risk" to Paugh's health. *See Sealock*, 218 F.3d at 1211. Bunnell's failure to monitor Paugh or to seek medical assistance further contravened Jail policy requiring close nighttime monitoring and calling for "emergency transportation to an outside health care provider if an adequate response to a serious health-care emergency is not possible in the jail." ECF Nos. 69–3 at 7; 85–2 at 19. Moreover, there is a fact dispute concerning whether Bunnell gave Paugh Librium. If Paugh was not given Librium and was instead given a

different medication, such as Benadryl, a reasonable jury could find that Bunnell was reckless in giving Paugh the wrong medication. In sum, instead of fulfilling his gatekeeper function, a reasonable jury could find that Bunnell's conduct amounts to deliberate indifference because he was "confronted with serious symptoms"—such as Paugh's uncontrolled shaking, paleness, fever symptoms of feeling variably cold and hot, and spitting up mucus—but "took no action to treat them." *See Burke*, 935 F.3d at 993. Thus, Bunnell is not entitled to qualified immunity.

### (c)    Conley's Deliberate Indifference

Conley interacted with Paugh during the July 24 day shift between 6:00 a.m. and 6:00 p.m. ECF No. 85–2 at 109. Conley was aware that Paugh struggled with alcoholism and "was always highly intoxicated" from prior experiences with Paugh at the Jail and while Conley was a Vernal Police Officer. *Id.* at 108–09. On this occasion, Conley knew that Paugh was highly intoxicated, had seen a doctor at ARMC, and he was stable enough to be booked into the Jail. *See id.* 109–110. Around 6:30 a.m., Conley checked on Paugh and served him breakfast, but Paugh did not eat. *See id.* at 109; 85–3 at 113. Conley stated that "Paugh seemed well and normal." ECF No. 85–3 at 188. Eventually, Conley reviewed at least part of Paugh's medical file or otherwise learned that Paugh was experiencing alcohol withdrawal and became aware that Dr. Bradbury had written a prescription for Librium as part of his discharge instructions to treat Paugh's condition. *See* ECF No. 85–2 at 109–110.

Around 11:30 a.m., Conley told Fuller that Paugh needed his prescription for Librium. *Id.* at 120. Conley then began completing the Jail's booking and medical screening process with Paugh, over nine hours after Paugh had first arrived at UCJ. *Id.* at 109; *see also* ECF No. 85–3 at 188. Midway through the questionnaire, Paugh had to stop to run back to detox cell #1 and vomit. *See* ECF No. 85–2 at 109. Conley asked if Paugh was alright and "Paugh stated that he would

probably be fine for awhile [sic]," so Conley continued the booking process. ECF No. 85–3 at 188. On his screening questionnaire, Paugh affirmatively indicated to Conley that he was "currently going through withdrawals" from alcohol, was in "lots of pain from three broken ribs," had other medical problems from seizures, was feeling "restlessness/anxiety," and suffered from alcoholism. ECF No. 85–3 at 44–45. Conley never contacted medical professionals about Paugh's affirmative answers to the screening questionnaire, *see* ECF Nos. 85–2 at 110, despite Jail policy that required him to do so, *see* ECF No. 69–3 at 6. Instead, Conley simply returned Paugh to detox cell #1. *See* ECF No. 85–3 at 188.

At approximately 5:00 p.m., Fuller began providing evening medications but had to respond to an emergency before reaching Paugh. ECF No. 85–2 at 131. Fuller asked Conley to take over those responsibilities, including for Paugh's second dose of Librium, but Conley never gave Paugh his Librium during this shift. *See id.* at 112, 131; *see also* ECF No. 85–3 at 96. Additionally, despite Jail "head count" protocol that "[p]risoners should be individually observed in their living areas at least once each hour, and whenever possible, every 30 minutes," Conley did not check on Paugh from when he finished the screening questionnaire to around 5:30 p.m. *See* ECF No. 85–3 at 101. At that time, Conley picked up Paugh's dinner tray, and he "could see Inmate Paugh shaking pretty bad." ECF No. 85–3 at 188; *see also* 85–2 at 12, 111. Paugh also informed Conley at this time that his withdrawal "ha[d] not peaked yet." ECF No. 85–3 at 188; *see also* 85–2 at 13, 111. But Conley did not contact medical personnel about Paugh's worsening condition. In failing to do so, Conley ignored Dr. Bradbury's discharge instructions, which Conley understood to say that "if [an inmate's] condition -- if [an inmate] need[s] to come in for some reason or [their condition] worsens," then the inmate should "come back" to the hospital. ECF No. 85–2 at 113.

In sum, Conley knew that Paugh was at risk of acute alcohol withdrawal because he was a chronic alcoholic, was highly intoxicated when being booked into Jail, and answered affirmatively to medical screening questions indicating a high risk of a serious medical problem. Conley knew that Paugh had exhibited worsening symptoms throughout his shift, including vomiting and "shaking pretty bad," and that he was supposed to contact medical professionals if Paugh faced the risk of a serious medical problem, based both on the Jail protocols and Conley's understanding of Dr. Bradbury's discharge instructions. But Conley disregarded this risk and did nothing, thereby "prevent[ing] [Paugh] from receiving treatment or deny[ing] him access to *medical personnel capable of evaluating the need for treatment.*" *See Oxendine*, 241 F.3d at 1279 (quoting *Sealock*, 218 F.3d at 1211). In addition, after Fuller assigned medication duties to Conley, Conley ignored this responsibility to ensure that he or someone else gave Paugh his Librium, in violation of Jail policies concerning timely medication distribution and recordkeeping. *See* ECF Nos. 69–2 at 5; 69–3 at 1–2, 19.

Thus, resolving any factual disputes in Plaintiffs' favor, a reasonable jury could find that Conley was deliberately indifferent because of his "absolute failure" to (a) "follow the required protocols" concerning prescriptions and medical follow up on Paugh's affirmative answers to the screening questionnaire; (b) "contact the appropriate medical personnel" when he observed Paugh's condition worsening from morning to night; or (c) "attempt to assist [Paugh] in any fashion" during his shift. *See Mata*, 427 F.3d at 758. Accordingly, Conley is not entitled to qualified immunity.

### (d)     Fuller's Deliberate Indifference

Fuller was the designated medical officer during the July 24 day shift between 6:00 a.m. and 6:00 p.m. Although Fuller was in charge of distributing medications, he had no specific

medical training. *See* 85–2 at 120–22. Fuller learned that Paugh came to Jail highly intoxicated, had seen a doctor at ARMC, and was withdrawing from alcohol but was deemed stable enough to be booked into the Jail. *See id.* at 123–24. Fuller testified that he knew in July 2015 that nausea, tremors and shakiness, vomiting, and agitation were symptoms of alcohol withdrawal. *See id.* at 124–25.

Around 11:00 a.m., Fuller served Paugh lunch and juice. *Id.* at 120. Knowing that Paugh was experiencing alcohol withdrawal and seeing that Paugh had shakiness in his hand, *see id.* at 123, 128, Fuller instructed Paugh to drink fluids and stay hydrated, *id.* at 120. Afterward, Conley told Fuller that Paugh had a prescription for Librium and Fuller decided to fill the prescription. *Id.* at 124–25. At that time, Fuller also had access to Dr. Bradbury's discharge instructions, which were included with the prescription. *Id.* at 124–25. Fuller indicated that it was the first time he had ever seen an inmate come to the Jail with a prescription from the emergency room. *Id.* at 124. Fuller called the local pharmacy around 11:30 a.m. and he left the Jail to fill the prescription. *Id.* at 125.

Fuller returned to the Jail in the midafternoon and gave Paugh his first dose of medication around 1:40 p.m. *See* ECF Nos. 85–2 at 127; 85–3 at 93. As stated above concerning Bunnell, there is a dispute of material fact concerning whether Paugh received any Librium during his time in Jail. *Compare* ECF Nos. 85–2 at 95–96, 127; 85–3 at 93, 95; 97–2 at 1–2, *with* ECF Nos. 80–2 at 17–19; 85–2 at 21, 48, 126, 132–33; 85–3 at 69, 176. When Fuller gave Paugh some medication, Fuller observed that Paugh's "hands shook" during this encounter and that he "obviously [had] seen him shake" during the day. ECF No. 85–2 at 9, 129.

After this medication round, Fuller recognized that Dr. Bradbury's discharge instructions indicated that two Librium capsules needed to be given every two hours as needed, which

conflicted with the Jail's typical routine of distributing medications three times daily at "7:00 [a.m.], 12:00 [p.m.], and 5:00 [p.m.]." ECF No. 85–2 at 120. Fuller called Clark to ask about the proper dosage and intervals. *See* ECF Nos. 85–2 at 129; 85–3 at 62. Fuller and Clark disagree about the content of this phone conversation and the extent to which Fuller informed Clark about Paugh's condition and the nature of his Librium prescription. *Compare* ECF No. 85–2 at 128–32, *with* ECF No. 85–3 at 62–67. Clark attests that during this conversation, he asked Fuller how Paugh was doing, to which Fuller responded that Paugh "looks to be fine." ECF No. 85–3 at 62. Clark asked if Fuller saw "any symptoms of withdrawal" such as "any shaking, any issues like that?" *Id.* Fuller responded that he did not see any symptoms, specifying that Paugh "is walking around good," "has been eating," and "he hasn't been throwing up and seems to be doing good." *Id.* Fuller allegedly made these representations despite the fact that he personally saw Paugh shaking, knew Paugh was nauseous, and was aware that Paugh had been throwing up only a few hours earlier. *See* ECF Nos. 85–2 at 128–30. Moreover, Clark states that Fuller failed to inform him that Paugh was booked with a .324 blood-alcohol concentration, had been in the emergency room, and had received his Librium prescription from the emergency room physician, Dr. Bradbury. ECF No. 85–3 at 62–63.

Based exclusively on Fuller's description and Clark's understanding that Paugh was showing no alcohol withdrawal symptoms, Clark instructed Fuller to change Paugh's Librium dosage from two capsules every two hours "as needed" up to 300mg/day (Dr. Bradbury's instructions) to a dosage of one capsule three times daily (conforming with the Jail's typical medication protocol). *Id.* at 64. Clark also told Fuller that he "expected to be notified" if "there was any change to [Paugh's] symptoms." ECF No. 85–3 at 68. Fuller wrote Clark's new dosage instructions on the Librium prescription packaging. *Id.* at 94.

At approximately 5:00 p.m., Fuller was distributing dinner medications when he had to attend to a different inmate's emergency. ECF No. 85–2 at 131. Fuller asked Conley to continue distributing medications, including for Paugh's Librium, but neither Conley nor any other member of the Jail staff gave Paugh his Librium during this shift, and Fuller never confirmed that Paugh received his medication. *See id.* at 112, 131; *see also* ECF No. 85–3 at 96. Additionally, despite Jail "head count" protocol that "[p]risoners should be individually observed in their living areas at least once each hour, and whenever possible, every 30 minutes," Fuller did not check on Paugh in his cell from when he provided Paugh medication around 1:30 p.m. until the end of his shift. *See* ECF No. 85–3 at 101. At the end of his shift, Fuller conducted a "brief pass-along" with Deputy Alarid and spoke about Paugh, but Fuller did not fully inform Alarid about Paugh's worsening condition or Clark's expectation that Jail staff must notify him if there was any change to Paugh's symptoms. *See* ECF No. 85–2 at 121, 132. Additionally, Fuller did not conduct any pass-along with Bunnell, who was the designated medical officer for the July 24–25 night shift.

Based on these facts and taken in the light most favorable to Plaintiffs, a reasonable jury could conclude that Fuller was aware of a substantial risk to Paugh's health and was deliberately indifferent to that risk. Fuller was acting in a gatekeeper capacity for Paugh's medical care, and an official may "fulfill[] their gatekeeper duties by communicating the inmate's symptoms to a higher-up." *Burke*, 935 F.3d at 993 (citation, internal quotation marks, and alterations omitted). But it is "more than mere malpractice or negligence to fail to call" medical professionals in the face of a risk of serious medical need. *Mata*, 427 F.3d at 758 (internal quotation marks omitted). Under the same reasoning, a reasonable jury could conclude that Fuller's failure to fully or accurately inform Clark of Paugh's condition and about his prescription was deliberately indifferent. *See Estate of Booker*, 745 F.3d at 429 (holding that prison personnel "may thus be

69

liable under § 1983 for indifference manifested in their response to the prisoner's needs or by intentionally denying or delaying access to medical care or *intentionally interfering with treatment once prescribed*" (emphasis added)).

Moreover, there is a fact dispute concerning whether Fuller gave Paugh Librium. If Paugh was not given Librium and was instead given a different medication, such as Benadryl, a reasonable jury could find that Fuller was reckless in giving Paugh the wrong medication. Finally, a reasonable jury could find that Fuller disregarded the substantial risk of harm to Paugh when he failed to relay during the pass-along to either Alarid or Bunnell the information and instructions from Clark to call him if Paugh's condition changed. In doing so, Fuller also "prevent[ed] [Paugh] from receiving treatment or den[ied] him access to *medical personnel capable of evaluating the need for treatment.*'" *Oxendine*, 241 F.3d at 1279 (quoting *Sealock*, 218 F.3d at 1211) (emphasis in original). Therefore, qualified immunity for Fuller is unwarranted.

### (e)   Gowen's Deliberate Indifference

Gowen was the shift supervisor during the July 24 day shift between 6:00 a.m. and 6:00 p.m., which meant that he was authorized "to determin[e] whether a prisoner brought into the jail requires medical attention." ECF No. 69–1 at 4. When Gowen started his shift, he knew that Paugh came to Jail highly intoxicated, had seen a doctor at ARMC beforehand, and was experiencing alcohol withdrawal but was deemed stable enough to be booked into the Jail. *See* ECF Nos. 85–2 at 5; 85–3 at 109. At some point in the morning, Gowen reviewed Dr. Bradbury's discharge instructions and Paugh's prescription for Librium. ECF No. 85–3 at 107.

Gowen was present in the booking area and seated nearby when Conley conducted the medical screening questionnaire with Paugh around 11:30 a.m. *Id.* at 111. Thus, taking the factual inferences in favor of Plaintiffs, Gowen also knew of Paugh's affirmative answers to the medical

screening questionnaire and was aware that Paugh vomited midway through his answers. Despite Jail policy to do so, *see* ECF No. 69–3 at 6, Gowen did not contact medical professionals about Paugh's questionnaire answers or direct Conley to do so, *see* ECF No. 85–3 at 110–11.

Around lunchtime between 11:00 a.m. and 12:00 p.m. on July 24th, Gowen observed Paugh and saw that both of his hands and his forearms were shaking. ECF No. 85–3 at 109. Gowen also stated that he knew Paugh had "retched," or dry-heaved "two or three times" over "two or three hours" time. *Id.* at 111. Gowen stated that he looked over at Paugh's cell from his desk periodically throughout the shift and recalled that Paugh "was sleeping the majority of the time" in the cell, although Gowen recognized that the light being off in the cell caused reduced visibility and he did not get up to specifically observe Paugh. *See id*.

At approximately 4:00 p.m., Gowen served Paugh dinner. ECF No. 85–3 at 93, 111. Gowen recalled speaking with Paugh, who stated that "he had not hit his peak yet" for his alcohol withdrawal symptoms and that he was "feeling sick and nauseous." *See id.* at 95, 114, 118. Gowen also observed on multiple instances that Paugh had tremors, both of his hands and forearms were "visibly shaking," he had "puked throughout the day," was "dry-heaving," Gowen "heard him retching" several times, he was not eating, and he was overall "really sick from detoxing while at . . . the jail." *See id.* at 95, 111–114, 118. But Gowen did not speak to or monitor Paugh for the rest of his shift. ECF NO. 85–2 at 6. During pass-along between the day shift and night shift, Gowen recalled that he instructed Anderson to monitor Paugh's symptoms and believes he would have shown her Dr. Bradbury's discharge instructions. ECF No. 85–3 at 113–14.

Gowen affirmed that he understood Dr. Bradbury's discharge instructions to mean that Paugh needed to return to the hospital if there was "worsening of his condition." ECF No. 85–3 at 107. Gowen also understood in July 2015 that alcohol withdrawal could result in death. ECF No.

85–3 at 111. However, Gowen stated that it was not his standard practice to take inmates to the hospital with signs of alcohol withdrawal such as those Paugh exhibited. *See id.* at 108. Gowen described that "[o]ver the years we expect [inmates withdrawing from alcohol] to get the shakes and fevers and vomit some," and if this occurred, he "would contact the nurse or [Clark]" to describe the inmate's symptoms and oblige their follow-up advice rather than take the inmate to the hospital. *Id.* at 107–08. However, Gowen never made a call to a Jail nurse or to Clark concerning his observation of Paugh's worsening symptoms. *Id.* at 111.

Viewing the disputed facts and inferences in favor of Plaintiffs, a reasonable jury could find that Gowen acted with deliberate indifference. A reasonable jury could find that the "symptoms displayed" during the period when Paugh was under Gowen's supervision—such as tremors, uncontrolled shaking in the hands and forearms, vomiting, restlessness and anxiety, repeated "retching" or dry-heaving, not eating despite having an appetite, and feeling nauseous— were "such that [Gowen] knew the risk to [Paugh] and chose (recklessly) to disregard it" by his decision not to do any checks of Paugh's vitals, ask Paugh about his symptoms, or send Paugh back to ARMC. *See Mata*, 427 F.3d at 753. Further, a reasonable jury could find that Gowen's failure to call Clark, despite his testimony that his practice was to do so for inmates in Paugh's condition, evinces that he "abdicated [his] gatekeeping role[] by failing to relay the problem to medical staff." *See Burke*, 935 F.3d at 994. Moreover, Gowen knew of Paugh's affirmative answers on the screening questionnaire that showed him to have a higher risk of severe alcohol withdrawal, which Gowen understood could result in death. Gowen's understanding and disregard of this risk could also demonstrate deliberate indifference, given that "the relevant question is the *risk* of substantial harm, not whether the official knew of the specific medical condition causing the symptoms presented by the prisoner." *Kellum*, 657 F. App'x at 770 (citing *Farmer*, 511 U.S.

at 842). In sum, Gowen is not entitled to qualified immunity because a reasonable jury could find that he knew Paugh "face[d] a substantial risk of serious harm and disregard[ed] that risk by failing to take reasonable measures to abate it." *See Farmer*, 511 U.S. at 847.

### (f)   Riddle's Lack of Deliberate Indifference

Riddle first became involved in Paugh's care around 2:00 a.m. on July 25th after he took over Bunnell's duties in the booking area nearby Paugh's cell. *See* ECF Nos. 85–2 at 49, 60–61; 85–3 at 96. In July 2015, Riddle was still in training and had been working at the Jail for less than two months. ECF No. 85–2 at 55. Neither Bunnell nor Anderson informed Riddle that Paugh was withdrawing from alcohol and at that time, Riddle had not been trained on how to review Paugh's medical files. *Id.* at 61–62. When Riddle was at the counter near booking cell #3, Paugh had either lost consciousness or was asleep, and Riddle stated that he could see Paugh laying down in booking cell #3 and when he "glanced" at Paugh's cell from the desk. *See id.* at 64, 68. Riddle did not go over to booking cell #3 to check on Paugh during his shift. *See id.* at 68–69.

Plaintiffs "concede that there is insufficient evidence from which a jury could conclude that Riddle was deliberately indifferent" to Paugh's serious medical need. ECF No. 85 at 62. The court agrees because "deliberate indifference is assessed at the time of the alleged omission," *Estate of Booker*, 745 F.3d at 433, and during his monitoring of Paugh, Riddle knew nothing about Paugh's condition or symptoms. Therefore, Riddle is entitled to qualified immunity.

### (iii)   Causation

The court must also address causation because Plaintiffs allege that Paugh suffered from an objectively serious medical need in part because his death "was caused by a delay in medical treatment." *See Al-Turki*, 762 F.3d at 1193. As described above, a reasonable jury could find that Anderson, Bunnell, Conley, Fuller, and Gowen were deliberately indifferent based on their delay

in providing Paugh access to medical care, among other conduct. Although there is no "bright-line rule for when expert medical testimony is required in a prisoner medical-treatment case" to establish causation from a delay in medical care, such testimony can help "a reasonable jury 'to determine that the delay caused additional harm.'" *King v. Patt*, 525 F. App'x 713, 721–22 (10th Cir. 2013) (unpublished) (quoting *Ortiz v. City of Chicago*, 656 F.3d 523, 535 (7th Cir. 2011)); *see also Mata*, 427 F.3d at 757 (considering expert affidavits concerning delay in providing medical care); *Zartner v. Miller*, 760 F. App'x 558, 564 (10th Cir. 2019) (unpublished) (finding expert testimony helpful when "causation entails a medical question beyond a layperson's ordinary experience" (citation omitted)).

Here, Plaintiffs' expert Dr. Porsa opined that Paugh would not have died if he had received monitoring, timely medical treatment, or his Librium as prescribed. *See* ECF No. 80–2 at 2. Defendants have presented no evidence to controvert this causation conclusion. Therefore, a reasonable jury could find that the individual defendants' deliberate indifference in their delay or denial of medical care to Paugh caused the harms that befell Paugh, including his death.

### D.   MUNICIPAL LIABILITY

Plaintiffs also pursue municipal liability claims against Uintah County under Section 1983. A municipality is subject to liability for the constitutional violations of its employees only if the municipality had a "policy or custom" that caused the violation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). However, "a municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be liable under § 1983 on a respondeat superior theory." *Id.* at 691. The Tenth Circuit has distilled Section 1983 municipal liability claims into three elements: "(1) official policy or custom, (2) causation, and (3) state of mind." *Schneider*, 717 F.3d at 769.

Here, disputes of material fact preclude entering summary judgment in favor of Uintah County on Plaintiffs' municipal liability claims. *See Olsen*, 312 F.3d at 1318 ("With regard to any attempted showing of deliberate indifference by a municipality, the existence of material issues of material fact precludes summary judgment." (citation, internal quotation marks, and alterations omitted)). Namely, the parties dispute the extent to which Sheriff Norton, the chief policymaker, or his delegated policymaking authorities such as Jail Commander Irene Brown, were aware of the medical policy, custom, or training deficiencies in the Jail and made conscious choices based on that awareness. The parties also dispute the facts concerning the Jail's custom of officers not calling medical professionals in response to worsening withdrawal or other health conditions, as well as not calling medical professionals after an inmate provided affirmative responses to medical screening questionnaires. Moreover, the parties dispute the amount of training Jail staff received concerning the CIWA form or any other monitoring of alcohol withdrawal, particularly during the period when Nurse Smith went on maternity leave and designated medical officers.

Resolving these factual disputes in Plaintiffs' favor, Plaintiffs have presented sufficient evidence for a reasonable jury to find that Uintah County may be liable for its inadequate training, various customs that amounted to informal policies, and failure to enact any policies concerning alcohol withdrawal. A reasonable jury could conclude that these customs and policies (or lack thereof) were the moving force behind the individual officers' treatment of Paugh constituted constitutional violations. And a reasonable jury could find that Uintah County maintained these policies and customs, or failed to enact necessary policies, with objective deliberate indifference to a known or obvious risk of constitutional violations. Therefore, Uintah County is not entitled to summary judgment.

### 1.      Policy or Custom

Plaintiffs must first identify a challenged municipal "policy or custom." *Burk*e, 935 F.3d at 999. Such a policy or custom may be written or unwritten, and even a single decision by a municipal policymaker or single instance of unconstitutional conduct may represent a policy for purposes of municipal liability. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986); *see also Carr v. Castle*, 337 F.3d 1221, 1229 (10th Cir. 2003) (stating that even "a single incident of [a violation of constitutional rights] can establish the existence of an inadequate training program if there is some other evidence of the program's inadequacy" (citation omitted)).

A municipal policy or custom may take the form of:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (citations, internal quotation marks, and alteration omitted). In addition, a municipality may form a policy or custom through its failure to act in certain circumstances. As the Tenth Circuit has recognized, a municipality is liable if it "has actual or constructive notice that its action or *failure to act* is substantially certain to result in a constitutional violation." *Barney v. Pulsipher*, 143 F.3d 1299, 1307–08 (10th Cir. 1998) (citing *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 407 (1997)) (emphasis added). Such a "failure to act" that would expose the municipality to liability can include failing to establish a policy to prevent a pattern or obvious risk of constitutional violation by its employees. *See id.* at 1308; *see also id.* at 1309 n.8 (recognizing a cause of action if a municipality "fail[s] to adopt various policies to

adequately protect" a class of persons). Multiple circuit courts have also explicitly recognized a failure-to-adopt-a-policy claim for municipal liability.[21] As the Ninth Circuit summarized:

> [A] plaintiff can allege that through its *omissions* the municipality is responsible for a constitutional violation committed by one of its employees, even though the municipality's policies were facially constitutional, the municipality did not direct the employee to take the unconstitutional action, and the municipality did not have the state of mind required to prove the underlying violation.

*Gibson v. County of Washoe, Nev.*, 290 F.3d 1175, 1186 (9th Cir. 2002) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387–89 (1989)), *overruled on other grounds by Castro*, 833 F.3d at 1076.

Finally, when the plaintiff alleges that widespread or well-settled customs amount to informal policies, it is of no moment that the alleged customs are contrary to written policies. This is because "a 'paper' policy cannot insulate a municipality from liability where there is evidence . . . that the municipality was deliberately indifferent to the policy's violation." *Daskalea v. District of Columbia*, 227 F.3d 433, 442 (D.C. Cir. 2000) (citation omitted); *see also Garcia v. Salt Lake County*, 768 F.2d 303, 306 (10th Cir. 1985) (finding that "[d]espite [three written] policy statements" concerning the admission of intoxicated inmates, the jail had a cognizable contrary "policy or custom" of not following the written policies).[22]

---

[21] *See, e.g.*, *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 585 (3d Cir. 2003); *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011); *Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019); *Szabla v. City of Brooklyn Park, Minnesota*, 486 F.3d 385, 390 (8th Cir. 2007) (en banc); *Oviatt ex rel. Waugh v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992). Also, as the Sixth Circuit has observed, "the harm alleged and the analysis required under the failure-to-train theory [of municipal liability] are functionally indistinguishable from the harm [the plaintiffs] allege and the analysis [applied] . . . under the failure-to-adopt-a-policy theory." *Jackson*, 925 F.3d at 828.

[22] Other courts of appeal have recognized a similar rule. *See, e.g.*, *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 929 (7th Cir. 2004) ("[I]gnoring a policy is the same as having no policy in place in the first place."); *Ware v. Jackson County*, 150 F.3d 873, 882 (8th Cir. 1998) ("[W]ritten

Here, Plaintiffs challenge Uintah County's policy or custom of (1) "fail[ing] to adequately train or supervise employees regarding the proper procedure to follow in dealing with alcohol withdrawal in the jail;" (2) maintaining the widespread practices of "not following up on medical screening," "not notifying its contract medical providers of inmates' medical needs" and "not following their advice," not doing "head counts" or using available withdrawal forms to check on "the medical needs of inmates who were undergoing alcohol withdrawal," and not having any trained medical professional on site; and (3) failing to have any policy, procedure, or protocol for dealing with inmates going through alcohol withdrawal. *See* ECF No. 85 at 48–50.

### (i)    Training

Plaintiffs first identify Uintah County's "fail[ure] to adequately train or supervise employees regarding the proper procedure to follow in dealing with alcohol withdrawal in the jail" as a policy for its municipal liability claims. *See* ECF No. 85 at 48. Even though the Jail's written policies required officers to have training in the signs and symptoms of emergency health conditions, *see* ECF No. 69–3 at 23, it is undisputed that no individual officer in this case had training or guidance concerning how to monitor, evaluate, or treat alcohol withdrawal, *see* ECF Nos. 85–2 at 35 (Anderson), 76 (Commander Brown), 100–102 (Bunnell), 114–15 (Conley), 121–22 (Fuller); 85–3 at 115 (Gowen).[23] This is despite the fact that officers had access to a CIWA form

---

policies of a defendant are of no moment in the face of evidence that such policies are neither followed nor enforced.").

[23] The court notes that Nurse Smith declared: "As a jail nurse prior to Coby Paugh's death, I would often educate jail officers on how to look for worsening symptoms and informed them how to use an Alcohol Withdrawal Assessment Flow Sheet (also called CIWAs) that could help them track symptoms during hours where there was no jail nurse on staff." ECF No. 99 at 3. However, as previously discussed, the court disregards this testimony under local rules and due process requirements because it was presented to the court only as an attachment to Defendants' reply brief and does not "rebut a claim that a material fact is in dispute." DUCivR 56-1(d). If anything, Nurse Smith's declaration does the opposite and indicates that there is a material dispute of fact concerning the extent Uintah County trained its jail officers to monitor alcohol withdrawal. In any

located in the front cover of the binder used when distributing medications to inmates. *See, e.g.*, ECF Nos. 85–2 at 14; 85–3 at 57. The Tenth Circuit has repeatedly recognized that providing inadequate training or no training can amount to a municipality's policy or custom if "the county can reasonably be said to have been deliberately indifferent to the need for additional training." *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010) (alterations omitted); *see also Burke*, 935 F.3d at 999 (identifying a policy for municipal liability when the jail "staff were inadequately trained"). Thus, Plaintiffs have adequately identified inadequate alcohol withdrawal training as a municipal policy.

### (ii)     Informal Customs

Second, Plaintiffs allege that Uintah County "had informal customs amounting to practices so widespread as to have the force of law," including not following up with medical professionals on inmates' medical needs, as indicated by the inmates' symptoms or affirmative answers to the screening questionnaire; not following the advice of medical professionals; not monitoring the welfare of inmates withdrawing from alcohol in the booking area; and not having a medical professional on-site at the Jail to provide treatment. ECF No. 85 at 48–49. "The custom or practice giving rise to liability must be so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." *Burke*, 935 F.3d at 998 (citation and internal quotation marks omitted). Specifically, the Tenth Circuit has permitted municipal liability claims against a county that "maintained a policy or custom of insufficient medical resources and training, chronic delays in care, and indifference toward medical needs at the jail." *Id.* at 999. Further, as stated above, "a

---

event, Nurse Smith's general statement about CIWA training also does not speak to whether the officers in this case (Anderson, Bunnell, Conley, Fuller, Gowen, and Riddle) received training on CIWA monitoring, which the officers attest they did not.

'paper' policy cannot insulate a municipality from liability where there is evidence, as there was here, that the municipality was deliberately indifferent to the policy's violation." *Daskalea*, 227 F.3d at 442; *Garcia*, 768 F.2d at 306 (applying a similar rule).

### (a)  Follow Up with Medical Professionals

Widespread "fail[ure] to timely address or follow-up on inmates' medical issues" may amount to a municipal policy. *Burke*, 935 F.3d at 999. Here, disputes of material fact concerning whether Jail staff have a widespread practice of not following up with medical professionals about inmate's worsening symptoms or affirmative answers to the screening questionnaire preclude summary judgment. Viewing these disputed facts in the light most favorable to Plaintiffs, however, a reasonable jury could find that UCJ officers' failure to conduct follow up and contact medical professionals when faced with indications of a serious medical need is so customary as to represent Jail policy. *See, e.g.*, ECF Nos. 85–2 at 89 & 96 (Bunnell), 110 (Conley), 130 (Fuller); 85–3 at 57–58 & 70 (Clark), 110–111 (Gowen).

### (b)  Overriding or Ignoring Medical Advice

Additionally, Plaintiffs argue that there was a widespread practice of overriding the advice of medical professionals that amounted to the municipality's policy. However, the record does not contain sufficient facts for a reasonable jury to find that the practice of officers overriding medical professionals is so widespread as to reflect municipal policy. In other words, the record does not provide indicia of a widespread practice of officers overriding or ignoring the advice of medical professionals beyond the individual officers who did so in denying or delaying medical care to Paugh. Thus, Plaintiffs have not established a municipal policy or custom based on a widespread practice of officers overriding or not following the advice of medical professionals.

80

(c)        **Monitoring Withdrawing Inmates in Booking**

Next, Plaintiffs argue that the Jail developed an informal policy of not doing hourly head counts or regularly checking on the welfare of inmates in the booking area. ECF No. 85 at 49. A Jail policy of examining inmates "solely through an external visual examination" may be constitutionally deficient. *See Burke*, 935 F.3d at 1000. It is undisputed that many Jail officers believed it was customary not to specifically check on the medical needs of inmates detained in the booking area. *See, e.g.*, ECF Nos. 85–2 at 36 & 43 (Anderson), 61 & 68 (Riddle), 90 & 99 (Bunnell), 114 (Conley); 85–3 at 111 (Gowen). However, there are disputes concerning the degree to which this custom was widespread as well as whether Sheriff Norton or his policymaking delegates for the Jail, including Commander Brown, knew of and acquiesced in this practice. *See, e.g.*, ECF Nos. 85–2 at 43, 75–76; 85–3 at 37, 130. Viewing the disputed facts and inferences in Plaintiffs' favor, a reasonable jury could determine that the Jail had an informal policy of not conducting individual head counts or health assessments of inmates detained in the booking area.

Along similar lines, Plaintiffs identify as a municipal policy the "widespread practice of ignoring the medical needs of inmates who were undergoing alcohol withdrawal" by not conducting formalized monitoring, such as through the CIWA form. ECF No. 85 at 49. It is undisputed that the Jail officers did not use the CIWA form or any other evaluative tool to monitor and address worsening alcohol withdrawal during Paugh's time in the Jail. *See* ECF Nos. 85–2 at 35 (Anderson), 59 (Riddle), 76 (Commander Brown), 100–102 (Bunnell), 114–15 (Conley), 121–22 (Fuller); 85–3 at 115 (Gowen). However, the parties dispute whether the officers had access to the CIWA form in their medical binders or had been directed and trained to use the form to evaluate alcohol withdrawal before Paugh's death. *See, e.g.*, ECF Nos. 85–2 at 14, 73; 85–3 at 36, 57, 99 at 4–5. It is also disputed to what extent municipal policymakers may have been aware of and ratified

the lack of formalized monitoring through an evaluative tool such as CIWA. *See, e.g.*, ECF No. 85–3 at 36, 58–62, 70, 74, 88–89, 130. Viewing these disputed facts and inferences in favor of Plaintiffs, a reasonable jury could find that not having, using, or providing training for an alcohol withdrawal assessment tool such as CIWA was the Jail's policy or custom.

### (d)    On-Site Medical Staffing

Finally, Plaintiffs argue that the Jail had an informal policy or custom of not having any on-site medical staff around the time that Paugh died. ECF No. 85 at 49. Specifically, Plaintiffs contend that the Jail "knew for months that its only nurse was going on maternity leave, and the only plan it came up with to replace her was to 'train' a few designated officers as 'medical officers,' which basically meant that they could pass out medications to inmates." *Id.* Having "no physician present at the jail most of the time" may form the Jail's policy and provide indicia of deliberate indifference to the risk of constitutional violations. *Garcia*, 768 F.2d at 308; *see also Burke*, 935 F.3d at 999 (recognizing a municipal policy when "the jail's medical operation was understaffed").

The parties do not dispute that UCJ had a policy of only having nursing staff on site during the day shift. *See* ECF No. 85–2 at 34, 37, 44, 57, 121; 85–3 at 55. The Jail also had a contract with off-site care providers, PA Clark and Dr. Tubbs, to be available by phone for a Jail officer to call in the event of an emergency and to conduct weekly visits on Thursday. ECF No. 85–3 at 40–41. On July 11, 2015, Nurse Smith (the only nurse on staff) went on maternity leave. ECF No. 99 at 4. This led to the "fairly new" policy of titling certain correction officers as the "designated medical officers" for a shift to be in charge of inmates' medical care and decisions, even though the officers did not have any medical certifications, licensing, or training. ECF No. 85–2 at 121; *see also* ECF No. 85–3 at 107 (Gowen describing designated medical officers policy). Sherriff

Norton explicitly ratified this informal policy of not having any medical staff on site at UCJ. ECF No. 85–3 at 135–37. Thus, a reasonable jury could find that the Jail operating with an understaffed medical operation, including having no licensed, certified, or trained medical professionals on-site at the Jail, amounted to the municipal policy.

### (iii)    Lack of Alcohol Withdrawal Protocols

A municipality may form a policy or custom through its failure to act in certain circumstances. A municipality is responsible for both "its action or *failure to act*" when doing so "is substantially certain to result in a constitutional violation." *Barney*, 143 F.3d at 1307–08. Thus, a municipality's omission or failure to have a policy can itself represent a policy for *Monell* liability. *See id.* at 1309 n.8 (recognizing a cause of action for "fail[ing] to adopt various policies to adequately protect" a class of persons); *Stella v. Davis Cty.*, No. 1:18-CV-002, 2019 WL 4601611, at *13 (D. Utah Sept. 23, 2019) (unpublished) (concluding that a policymaker's "decision to operate the jail without a written medical policy" itself constitutes an actionable policy). Here, it is undisputed that the Jail operated without any policy or directives, formal or informal, establishing the protocols officers should follow for inmates experiencing alcohol withdrawal. *See, e.g.*, ECF Nos. 85–2 at 19, 73; 85–3 at 145. A reasonable jury could determine that this omission "amounts to an intentional choice, not merely an unintentional negligent oversight." *See Canton*, 489 U.S. at 390.

### 2.    Causation

Second, Plaintiffs must establish that a reasonable jury could conclude that Uintah County's policies and customs were "the 'moving force' behind the injury alleged" or that there is "a direct causal link" between the municipality's action or inaction and the deprivation of Paugh's constitutional rights. *See Brown*, 520 U.S. at 404–05 (citations omitted). Although there is no "absolute[] requir[ement]" in the Tenth Circuit for "expert testimony to establish causation in an

Eighth Amendment medical-treatment claim," *Kellum*, 657 F. App'x at 771, such testimony may be instructive on this issue. Here, both of Plaintiffs' experts testified that without Uintah County's deficient training, resourcing, staffing, and protocols concerning alcohol withdrawal and monitoring, Paugh would have received the treatment he needed and not experienced the alleged constitutional violations. *See* ECF Nos. 80–2 at 2, 20; 81–2 at 30–31. Specifically, Dr. Porsa opined that Uintah County's policies and customs of not having a medical professional on site, failure to adequately train or provide resources for officers to evaluate and address serious medical needs, and failure to have any "protocols specifically regarding the treatment of inmates experiencing withdrawal from alcohol" resulted in the "highly predictable consequence" of Paugh's death. ECF No. 80–2 at 9–11.

Beyond Plaintiffs' expert witnesses' opinions, Plaintiffs have also provided sufficient evidence for a reasonable jury to find causation from the medical records and testimony of the individual defendants. *See Ortiz*, 656 F.3d at 535 (holding that "a jury could infer," causation in a Section 1983 medical need claim "based on medical records and witness testimony"). Anderson attested to her belief that, with different training and protocols, she "would probably [have] check[ed] [Paugh's] vital signs more often and communicate[d] with the nurse myself more" about seeking care for Paugh. ECF No. 85–2 at 44. Bunnell came to a similar conclusion, stating that he would have understood that Paugh was experiencing worsening alcohol withdrawal and would have called medical providers about his condition if not for Uintah County's lack of training and policies in July 2015. *See id.* at 103. When asked about the CIWA protocol score and his training on what he should do if an inmate's "withdrawal is getting worse," Conley stated that he now knew he should "[c]all the nurse or the doctor, or notify the nurse if she's there" about an inmate's worsening condition. *Id.* at 115. Similarly, when asked "[i]f Coby Paugh had been given CIWA

during [his] shift on July 24th at the beginning and had gotten a score, and then in the middle and end of shift that score had gotten higher, even if just by a few points," Gowen responded that he "would have contacted medical." ECF No. 85–3 at 116. Thus, a reasonable jury could find that absent Uintah County's constitutionally deficient medical policies, staffing, resourcing, and training, municipal employees would have monitored Paugh, recognized his increased symptoms of alcohol withdrawal, and sought further care before his death.

### 3.       Deliberate Indifference

Second, Plaintiffs must establish that a reasonable jury could conclude that Uintah County maintained these identified policies or customs with deliberate indifference. Unlike in the individual liability context, a municipality's deliberate indifference is defined objectively, in part because of the "considerable conceptual difficulty [that] would attend any search for the subjective state of mind of a governmental entity, as distinct from that of a government official." *Farmer*, 511 U.S. at 841 *see also Barney*, 143 F.3d at 1307 n.5 (discussing the deliberate indifference distinction). Moreover, contrary to Plaintiffs' urging, *Kingsley v. Hendrickson* has no bearing on the municipal liability analysis because the "state-of-mind standard for a municipality is deliberate indifference regardless of the nature of the underlying constitutional violation." *Schneider*, 717 F.3d at 771 n.5; *see also Aus v. Salt Lake Cty.*, No. 2:16-CV-0266, 2019 WL 3021217, at *11 n.23 (D. Utah July 10, 2019) (unpublished) (recognizing that *Kingsley* does not affect the municipal liability analysis).

Accordingly, to hold Uintah County liable, Plaintiffs must prove that the County maintained the identified policies or customs that caused the underlying constitutional violations with "deliberate indifference . . . [to] a known or obvious" risk of violation to inmates' constitutional rights. *Brown*, 520 U.S. at 410 (citing *Canton*, 489 U.S. at 388). A municipality may be found deliberately indifferent "absent a pattern of unconstitutional behavior if a violation of

federal rights is a 'highly predictable' or 'plainly obvious' consequence of a municipality's action or inaction . . . thus presenting an obvious potential for constitutional violations." *Barney*, 143 F.3d at 1307–08 (citing *Brown*, 520 U.S. at 409, and *Canton*, 489 U.S. at 390 & n.10). Stated differently, the need for a municipality to have sufficient policies, training, resourcing or staffing in the face of a high risk of constitutional violation "can be said to be 'so obvious,' that failure to [have these sufficient policies] could properly be characterized as 'deliberate indifference' to constitutional rights." *See Canton*, 489 U.S. at 390; *see also Brown*, 520 U.S. at 407 (holding that decisionmakers' "continued adherence to an approach they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability.").

For example, in *Olsen v. Layton Hills Mall*, the Tenth Circuit recognized that a County may "manifest[] deliberate indifference by failing to train its jail's . . . officers to recognize [a common serious medical need] and handle sufferers appropriately." 312 F.3d at 1319. In *Olsen*, a jail admittee with obsessive-compulsive disorder (OCD) received inadequate medical care that resulted in him experiencing multiple panic attacks and other mental anguish while detained. *Id.* at 1310–11. After finding that a reasonable jury could conclude the individual officers violated the plaintiff's constitutional rights, the court also concluded that a reasonable jury could find the municipality maintained constitutionally deficient training and procedures with deliberate indifference to an obvious risk of rights violations. *See id.* at 1319–1320. Specifically, the court recognized that having training and protocols that "left [officers] with discretion in determining whether an inmate suffers from a psychological disorder requiring medical attention" was deliberately indifferent to a "plainly obvious consequence" of constitutional violations because "one could hardly deem [OCD] an obscure disorder." *Id.* (quotations omitted).

Likewise in *Garcia v. Salt Lake County*, the Tenth Circuit held that a municipality's "[d]eliberate indifference to serious medical needs may be shown by proving there are such gross deficiencies in staffing, facilities, equipment, or procedures that the inmate is effectively denied access to adequate medical care." 768 F.2d at 308 (citing *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980)). The court determined that the Jail's informal policy of admitting unconscious, intoxicated inmates, despite having a formal policy to the contrary, subjected the municipality to liability because its failures in having "no physician present at the jail most of the time" and maintaining inadequate "staffing and procedures to monitor persons admitted to the jail in an unconscious condition who are suspected of being intoxicated" amounted to deliberate indifference to an obvious risk of constitutional violations. *Id.*

In *Burke v. Regalado*, the Tenth Circuit recently ruled similarly to the court in *Garcia* based on like considerations. 935 F.3d at 1000–01. The court found that a sheriff's "continuous neglect" of the "deficient medical care at the jail characterized by inadequate training, understaffing, and chronic delays" amounted to deliberate indifference and "was the moving force behind the injury alleged." *Id.* at 1001 (quoting *Brown*, 520 U.S. at 405).

As recognized in *Olsen*, *Garcia*, and *Burke*, a reasonable jury could find that Uintah County maintained the identified policies and customs in training, resourcing, staffing, and monitoring protocols concerning alcohol withdrawal with objective deliberate indifference to a known or obvious risk of constitutional violations. Concerning a known risk, there remain genuine disputes of material fact as to whether Sheriff Norton, as the municipal policymaker, or his policymaking delegates such as Commander Brown, knew of the Jail's deficiencies as to medical care in general and treatment for alcohol withdrawal in particular. *See Olsen*, 312 F.3d at 1318 ("With regard to

any attempted showing of 'deliberate indifference' by a municipality, the existence of 'material issues of material fact preclude[s] summary judgment.'" (citation omitted)).

Viewing these disputed facts in favor of Plaintiffs, a reasonable jury could determine that Uintah County policymakers knew of the above-described deficiencies in the Jail's policies for providing medical care and were deliberately indifferent to a known risk of constitutional violations. For example, Clark "voiced [his] concern" to policymakers "that someone—there would be a bad outcome if [jail officials] did not change their ways" regarding alcohol withdrawal monitoring, but he saw "minimal to no improvement" in the Jail leading up to Paugh's death. ECF No. 85–3 at 60–62. Clark's call for policy changes became especially urgent after another inmate, Jeremy Hunter, died in the Jail in December 2014 (seven months before Paugh) after officers did not contact assigned medical professionals or had otherwise acted to delay Hunter's care. *See id.* at 70.[24]

Sheriff Norton recognized that Clark had raised concerns about medical care in the Jail before Paugh died, *id.* at 137–39, stated that upon becoming Sheriff, he "really questioned [the Jail's] medical," *id.* at 131, and stated that he knew people withdrawing from alcohol were "going through hell" in the Jail, *id.* at 133. But Sheriff Norton admitted that he did nothing to improve the Jail's alcohol withdrawal protocols and training leading up to Paugh's death. Specifically, Sheriff Norton stated that instead of addressing medical or alcohol withdrawal deficiencies in the jail, he "did not do anything, put any memos out or anything like that to talk about that subject matter, no." *Id.* at 145. Indeed, a reasonable jury could find that the medical care standards in the Jail

---

[24] *See Estate of Hunter by Hunter v. Uintah County*, 807 F. App'x 868, 871–72 (10th Cir. 2020) (unpublished) (finding that the individual officers in that case did not exhibit subjective deliberate indifference but declining to address municipal liability concerns after finding the plaintiffs waived that claim).

actually *worsened* after Hunter's death because by July 2015, the Jail had no medical professionals on site and left all medical monitoring and evaluation to the discretion of untrained and unlicensed jailers. Thus, disputed issues of material fact exist concerning whether Uintah County was deliberately indifferent to a known risk of constitutional violations based on inadequate health care, and specifically for alcohol withdrawal.

A reasonable jury could also find that the municipality was deliberately indifferent to an obvious risk of constitutional violations. For example, there is an obvious need to have proper training and protocols for officers admitting inmates with certain mental health disorders, such as OCD, into a Jail. *See Olsen*, 312 F.3d at 1318–20. Similarly here, alcohol withdrawal is a recurring problem in correctional facilities that presents an obvious potential for constitutional violations by individual officers without proper training, resources, staffing, and protocols. Alcohol withdrawal is the third highest cause of jail deaths both nationwide and in Utah, accounting for six percent of all jail deaths in the state between 2013 and 2017. ECF Nos. 80–2 at 4; 85–3 at 153. Specific to UCJ, Nurse Smith affirmed that after suicidal ideation, alcohol withdrawal is the second most common life-threatening medical condition in the jail. ECF No. 101–1 at 6. Moreover, Plaintiffs' experts emphasize the universal prevalence of alcohol withdrawal in the carceral context. *See* ECF Nos. 80–2 at 2; 81–2 at 30. Dr. Porsa also criticized that the Jail "only rel[ied] on an off-site independent contractor PA Logan Clark" for medical care while Nurse Smith was on maternity leave, and that it was a "highly predictable consequence" of this practice that someone would die in the Jail from a serious medical need, such as Paugh. ECF No. 80–2 at 10. Therefore, like OCD in *Olsen*, "one could hardly deem [alcohol withdrawal] an obscure disorder" for which the Jail could not have known it needed to have policies and training. *See* 312 F.3d at 1319.

In any event, the question of whether a risk of violations is obvious such that "a local government has displayed a policy of deliberate indifference to the constitutional rights of its citizens is generally a jury question." *Gibson*, 290 F.3d at 1194–95; *see also Olsen*, 312 F.3d at 1320 (finding that "[d]eliberate indifference . . . is a question for the jury" concerning a municipal liability claim involving an alleged obvious failure to train); *Natale*, 318 F.3d at 584–85 (leaving for the jury to decide whether a county jail's "failure to establish a policy to address the immediate medication needs of inmates with serious medical conditions creates a risk that is sufficiently obvious as to constitute deliberate indifference to those inmates' medical needs").

In sum, genuine disputes of material fact preclude entry of summary judgment in favor of Uintah County. Viewing the facts and inferences in favor of Plaintiffs, a reasonable jury could find that Uintah County operated the Jail under the identified policies or customs, those policies or customs were the moving force behind the constitutional violations and harm Paugh suffered, and the municipality maintained the policies or customs with deliberate indifference to a known or obvious risk of constitutional violations to inmates experiencing alcohol withdrawal.

## IV.   ORDER

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART. Specifically:

1. Dr. Porsa's expert report is admissible and the court considers it in resolving this Motion to the extent that it does not usurp the court or jury's role in determining deliberate indifference. Moreover, the court considers the affidavits and exhibits attached to Defendants' Summary Judgment Reply brief in conformity with DUCivR 56-1(d);

2. Plaintiffs Noleen Paugh and Donald Paugh are dismissed with prejudice for lack of standing;

3. The court DENIES summary judgment for Defendant Kori Anderson on the basis of qualified immunity;

4. The court DENIES summary judgment for Defendant Dan Bunnell on the basis of qualified immunity;

5. The court DENIES summary judgment for Defendant Tyler Conley on the basis of qualified immunity;

6. The court DENIES summary judgment for Defendant Kyle Fuller on the basis of qualified immunity;

7. The court DENIES summary judgment for Defendant Richard Gowen on the basis of qualified immunity;

8. The court GRANTS summary judgment in favor of Defendant Justin Riddle on the basis of qualified immunity;

9. The court DENIES summary judgment for Defendant Uintah County.


Signed August 11, 2020


BY THE COURT:


Jill N. Parrish
United States District Court Judge