IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| TRISTEN CALDER, as personal representative of THE ESTATE OF COBY LEE PAUGH,<br><br>Plaintiff,<br><br>v.<br><br>UINTAH COUNTY; KORI ANDERSON; DAN BUNNELL; KYLE FULLER; TYLER CONLEY; and RICHARD GOWEN,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER PARTIALLY GRANTING AND PARTIALLY DENYING PLAINTIFF'S AND DEFENDANTS' MOTIONS IN LIMINE**<br><br>Case No. 2:17-cv-01249-JNP-CMR<br><br>District Judge Jill N. Parrish<br><br>Magistrate Judge Cecilia M. Romero |

Before the court are motions in limine filed by Plaintiff Tristen Calder, as personal representative of the Estate of Coby Lee Paugh ("Paugh") (ECF Nos. 147, 148, 149, 150, 151, 152, 153, 154, 155, 156, 157, 158, 159, 160, & 161), and Defendants Uintah County, Kori Anderson, Dan Bunnell, Kyle Fuller, Tyler Conley, and Richard Gowen (ECF No. 162 & 163) in anticipation of their upcoming trial. This case arises from Plaintiff's claim that Defendants violated Paugh's constitutional rights by failing to adequately provide care for his serious medical condition. The court held oral argument on these motions on August 3, 2023. For the reasons presented herein, the court PARTIALLY GRANTS and PARTIALLY DENIES Defendants' first motion in limine, GRANTS Defendants' second motion in limine, PARTIALLY GRANTS and PARTIALLY DENIES Plaintiff's first, second, fifth, seventh, ninth, and tenth motions in limine, GRANTS Plaintiff's eighth, twelfth, and fourteenth motions in limine, and DENIES Plaintiff's third, fourth, sixth, eleventh, and thirteenth motions in limine.

## ANALYSIS

The court first examines and decides Plaintiff's motions in limine. It then turns to Defendants' motions in limine.

## I.   PLAINTIFF'S MOTIONS IN LIMINE

### 1.   Motion to Exclude Defense Exhibit 23 and Evidence of Paugh's Alcoholism

Plaintiff moves to prohibit Defendants from introducing Defense Exhibit 23 and any evidence of Paugh's alcoholism except to say that he was a "diagnosed alcoholic." *See* ECF No. 152. The Estate argues that this evidence is inadmissible under Rule 401 and 403 because it is both irrelevant and highly prejudicial.[1] The court partially grants and partially denies this motion.

First, the admission of Exhibit 23 is clearly barred by Rule 403. This exhibit is a social media post authored by Paugh's brother, Robert Harlow ("Harlow"). It states in full:

> Important Question! This is my little brother Coby Paugh. He is 27 and I don't think he will make it to his 28th birthday in October. He is literally drinking himself to death. Doc [sic] told him his liver is swollen and he has fatty deposits. He refuses to stop. He's been to jail. Been to detox... He refuses to stop. He doesn't care. He is just a drunk in my parents [sic] house. We have done all we could besides just putting him on the streets. I personally accepted the fact he is dying a long time ago. He has no money. No job. No insurance and no desire to stop... I'm open to suggestions other than watch him die.

ECF No. 152-1. Harlow's post also includes what is presumably a picture of Paugh asleep (possibly drunk) on a bed and several comments authored by third parties. *Id.*

Setting aside the significant hearsay issues this exhibit presents, it is inadmissible because "its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. As an initial matter, it is fair to say that this post is relevant to the case at hand. For instance, it establishes that Paugh was an alcoholic and that his liver was swollen with fatty deposits. Still,

---

[1] During the hearing on the motion, Plaintiff also argued that Exhibit 23 includes hearsay.

this exhibit is not unique in its ability to establish these facts. For instance, Dr. Joseph Bradbury's ("Dr. Bradbury") testimony will show that Paugh was an alcoholic and provide detail on his symptoms. Thus, while Harlow's post includes relevant information, the probative value of the exhibit is very low. Moreover, this exhibit is highly prejudicial. The post includes references to Paugh's criminal history, financial struggles, and lack of employment. It also asserts that Paugh was on the verge of homelessness and includes a picture of Paugh at one of his lowest moments. There is no question that the Exhibit 23's low probative value is outweighed by the substantial risk of unfair prejudice its introduction would create. Therefore, it is inadmissible under Rule 403.

Second, Plaintiff argues that the court should exclude any evidence pertaining to Paugh's alcoholism except to say that he was a diagnosed alcoholic. While Defendants concede that evidence of Paugh's alcoholism is not relevant to answering the question of liability, they still contend that it is relevant for determining Paugh's damages. The court agrees with Defendants.

The court recently held in *Stella v. Davis* that evidence of drug abuse was highly probative because it shed light on "the value of [the victim's] life, including her life expectancy and her capacity for earning." *Stella v. Davis Cty.*, No. 1:18-cv-00002-JNP-DBP, 2022 WL 766401, at *3 (D. Utah Mar. 14, 2022*), reconsideration denied*, No. 1:18-cv-00002-JNP-DBP, 2022 WL 2390829 (D. Utah July 1, 2022) (citing *Gfroehrer v. Calice*, No. 3:09-cv-2111, 2011 WL 5320712, at *4 (M.D. Pa. Nov. 1, 2011) ("[S]ince a history of drug and alcohol abuse clearly has bearing on a person's life expectancy, the evidence will be admissible.")). The same is true of evidence pertaining to alcohol abuse. In *Stella*, the court also found that even though evidence of the victim's substance abuse was potentially prejudicial, its probative value was not substantially outweighed by this risk. *Stella*, 2022 WL 766401, at *3 (citing *Gregory v. Oliver*, No. 00 C 5984, 2003 WL 1860270, at *1 (N.D. Ill. Apr. 9, 2003) (noting that "a litigant's use of drugs has an obvious

potential for being extraordinarily prejudicial.")). The court holds that the same is true here. While there is a risk jurors may hold Paugh's alcoholism against him, disclosure of his condition beyond a stipulated statement is necessary for a fair calculation of damages.

That being said, as in *Stella*, "this court will not tolerate defense counsel engaging in character assassination via evidence of" alcohol abuse.[2] 2022 WL 766401, at *3. It is willing to admit evidence establishing Paugh's alcoholism only for the purpose of proving damages or impeaching witnesses. To that end, the court will not permit cumulative evidence on the subject. In sum, the court grants Plaintiff's motion as it pertains to Exhibit 23 but denies the motion insofar it would bar Defendants from introducing evidence of Paugh's alcohol abuse.

**2. Motion to Exclude Dr. Kennon Tubbs as an Expert Witness**

Plaintiff moves for an order striking Dr. Kennon Tubbs ("Dr. Tubbs") as an expert and prohibiting him from testifying. *See* ECF No. 158. Specifically, the Estate argues that Dr. Tubbs cannot qualify as an expert under Federal Rule of Evidence 702 because he is biased, unqualified, unreliable, and will provide evidence that is both outside the scope of his expertise and irrelevant.

Rule 702 provides that

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>> (b) the testimony is based on sufficient facts or data;
>> (c) the testimony is the product of reliable principles and methods; and
>> (d) the expert has reliably applied the principles and methods to the facts of the case.

---

[2] In no way does the court wish to insinuate that it expects Defendants will perform a character assassination. This evidentiary limitation is merely intended to outline the court's expectations to the parties.

This rule "imposes on a district court a gatekeeper obligation to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003) (quoting *Daubert v. Merrell Dow. Pharm., Inc.*, 509 U.S. 579, 589 (1993)). The purpose of such inquiry is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). Overall, the court has broad discretion in determining whether to exclude an expert's proposed testimony. *See United States v. McSwain*, 197 F.3d 472, 482 (10th Cir. 1999).

To perform its gatekeeping function, the court generally uses a two-step analysis. First, it determines whether an expert is qualified by "knowledge, skill, experience, training, or education" to render an opinion. Fed. R. Evid. 702. At this step, the court must decide whether the witness's expertise is reasonably related to an issue relevant to deciding the case. *See Witherspoon v. Navajo Refining Co., LP*, No. Civ.03-1160, 2005 WL 5988649 (D.N.M. July 18, 2005) at *3 (citing *Ralston v. Smith &Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001)). The second step is to determine whether the expert's opinions are sufficiently "reliable." *See United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc).

As an initial matter, Dr. Tubbs is generally qualified to speak on the issues Defendants have identified as the topics of his testimony. Defendants designated Dr. Tubbs, a physician, as a "corrections medical expert" with "expertise in medical treatment of inmates by corrections officers and nurses." ECF No. 158-1 at 1. Their expert designation stated that Dr. Tubbs would testify regarding "all aspects of providing care, treatment, supervision, and Jail administration in dealing with inmates withdrawing from alcohol." *Id*. at 1-2. As of the filing of his expert report,

Dr. Tubbs had practiced medicine in the Utah State Prison system for 15 years. He was also the medical director for ten county jails throughout Utah and Wyoming. One of these jails was Uintah County Jail, at which he was the medical director from 2007-2017.

Plaintiff argues that just because Dr. Tubbs has a correctional medicine background, this does not mean he is qualified to testify on the specific issue of "jail administration." The court disagrees. As medical director of several county jails, Dr. Tubbs has amassed sufficient experience to testify to the medical aspects of jail administration. Of course, there may be some aspects of jail administration that Dr. Tubbs does not have the expertise to testify to, for instance, the financial or legal side of jail administration. But there is no indication Defendants will ask him to testify on such topics. If they do, Plaintiff may object at trial.

Plaintiff also contends that the court should exclude Dr. Tubbs because his testimony is unreliable. Specifically, the Estate argues that Dr. Tubbs is biased because he is an interested party in this suit. As previously mentioned, it is undisputed that Dr. Tubbs was the Uintah County Jail's medical director at the time of Paugh's death. Plaintiff points out that a finding that Paugh's death was the Jail's fault could reflect poorly on Dr. Tubbs since he was at least in part responsible for the quality of medical services it provided. Further, in 2017, Dr. Tubbs lost the contract to serve as the Uintah County Jail's medical director. Plaintiff contends that Dr. Tubbs may see his testimony as a way to curry favor with the County and regain this contract when it comes up to bid once more.

Though the court is convinced that it is clearly within Dr. Tubb's interest to assist the County with his testimony, Plaintiff offers no rule of evidence or authority suggesting that a court has the discretion to deny a witness expert status simply because of a conflict of interest. On the other hand, Defendants provide several cases in which courts allowed a party to employ an expert

witness with obvious conflicts of interest. *See Dunn v. Sears, Roebuck & Co.*, 639 F.2d 1171, 1174 (5th Cir.), *opinion corrected*, 645 F.2d 511 (5th Cir. 1981) ("That a witness is an employee of a party does not preclude his qualification as an expert."); *Scheidt v. Klein*, 956 F.2d 963, 968 n.4 (10th Cir. 1992) ("The only pertinent circuit decisions we have found uphold the admission of expert testimony related by a party."); *Sw. Const. Corp. v. West*, 82 F.3d 435 (Fed. Cir. 1996) (upholding the admissibility of expert testimony from a party's former employee.). Indeed, this very court recently acknowledged that individuals with a stake in the outcome of a case can be granted expert witness status. In refusing to strike the expert testimony of a public adjuster who would only receive payment if a plaintiff prevailed, the court explained that "if it were to accept that all those who have an interest in the outcome of a case cannot serve as expert witnesses, it would have to exclude many useful categories of expert witnesses that commonly testify in federal court." *Angus v. State Farm Fire & Cas. Co.*, No. 1:21-cv-00034-JNP-JCB, 2022 WL 4610047, at *7 (D. Utah Sept. 30, 2022). The decision in *Angus* explains that the remedy for an expert witness's bias is not exclusion, but rather cross-examination. Here, Plaintiff will "have every opportunity on cross-examination to persuade jurors that [Dr. Tubbs is] biased." *Id.*; *see also Dunn*, 639 F.2d at 1174 ("His potential bias may be explored on cross-examination and argued to the jury. His qualification, however, depends on his knowledge, skill, experience, training or education.").

Beyond Dr. Tubb's conflict of interest, Plaintiff also contends that Dr. Tubbs' testimony will be unreliable because his expert report solely relied on the facts contained in the declarations of Defendants and because his report failed to deploy detailed citations. The court is unconvinced by these arguments. Plaintiff cites to no authority holding that experts may not base their reports on the facts contained in the sworn declarations of the parties to a case. And Dr. Tubbs cites more

than the declarations of Defendants as the factual foundation for his report. The report's "materials reviewed" section lists the following sources of information used to reach its conclusions:

- First amended complaint
- Medical records and chart notes of Paugh from July 2015
- Autopsy
- Depositions of Kori Anderson, Joseph Bradbury, Irene Brown, Dan Bunnell, Logan Clark, Tyler Conley, Kyle Fuller, Richard Gowen, Noleen Paugh, Calvin Harlow, Brandon Cottam, Donald Paugh, Erik Christensen, Kyle Calder, Robert Harlow, Justin Riddle, Kate Smith, Melissa Butcher, Jeff Merrell, Sharity Shiltz, Vance Norton
- Expert Opinion Dr. Esmaeil Porsa
- Expert Opinion Jeff Eiser
- Plaintiff's memorandum in opposition to defendants motion to alter or amend the court's August 11, 2020 memorandum decision and order and decision
- Opposition to defendants motion for summary judgement.
- Court decision to deny summary judgement.
- Court decision to deny motion to alter or amend
- Appellate court appendix

ECF No. 158-2 at 3.

Even if Dr. Tubbs did rely on information beyond declarations, Plaintiff still argues that his report is unreliable because he failed to specifically cite his factual sources whenever he set forth a key opinion. This contention does not convince the court that Dr. Tubbs' report is unreliable. It is fairly obvious which sources Dr. Tubbs' used when formulating each of his key opinions. For instance, when Dr. Tubbs criticized the medical examiner's conclusions, there is no doubt that he looked to Paugh's autopsy, Paugh's medical records, and his own knowledge of alcohol withdrawal. If Plaintiff has questions about the sourcing in Dr. Tubbs' expert report, it may explore this issue during cross-examination.[3] The court notes, however, that if Dr. Tubbs drafts expert reports in the future, he should more rigorously cite his sources.

---

[3] It is worth noting that Plaintiff's own medical expert's report also does not contain detailed citations. *See* ECF No. 169-3.

Additionally, Plaintiff attempts to argue that Dr. Tubbs' report is unreliable because it impermissibly includes speculation. Opinions "must be based on facts which enable [the expert] to express a reasonably accurate conclusion as opposed to conjecture or speculation, [but] absolute certainty is not required." *Goebel v. Denver & Rio Grande W. R. Co*., 346 F.3d 987, 991 (10th Cir. 2003) (citation and alteration omitted). To show that Dr. Tubbs' report contains speculation, the Estate provides a single example of conjecture. According to Plaintiff, Dr. Tubbs speculated that "Paugh's CIWA-Ar score would have been 8 and only scored as very mild withdrawal symptoms," even though Paugh's CIWA-Ar score was never taken by Defendants at the Jail. ECF No. 158-2. This sole instance of speculation is not enough for the court to throw out Tubbs' entire report. Frankly, more than one instance of speculation is needed to exclude a witness based on the unreliability of his testimony. But the court does have significant concerns about this piece of testimony. Plaintiff represents that it is impossible to calculate a CIWA-Ar score without face-to-face interaction with a patient. This could well be true. If at trial Dr. Tubbs testifies about Paugh's CIWA-Ar score and Plaintiff can successfully convince the court that his methodology contains flaws, Plaintiff may object to Dr. Tubbs' testimony on this issue. At that time, the court will strike Paugh's CIWA-Ar score from the record.

Finally, Plaintiff argues that Dr. Tubbs' report is unreliable because his methodology is not intellectually rigorous. As support for this proposition, the Estate contends that Dr. Tubbs' life expectancy calculation, which concluded Paugh would die within the year, is flawed. ECF No. 158-2 at 16. While the court is not willing to entirely throw out Dr. Tubbs' testimony because of this methodologically questionable finding, it will not allow Dr. Tubbs to testify about Paugh's life expectancy.

The only bases for Dr. Tubbs' finding that Paugh "would have died from alcoholism anytime within the next year," is that "Coby, Noleen, Bradbury and Ashley Regional Medical Center [believed] that Coby had a life-threatening alcoholic disease prior to his incarceration on July 24" and that "[t]he national institute of health reports that males with alcohol use disorder have an average life expectancy of 47-53 years." *Id*. The fact that Dr. Tubbs' reviewed hearsay speculation about Paugh's health and reproduced this information in his report is hardly an application of "reliable principles and methods," which is required by Rule 702(c)-(d). Additionally, the National Institute of Health report seems to cut against Dr. Tubbs' argument that Paugh was on the brink of death. Indeed, if Paugh was an average individual with alcoholism, the report indicates he may have had years left to live. More is needed for the court to allow Dr. Tubbs to share an opinion about Paugh's life expectancy. Rule 702 requires that experts use and apply "reliable principles and methods" to the facts of the case. That could involve, for instance, specific evidence that Paugh's alcoholism was of a variety that inevitably leads to death within a year or medical evidence that his liver was unable to support life. This evidence is absent. Thus, the court excludes Dr. Tubbs' life expectancy testimony.

In addition to challenging Dr. Tubbs' expertise and the reliability of his methods, Plaintiff argues that his expert testimony will exceed the scope allowed under the Federal Rules of Evidence. An expert's testimony may be excluded if it goes beyond the scope of his expert designation. *Frederick v. Swift Transp. Co.*, 616 F.3d 1074, 1083 (10th Cir. 2010). This occurs when the expert "usurps the function of the jury in deciding the facts, or interferes with the function of the judge in instructing the jury." *U.S. v. Dazey*, 403 F.3d 1147, 1171 (10th Cir. 2005).

First, Plaintiff argues that Dr. Tubbs' expert report impermissibly displaces the fact-finding role of the jury. As an example, Plaintiff cites Dr. Tubbs' statement that "[c]hronic alcoholism and

[the] failure of Paugh to follow physician and court ordered abstinence from alcohol was the most significant factor contributing to Paugh's death." ECF No. 158-2 at 13. The Estate also contends Dr. Tubbs usurps the jury's role through his factual finding that the medical examiner's autopsy was insufficient.[4]

But these highlighted opinions are exactly the type that experts are supposed to provide to assist juries. No lay witness could determine a deceased individual's cause of death with any reliability. Nor could they determine if a medical examiner's report was in error. Courts allow experts to testify because they have the technical knowledge needed to enable juries to make such determinations. *United States v. Garcia*, 635 F.3d 472, 476 (10th Cir. 2011) ("[r]elevant expert testimony must 'logically advance[] a material aspect of the case,' and be 'sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."). Here, Dr. Tubbs' opinion testimony provides just the type of useful assistance Rule 702 was intended to allow at trial.

Second, Plaintiff maintains that Dr. Tubbs impermissibly reached legal conclusions in his expert report. Because reciting legal standards is the purview of judges, the Estate argues that Dr. Tubbs' testimony is inadmissible. *See Dazey*, 403 F.3d at 1171. The court agrees that Dr. Tubbs reached legal conclusions and cited legal standards in his report and that such opinions are inadmissible. It therefore bars Dr. Tubbs' from testifying about the following statements:

- "The standard of conduct to which an officer must conduct patient care is that of a reasonable officer under the circumstances. However, this is a lower standard than what is required to prove a violation under the United States Constitution for failing to provide medical care." ECF No. 158-2 at 3.

---

[4] Plaintiff also argues that Dr. Tubbs may not testify as to the results of an autopsy because he is not a medical examiner. The Estate offers no authority for this argument. It also offers its own expert physician to testify on the accuracy of the autopsy even though he also lacks experience with autopsies. The court, therefore, is not convinced by Plaintiff's argument for exclusion on this basis.

- "There is no constitutional requirement for the jail to have medical staff onsite." *Id*. at 14.

The court also notes that Defendants implicitly acknowledge the fact that Dr. Tubbs' report may have crossed over into impermissibly providing legal standards better delivered by the court. As such, they have stated that they will not ask Dr. Tubbs to provide legal standards or conclusions for the jury in his testimony.

Finally, Plaintiff contends that Dr. Tubbs' final opinion should be excluded because it is not relevant. Dr. Tubbs' final opinion states that "Paugh was given the opportunity and free choice to undergo hospitalization with detoxification instead of going to jail" and that he was, thus, given "appropriate access to medical services." ECF No. 158-2 at 17. Whether this statement is relevant is an issue addressed by motion in limine twelve. The court's analysis of that motion is discussed in detail later in this memorandum decision but, in short, it concludes that Dr. Tubbs may not testify about Paugh's decision to leave the hospital or suggest that his decisions should absolve Defendants of liability in this case.

Ultimately, the court concludes that Dr. Tubbs is qualified and that some of his opinions are reliable enough to warrant his designation as an expert. Additionally, the court finds that Dr. Tubbs' report, with limited exception, does not go beyond the scope of allowable expert testimony. Thus, the court partially grants and partially denies Plaintiff's motion.

### 3. Motion to Exclude Testimony from Nurse Kate Smith

Plaintiff moves for an order prohibiting Nurse Kate Smith ("Nurse Smith") from testifying. *See* ECF No. 147. The Estate argues that Nurse Smith's testimony would inevitably violate Rule

602's bar on testimony that is not supported by a witness's personal knowledge.[5] It also contends that, insofar as her testimony discusses the Jail's general policies and procedures, it should be excluded because Nurse Smith was not designated by Defendants as a 30(b)(6) witness. The court is unconvinced by both arguments.

At the time of Paugh's death, Smith was employed as a registered nurse at the Uintah County Jail. But Nurse Smith was not present on the day Paugh died. Instead, she was on maternity leave and did not return to work at the Jail until several months after Plaintiff's passing. No party alleges that Nurse Smith had any interaction with Paugh or any of the Defendants during Paugh's two-day incarceration. Indeed, Smith admitted in a deposition that she "didn't know anything about" Paugh's death. ECF No. 147-1 at 10:9. From this fact pattern, Plaintiff argues that Nurse Smith has no personal knowledge relevant to the case at hand and, thus, may not testify.

Defendants counter that Nurse Smith has relevant personal knowledge of the Jail's policies, practices, and customs in the provision of medical services. Specifically, they claim that, as the Jail's nurse, Smith was aware of the frequency at which the Jail treated inmates with alcohol withdrawal (ECF No. 174-1 at 26:17-27:3, 111:2-6), the Jail's procedures for treating inmates with alcohol withdrawal and other medical issues (*Id*. at 22:18-23:6, 90:6-91:14, 104:2-9, 124:6-14), the Defendants' familiarity with the Jail's standard operations for medical care (*Id*. at 62:22-63:2, 77:23-78:8), and the medical training provided to Defendants (*Id*. at 36:11-13, 38:4-39:1, 40:11-17, 64:22-65:14).[6] Each of these potential pieces of testimony is derived from first-hand

---

[5] Alternatively, Plaintiff argues that Nurse Smith may not testify as an expert because Defendants failed to designate her as such. Defendants respond by stating that they never intended for Nurse Smith to testify as an expert. They agree that she may not testify as such.

[6] Defendants also note that Nurse Smith can testify to "the relevance of an inmate's CIWA score to the provision of medical care." ECF No. 174 at 2. Depending on the form this testimony takes, it could cross the line into the type of testimony that may only be delivered by an expert. Because

knowledge. This information could help establish (or not) Defendants' liability by showing that a Uintah County Jail policy or custom was the moving force behind an underlying constitutional violation. *See Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403-04 (1997). Thus, Nurse Smith has personal knowledge that is relevant to the resolution of this case.

Plaintiff responds that even if Nurse Smith possesses relevant first-hand knowledge, she may not testify on the topic of Uintah County Jail policies and procedures because Defendants did not designate her as their 30(b)(6) witness. As far as the court can tell, the Estate simply assumes that only 30(b)(6) witnesses, or those who "a party [has named] as the deponent a public or private corporation," may testify about an institution's policies and procedures. Fed. R. Civ. P. 30(b)(6). This assumption is unfounded. First, Rule 30(b)(6) only applies during the deposition phase of litigation. It does dictate who may or may not testify at trial. Second, even if Rule 30(b)(6) did apply at trial, no part of the Rule does anything to limit a party's ability to question a non-designated witness about an institution's policies and procedures. As a result, Rule 30(b)(6) does not prohibit Nurse Smith's testimony and the court, therefore, denies Plaintiff's motion to exclude it.

### 4. Motion to Limit Defendants' Cross-Examination to the Scope of Direct Examination

Plaintiff moves for an order limiting Defendants' cross-examination to the scope of Plaintiff's direct examination. *See* ECF No. 153. Essentially, the Estate requests that the court confine examination of its witnesses to issues it wishes to discuss in its case-in-chief, while allowing Defendants to examine these same witnesses on all other issues only during Defendants' case-in-chief. In effect, if the court were to grant the motion, Plaintiff and Defendants would have

---

Nurse Smith is not designated as an expert, Defendants must not ask questions that would require her to cross this line.

to call some witnesses twice for the sole purpose of giving Plaintiff the chance to fully control it witnesses' narratives during its case-in-chief.

To support this motion, Plaintiff cites the first sentence of Federal Rule of Evidence 611(b). It provides that "[c]ross-examination should not go beyond the subject matter of the direct examination and matters affecting the witness's credibility." Fed. R. Evid. 611(b). But Plaintiff omits the next sentence. It states that "[t]he court may allow inquiry into additional matters as if on direct examination." Fed. R. Evid. 611(b). This sentence indicates that the court has discretion to allow Defendants to examine Plaintiff's witnesses during Plaintiff's case-in-chief on any topic if it so chooses.

The Estate contends that the court ought not allow Defendants to directly question Plaintiff's witnesses during its case-in-chief because allowing Defendants to "present their case through Plaintiff's witnesses would be grossly unfair as well as inefficient." ECF No. 153 at 2. This is not so. On the issue of fairness, Plaintiff does not provide any authority or argument explaining why consolidating examination of witnesses would skew the playing fields. On the issue of efficiency, it is clear that consolidating the questioning of witnesses would take far less time than calling a witness once during Plaintiff's case and a second time during Defendant's case. In a second round of examination, the parties would likely waste significant time reestablishing the facts of the witness's previous testimony. Additionally, it is highly probable that many of the witnesses the parties will call twice live hours away from the courthouse. Forcing these witnesses to return to court for a second examination would waste their time and money.

In sum, there is no reason to conclude that consolidating examination of each witness would be unfair or inefficient. Thus, the court exercises its discretion to "allow inquiry into

additional matters as if on direct examination" and denies Plaintiff's motion to limit the scope of cross-examination. Fed. R. Evid. 611(b).

### 5. Motion to Exclude Medical Records Unrelated to Plaintiff's Injury

Plaintiff moves for an order prohibiting Defendants from introducing evidence or questioning witnesses regarding medical records that are "unrelated to the injuries sustained by Coby in the Uintah County Jail on July 24-25, 2015." ECF No. 154 at 2. The Estate argues that this evidence and testimony should be excluded under Rules 401 and 403 because it is irrelevant and highly prejudicial.

As an initial matter, this motion is seriously defective because it does not identify *specific* medical records it is asking the court to exclude. The motion vaguely defines "unrelated" medical records to encompass any indication that Paugh was seen or treated by a doctor for health conditions before July 24, 2015. Plaintiff may wish to exclude evidence of Paugh's broken ribs, his treatment for alcohol poisoning just before his incarceration, or his appointment with a doctor years before his death—it is just not clear from the face of the motion. All this potential evidence may fall under the ambit of Plaintiff's motion, yet each piece of evidence's relevance and prejudicial effect is not uniform. Thus, the court declines to make a broad ruling barring "unrelated" medical records under Rule 403. But the court will rule on two categories of pre-July 24 medical records that Defendants may attempt to present at trial—records related to Paugh's alcoholism and records related to Paugh's broken ribs.

As already explained, evidence of Paugh's alcoholism generally has probative value because Defendants require it to calculate damages. Additionally, evidence of Paugh's broken ribs could have limited probative value insofar as it would show that the medical examiner's autopsy did not identify at least one of Paugh's conditions. But while general evidence of alcoholism and broken ribs has some value, the court seriously doubts the probative value of introducing the

*medical records* pertaining to these conditions. A lay jury will likely have trouble understanding medical records without the guidance of an expert. And if an expert is called to explain these records, the expert's testimony is sufficient to convey the records' findings to the jury. In addition, the introduction of medical records could confuse the jury and waste time. Thus, the court excludes pre-July 24 medical records related to Paugh's alcoholism and broken ribs under Rule 403.[7]

In sum, pre-July 24 medical records pertaining to Plaintiff's alcoholism and broken ribs are generally inadmissible under Rule 403. Thus, Plaintiff's motion is partially granted and partially denied.

### 6. Motion to Limit the Factual Determinations of Defendants' Experts

Plaintiff moves for an order excluding the testimony of Dr. Tubbs and Nurse Deborah Ash ("Ash") "insofar as their testimony regards any purported factual elements, insinuations, or causation of the evidence." ECF No. 155 at 2. The Estate argues that any such testimony is beyond the scope of Rule 702. At hearing, this motion also morphed into a request to prevent Defendants' experts from "making up" facts during their testimony. In either form, the court denies the motion.

Courts allow expert witness testimony because listening to the opinions of experts qualified by "knowledge, skill, experience, training, or education" is sometimes the only way fact finders are able "to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. To adopt Plaintiff's limitations on expert witness testimony would completely gut experts' ability to deliver the type of helpful testimony Rule 702 was intended to allow.

Plaintiff proposes to limit experts' use of "factual elements." The broadest interpretation of this limitation would narrow expert testimony so severely that it would have almost zero utility.

---

[7] Medical records may be admissible in certain circumstances. For instance, if an expert's testimony is contradicted by Paugh's medical records, the court will not prevent a party from using those records for impeachment.

Facts are the very foundation on which opinions are based. Prohibiting their use would essentially prohibit experts from introducing their opinions as well. This cannot be right.

If Plaintiff's argument is, more narrowly, that expert testimony that relies on facts the expert has no personal experience with should be prohibited, this argument must be rejected because such a limitation would prohibit nearly all useful expert testimony. Experts almost never have firsthand knowledge of the facts of the given case, so, under Plaintiff's proposed rule, they would almost never be able to testify.

If Plaintiff's argument is that experts should not be able to testify about facts that are contested, the court disagrees. In cases where parties contest medical causation, the thorniest issues often involve contested issues of fact. If experts were unable to incorporate these disputes into their testimony, their usefulness in helping the jury understand the *most crucial* issues in a case would be almost zero. Their testimony would be limited to only issues of secondary importance.

If Plaintiff's argument is simply that experts should not be able to "make up" facts that other witnesses have not substantiated, the court agrees that this is a reasonable limitation. Still, now is not the time for Plaintiff to make such a broad objection. An expert has yet to use an unsupported fact in his or her testimony. If such an event occurs, Plaintiff may object at trial.

Plaintiff also requests a prohibition on testimony related to causation or "insinuation." This limitation would bar experts from usefully applying their medical knowledge by preventing them from explaining *why* an individual suffered from a medical condition. This cannot be right because explaining *why* an individual suffered from a medical condition is the reason experts are often required in § 1983 cases involving complex medical issues. *Zartner v. Miller*, 760 F. App'x 558, 564 (10th Cir. 2019) (listing cases).

At trial, the court will, of course, impose limitations on the scope of each expert witnesses' testimony pursuant to Rule 702 and all other Federal Rules of Evidence. For instance, the court will not allow experts to make up evidence or pass judgment on the credibility of other witnesses. But Plaintiff's expansive motion for a narrowing of testimony is denied. If either party determines that an expert has gone beyond the allowable scope of their testimony during the trial, the court will be open to objections at that time.

### 7.   **Motion to Exclude Nurse Deborah Ash as an Expert Witness**

Plaintiff moves for an order prohibiting or limiting Nurse Ash's expert testimony on grounds that she is not qualified, that her potential testimony is beyond the scope of her expertise, that her methodology is unreliable, and that her opinions would not be helpful to the jury. *See* ECF No. 156. The court will not entirely exclude Nurse Ash's testimony, but it does limit it in several areas.

As previously stated, before the court may admit expert testimony it must determine that this testimony is both delivered by a qualified witness and reliable. *Daubert*, 509 U.S. at 589. A witness is qualified when they have "knowledge, skill, experience, training, or education" related to the topic of their testimony. Fed. R. Evid. 702. Their testimony is reliable "when it employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 158. An expert witness may not provide testimony or legal conclusions that "usurp[] the function of the jury in deciding the facts, or interfere[] with the function of the judge in instructing the jury." *Dazey*, 403 F.3d at 1171. An expert witness may be excluded if she goes beyond the scope of her designation. *Frederick*, 616 F.3d at 1083.

First, Plaintiff argues that Nurse Ash "is not qualified to testify as a corrections officer or to the duties, medical or otherwise, of a corrections officer." ECF No. 156 at 4. Instead, the Estate contends that the court must limit Nurse Ash's testimony so that she may only speak "from the

perspective of a registered nurse." *Id*. The court declines to limit Nurse Ash's testimony as requested. Nurse Ash has worked in correctional nursing for the last fourteen years—largely in county jails. ECF No. 156-2 at 1. Additionally, she "actively participate[s] in the delivery of care to inmates, provide[s] guidance for the development and implementation of policies and procedures, conduct[s] internal quality assurance and risk management audits, and initiate[s] care enhancement plans." *Id*. at 2. While it is true that Nurse Ash is not herself a corrections officer, she is more than qualified to testify to these professionals' role in providing medical treatment to prisoners. Interacting with officers and overseeing care delivered by correction officers is an important part of a correctional nurse's job. This means that Nurse Ash has plenty of experience observing the standard operating procedures of these individuals. Moreover, Nurse Ash has "trained hundreds, probably thousands, of Deputies and non-medical ancillary staff on how to respond to medical emergencies." *Id*. at 6. A nurse who trains law enforcement officers *must be* familiar with the profession's medical standard. Because of Nurse Ash's leadership role in providing medical care in jails, she is just as qualified to testify about the responsibilities of a corrections officer in providing medical care as a corrections officer.

Second, Plaintiff argues that Nurse Ash's testimony is irrelevant and beyond the scope of her expertise. But the Estate only provides one example of Nurse Ash going beyond the scope. Plaintiff states that Nurse Ash will testify that correctional officers would not understand Dr. Bradbury's potentially vague instructions to provide Paugh with Librium "as needed." ECF No. 156-2 at 3-4. According to Plaintiff, the court should exclude this testimony because Nurse Ash only has the expertise to determine whether a nurse would understand these instructions, not whether a correctional officer would understand them. This example is does not establish that Nurse Ash's testimony is inadmissible as a whole, but the court agrees that it is not a proper topic

for expert testimony. In essence, Defendants are asking Nurse Ash to speculate as to what the individual Defendants understood. This is not warranted where these Defendants are available to testify as to their actual understanding of Paugh's mindset. Moreover, discharge instructions are not uniquely difficult documents to read. It is well within jurors' capabilities to interpret them without an expert's explanation. Jurors can read the discharge instructions themselves and judge whether a non-medically trained individual would be able to understand them. Thus, the court does not find that Nurse Ash's testimony, as a whole, is beyond the scope, but it will not allow her to testify about whether the Defendants understood Dr. Bradbury's instructions.[8]

Third, Plaintiff maintains that the methodologies Nurse Ash used to arrive at the opinions in her report lacked intellectual rigor and were, as a result, unreliable. The Estate cites three of Nurse Ash's conclusions that allegedly lack methodological soundness. Nurse Ash's first apparently flawed conclusion is her opinion that Paugh must have either "taken a high dose of Benadryl before coming into the jail, or . . . he brought it in as contraband." ECF No. 156-2 at 11. According to Plaintiff, this statement is based purely on speculation. But Nurse Ash's testimony indicates that she actually agrees that there is no way to know just how Benadryl ended up in Paugh's system. Instead of reaching a hard and fast conclusion about the source of the Benadryl, she states that she is "not able to answer the mystery of why the autopsy report . . . did show the presence of Benadryl." *Id*. Because Nurse Ash has no opinion based on medically reliable principles or methods, the court will limit Nurse Ash's testimony on this issue by prohibiting her from speculating as to the many possible sources of Benadryl in Paugh's system during his

---

[8] Plaintiff also briefly argues that Nurse Ash's testimony is irrelevant because there was no nurse present at the Uintah County Jail at the time of Paugh's death. This argument is unpersuasive because, as already explained, Nurse Ash may testify to the standards expected of correctional officers in the provision of care.

autopsy. The jury does not need to know, for instance, about the remote possibility that Paugh brought contraband Benadryl into the Jail.

To argue that Nurse Ash's methodology was flawed, Plaintiff also cites her conclusion that she believed Paugh received Librium instead of Benadryl because Paugh "alerted Deputy Bunnell that he did not receive his 5pm dose of Librium during the evening med pass on July 24." *Id.* at 11. According to the Estate, the claim that Paugh was "educated about his medication and would surely have noticed if he was not being given the correct medication," is not an expert opinion based on reliable medical principles or methods. A nurse cannot predict or know a patients' mindset with any certainty, even with years of experience in the field. Lay individuals are just as well situated as Nurse Ash to draw conclusions about Paugh's state of mind from the evidence presented. Thus, the court will not allow Nurse Ash to testify on this issue.

Finally, Plaintiff attempts to call into question Nurse Ash's methodology by explaining that she had no sound basis to believe that "the Deputies had a good understanding of the basic concepts [required for] providing an incarcerated individual's right to be granted access to care and the importance of and following the provider's order." *Id.* at 10. The court disagrees that Nurse Ash had no foundation for such a claim. Nurse Ash states that she reviewed the individual Defendants' testimony about their training and found that their descriptions aligned with the training requirements for jails of a similar size and population as Uintah County Jail. Given Nurse Ash's experience in conducting trainings, she has sufficient experience to come to such a conclusion based on the information provided. Ultimately, while some of Nurse Ash's conclusions and methodologies require exclusion, her report does not require exclusion as a whole. If Plaintiff remains skeptical of sections of Nurse Ash's report, it will have ample opportunity to attack them during cross-examination and object to further issues at trial.

Finally, Plaintiff contends that Nurse Ash's testimony should be excluded because it will not be helpful to the jury, as required by Rule 702. This argument is essentially a restatement of the Estate's previous justifications for excluding Nurse Ash's testimony. Nurse Ash's knowledge about the medical standards in correctional facilities will provide jurors with substantial useful knowledge that will help them decide the case.

In sum, the court is convinced that Nurse Ash is generally qualified to testify as an expert, however, it does limit the scope of her testimony in several areas. Therefore, Plaintiff's motion is partially granted and partially denied.

### 8.  Motion to Exclude Paugh's Prior Criminal History

Plaintiff moves for an order prohibiting Defendants from introducing or referring to any evidence of Paugh's criminal record or unlawful acts, except to say that he violated the terms of his probation. *See* ECF No. 159. The Estate argues that this evidence is inadmissible under Rule 401 because it is irrelevant and inadmissible under Rule 403 because "its probative value is substantially outweighed by a danger of . . . unfair prejudice."[9] The court grants the motion.

First, this trial is focused on whether Defendants failed to provide adequate care for a known serious medical condition. Direct evidence of Paugh's criminal record and past unlawful conduct is irrelevant to this question other than to establish the basic context that Paugh was jailed due to a probation violation.[10] But Defendants state that they should be allowed to introduce evidence of Paugh's dealings with jail officials prior to his July 24th incarceration. They contend

---

[9] At hearing, Plaintiff also argued that this evidence violates Federal Rule of Evidence 404, which prohibits the introduction of character evidence in most circumstances. The court need not examine this argument because Paugh's criminal history is clearly inadmissible under Rules 401 and 403.

[10] In their response brief on this motion in limine, Defendants mention that direct evidence of Paugh's criminal record could be used to establish damages. It does not provide any justification for this argument. Thus, the court disregards this possibility.

that this evidence shows that jail officials had no reason to believe that Paugh was at any risk of harm because his behavior near the time of his passing was allegedly the same as during past visits to jail that did not end in death.

The court acknowledges that evidence of Paugh's past interactions with officers may have some minimal probative value, but allowing evidence of these dealings would require an admission that Paugh was a repeat offender. Introducing this criminal history, even if it is not detailed, would be highly prejudicial. *See Spencer v. State of Texas*, 385 U.S. 554 (1967). And this unfair prejudice easily outweighs any probative value. If evidence of Plaintiff's time in jail is introduced, the jury would essentialy be informed that Paugh was "the town drunk." This reputation would create a substantial risk that Paugh might not receive a fair trial. Ultimately, evidence of Paugh's criminal history cannot survive Rule 403 despite the Federal Rules' "presumption of admissibility." *United States v. Cross*, 308 F.3d 308, 323 (3d Cir. 2002); *see also United States v. Enjady*, 134 F.3d 1427, 1431 (10th Cir. 1998). The court therefore grants Plaintiff's motion to exclude.

9. **Motion to Prohibit Defendants and Their Supporters from Wearing Uniforms in the Courtroom**

Plaintiff moves for an order prohibiting Defendants from wearing their uniforms, badges, and guns to court and an order prohibiting Defendants from using uniformed supporters to "pack the courtroom." *See* ECF No. 160. The basis for this motion is the court's Rule 403 power to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Plaintiff argues that the presence of uniformed officers in the courtroom could cause substantial unfair prejudice by intimidating the jury and bolstering uniformed witness' credibility. The court first addresses the issue of Defendants' apparel before turning to the separate issue of courtroom packing.

First, the court partially grants and partially denies Plaintiff's motion to prohibit Defendants from wearing their uniforms, badges, and guns at trial. When faced with this issue, district courts in Massachusetts and Illinois have allowed defendant officers to wear their uniforms and badges during § 1983 trials. *See Owens v. Ellison*, No. 13-CV-7568, 2017 WL 1151046, at *6 (N.D. Ill. Mar. 28, 2017); *Sughayyer v. City of Chicago*, 2011 WL 2200366, at *4 (N.D. Ill. June 6, 2011); *Echavarria v. Roach*, No. 16-CV-11118-ADB, 2022 WL 606076, at *4 (D. Mass. Mar. 1, 2022). These courts explain that in § 1983 cases it is no secret that Defendants are officers, thus the wearing of their uniforms would not prejudice the jury. The court agrees with this reasoning and finds that the risk of prejudice presented by a uniform and badge is quite low.[11]

As for the issue of weapons in the courtroom, the court need not rely on the Federal Rules of Evidence to prohibit Defendants from bringing firearms to the trial. 18 U.S.C § 930(e) imposes penalties on any individual who "knowingly possesses or causes to be present a firearm or other dangerous weapon in a Federal court facility" with the exception of those who are engaged in the "lawful performance of official duties." Defendants are being sued in their personal capacities, not their official capacities, and are consequently not entitled to the exception for law enforcement in § 930(e). Thus, they are prohibited from carrying firearms during trial.[12]

Second, the court denies Plaintiff's motion to prohibit Defendants from packing the courthouse with uniformed officers. Authority on courtroom packing tends to arise from orders

---

[11] Courts have noted that wearing medals at trial is a different matter. *Tolliver v. Gonzalez*, No. 10 C 1879, 2011 WL 5169428, at *1 (N.D. Ill. Oct. 31, 2011) (permitting defendant officers to wear uniforms but not medals at trial); *Sughayyer*, 2011 WL 2200366, at *4 (same). This is because Defendants may attempt to use medals to expose the jury to impermissible character evidence. *See* Fed. R. Evid. 404. Therefore, the court will not allow Defendants to wear this variety of uniform accessory at trial.

[12] To be clear, Defendants' counsel represent that they have no intention of bringing firearms to court.

deciding post-trial motions seeking to overturn criminal convictions on constitutional grounds based on the reasoning that the presence of officers creates unfair prejudice. In this context, a consensus has developed "that the presence of uniformed police officers in the courtroom is not by itself so inherently prejudicial as to deny a defendant of his constitutional right to a fair trial." *Encarnacion v. Walker*, No. 96-cv-329-FJS-GLS, 1998 WL 34002608, at *6 (N.D.N.Y. Aug. 21, 1998) (citing *Holbrook v. Flynn*, 475 U.S. 560 (1986) (finding that the presence of four state troopers in the front row of the spectator section of the gallery as a supplement to regular courtroom security was not unconstitutional.); *Smith v. Farley*, 59 F.3d 659, 664-65 (7th Cir. 1995) (holding that  a prosecutor's ambiguous reference to an unknown number of police officers in the courtroom did not intimidate the jury.); *Resnover v. Pearson*, 754 F. Supp. 1374, 1389 (N.D. Ind. 1991) (finding that the presence of a "large number" of police officers was not unconstitutional.)). That being said, there are cases in which the presence of officers in a courtroom can create such obvious prejudice that a new trial is warranted due to unfairness. For instance, in *Woods v. Dugger*, the Eleventh Circuit held that new proceedings were required due to the presence of uniformed officers at the trial of an accused murderer of a prison guard. 923 F.2d 1454, 1457-58 (11th Cir. 1991). There, the rural nature of community, the importance of the prison at issue in the local economy, the amount of pre-trial publicity, the community activism of the victim's sister, the composition of jury, and objections by defense counsel all combined to create a unique scenario where the presence of the officers "met the extremely high standard necessary for a successful claim of presumed prejudice." *Id*. at 1460.

While this court understands that the standard for a finding of prejudice on a motion in limine in a civil case and the standard for such a finding in a post-trial constitutional appeal of a criminal conviction are different, it still can deny Plaintiff's motion using the logic from *Woods*.

Plaintiff has presented no evidence showing that the presence of officers in this trial will have anywhere near the effect that led the court in *Woods* to find that the defendant was prejudiced. 923 F.2d at 1457-58. The jury in this case will come not from a small town, but from across the state of Utah. It will also be immune from nearly all of the other pressures faced by the jury in *Woods*. Indeed, Plaintiff has not even made a showing that officers will be present in the courtroom during the trial.

That being said, the court will not foreclose the possibility of issuing an order prohibiting courtroom packing if the presence of officers in the courtroom becomes a distraction. If such a scenario occurs, Plaintiff should renew this motion and the court will consider it once more.

**10. Motion to Prohibit Defendants from Using the "Empty Chair Defense," Insinuating That Claims Related to This Case Were Settled, and From Allocating Fault to Paugh Due to his Alcohol Abuse**

This motion has three parts. The court addresses each issue individually.

*a. Empty Chair Defense*

Plaintiff moves for an order prohibiting Defendants from utilizing what is commonly known as the "empty chair defense." ECF No. 148 at 2. This defense involves blaming parties not at trial for a plaintiff's injury. The Estate offers no authority indicating that such a defense is impermissible in a § 1983 action. While the court was able to identify state law that limits the use of the empty chair defense, it could find no basis for doing so in the context of § 1983. *See, e.g.*, *Am. Radiology Servs., LLC v. Reiss*, 470 Md. 555, 589 (2020) (holding that under Maryland medical malpractice law, expert testimony is generally required to establish the non-party's breach of the standard of care for the jury to consider the empty chair defense.); *Bahrle v. Exxon Corp.*, 652 A.2d 178 (N.J. Super. Ct. App. Div. 1995) (holding under New Jersey law that dismissal of a co-defendant from an action pursuant to summary judgment can preclude a defendant from employing the empty chair defense.); *Bell v. Glock, Inc.*, 92 F. Supp. 2d 1067, 1070 (D. Mont.

2000) (holding under Montana law that defendants cannot negate the causation element "by introducing evidence or arguing that the conduct of unnamed third parties were the real cause of Plaintiff's injury.").

Beyond arguing that empty chair defenses are prohibited per se, Plaintiff also seems to contend that Defendants may not use the empty chair defense because they failed to allocate any fault to a third party in their responsive pleadings as an affirmative defense. While it is true Federal Rule of Civil Procedure 8(c)(1) provides that "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense . . . ," this is not relevant to the matter before this court because the empty chair defense is not an affirmative defense. Generally, "[a]n affirmative defense . . . is a defense that does not negate the elements of the plaintiff's claim, but instead precludes liability even if all of the elements of the plaintiff's claims are proven." *Roberge v. Hannah Marine Corp.*, 124 F.3d 199 (Table), 1997 WL 468330, at *3 (6th Cir. Aug. 13, 1997). The empty chair defense does not rise to this standard. Convincing a jury that a non-defendant third party injured Paugh would not negate liability automatically if Plaintiff proved the elements of their claims. In other words, it is possible for several Defendants and non-defendants to be held liable in this case simultaneously (indeed, that is why there are multiple defendants). As a result, Defendants did not waive the empty chair defense by failing to assert it in their answer. The court, thus, denies Plaintiff's motion to prohibit the empty chair defense.

*b. Insinuation of Settlement*

Plaintiff moves for an order prohibiting Defendants from insinuating that any non-party settled with Plaintiff. *See* ECF No. 148. Federal Rule of Evidence 408 provides that evidence of "furnishing, promising, or offering — or accepting, promising to accept, or offering to accept — a valuable consideration in compromising or attempting to compromise the claim" is inadmissible. Allowing Defendants to falsely insinuate that Plaintiff previously reached a settlement with non-

parties regarding this matter would fly in the face of this Rule's logic. If parties with an actual settlement may not speak of their settlement in court, it is not acceptable for a Defendant with no evidence of a settlement to insinuate that one was reached. The court, thus, grants Plaintiff's motion to prohibit Defendants from insinuating that any non-party settled with Plaintiff.[13]

   c.   *Allocation of Fault to Paugh*

Plaintiff moves for an order prohibiting Defendants from allocating fault to Paugh. *See* ECF No. 148. The Estate argues that the court should not allow Defendants to point to Paugh's alcoholism or any other medical condition as the sole cause of his death because the presence of a medical condition does not absolve Defendants from their duty to provide adequate medical care. The court agrees with this analysis.

To prevail on its constitutional claims, Plaintiff must prove that Defendants harmed Paugh by failing to provide adequate medical care in deliberate indifference to his serious medical need. *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000). Unlike a tort claim, which often requires a determination of comparative fault, whether Paugh is responsible for creating his medical need is not an element that needs to be proven for a determination of liability. *Id*. In other words, Defendants cannot escape liability simply by pointing out that Paugh's drinking contributed to his death.

This makes sense. Jail officials and their medical staff must take inmates as they find them. To adopt the principle that an officer is liable only when he is the sole cause of death would essentially mean that jails may refuse to provide healthcare for inmates, allowing them to needlessly die, whenever an injury occurred outside of the jail or was the result of an inmate's poor

---

[13] At hearing, Defendants' counsel denied any knowledge of a settlement and stated that it does not intend to insinuate that the Estate ever reached a settlement for Paugh's injury.

choices. This *cannot* be the law in a country with a constitution that guarantees incarcerated individuals, people who are at the full mercy of the state, a right to adequate medical care. *Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)) (stating that officers violate the Constitution when they are deliberately indifferent to the serious medical needs of prisoners because this "constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment.").

Still, regardless of if Paugh's fault is relevant to the issue of liability, Defendants argue that the court should allow discussion of Paugh's fault to help the jury determine damages. It is true that Paugh's fault could shed some light on the damages issue, but there is substantial risk that any argument allocating fault to Paugh for this purpose could influence the Jury's decision on liability. The suggestion that a victim is at fault for his injury is a powerful emotional argument. Even its suggestion could cause unfair prejudice by incorrectly focusing a juror's mind not on Defendants' actions, but Paugh's choices. As a result, the court grants Plaintiff's motion and prohibits Defendants from allocating any fault to Paugh for his own death.

### 11. Motion to Limit the Evidence to the Issues Before the Court

Plaintiff moves for an order limiting Defendants' evidence to the issues before the court—specifically the issue of whether Defendants were deliberately indifferent to a known medical need that resulted in Paugh's death. *See* ECF No. 149. This motion seems to boil down to a restatement of Plaintiff's requests in other motions. Specifically, its motions to exclude evidence pertaining to Paugh's criminal record, medical history, alcoholism, and decision to go to jail. *See* ECF Nos. 152, 154, 159, & 161. Insofar as this motion is limited to these issues, the court adopts its rulings and reasoning explained elsewhere.

One could, however, interpret this motion as a broad request under Rule 401 to prevent Defendants from introducing any evidence that does not directly relate to "the care that Coby

Paugh received in the Uintah County Jail from July 24-25, 2015, the training given to Officers by Uintah County and whether any custom or policy led to the inadequate monitoring of Coby while in the Uintah County Jail." ECF No. 149 at 2. The court will not issue such a wide-ranging order. Issuing this order would potentially exclude important expert testimony about the seriousness of the ailment Paugh faced. Additionally, it would prevent the parties from introducing evidence related to damages. There may also be other evidence that does not relate to Plaintiffs' three categories that is relevant to the outcome of this trial.

While the court will not admit irrelevant evidence, it will not predefine what constitutes relevant evidence unless Plaintiff identifies a specific piece or category of evidence it seeks to exclude. Thus, Plaintiff's general motion to limit the evidence to the issues before the court is denied.

### 12. Motion to Exclude Evidence and Testimony that Paugh Chose to Go to Jail

Plaintiff moves for an order excluding evidence and testimony that Paugh chose to go to the Uintah County Jail rather than stay at the Ashley Regional Medical center on July 24, 2015. ECF No. 161. The Estate argues that such evidence lacks probative value, warranting exclusion under Rule 401, and is highly prejudicial, warranting exclusion under Rule 403. The court grants the motion.

Plaintiff alleges that during a discussion between Paugh and Dr. Bradbury at the Ashley Regional Medical Center, Dr. Bradbury gave Paugh the option to stay at the hospital or be released to officers who would bring him to the Uintah County Jail. ECF No. 161-2 at 21:5-7. According to Dr. Bradbury, Paugh replied "Send me to the F'in jail." *Id*. at 55:14. Plaintiff argues that this evidence is irrelevant because the outcome of this case hinges solely on Defendants' conduct once Paugh arrived at jail. Evidence must, thus, only focus on "whether Defendant Officers properly followed Dr. Bradbury's known discharge instructions, whether they properly monitored Paugh

31

while he was at the Jail, whether their assessments, as untrained medical personnel, of his symptoms were appropriate, and whether they should have returned him to the hospital when his symptoms worsened." ECF No. 161 at 4. Plaintiff argues that the fact that Paugh's decision to go to jail does not fit into one of these categories means that it must be excluded.

Defendants contends that this conception of what evidence is relevant is too narrow. First, they point out that Dr. Tubbs' expert report found that Paugh's decision to go to jail was highly relevant. It stated that the fact that "Paugh was given the opportunity and free choice to undergo hospitalization with detoxification instead of going to jail" undermined the argument that Defendants did not provide Paugh with adequate medical care. ECF No. 157-2 at 23. Paugh's choice is part of a larger argument that Paugh continually chose to minimize the severity of his own symptoms, leading officers to fail to recognize that he was at risk of a health crisis. There is certainly other evidence that tends to support this theory. *See Id*. at 21 ("Paugh reported to the officers that the hand tremor was likely and normal and that he had worse withdrawal symptoms in prior detoxification episodes and did not indicate to officers that this was concerning."). The argument that Paugh minimized the severity of his symptoms could reduce Defendants' culpability, but Paugh's decision to go to jail is only a small portion of this potential line of attack. Additionally, there is no indication that any of the Defendants were privy to Paugh's decision to go to jail. This means that Paugh's decision did not influence their treatment regimen. Thus, while evidence of Paugh's choice is somewhat relevant to the resolution of this case, it has minimal probative value in resolving the question of liability.[14]

---

[14] Defendants also argued at hearing that Paugh's decision was relevant to determining municipal liability. The court sees zero link between Paugh's choice and municipal liability.

Second, Defendants state that they plan to use evidence of Paugh's decision to go to jail to establish damages. They argue that the choice is relevant because "a jury, upon finding a constitutional violation occurred, might give a greater award to someone who wanted to go to the hospital but was refused, versus someone who was offered inpatient treatment for alcohol withdrawal but chose to go to jail instead." ECF No. 172 at 3. Defendants reason that Paugh's desire to go to jail instead of receiving medical treatment may indicate a desire to die, which would "certainly affect[] how long he would be expected to live, and thus what amount of money to award . . . his estate." *Zitzka v. Vill. of Westmont*, No. 07 C 0949, 2011 WL 4738249, at *4 (N.D. Ill. Oct. 7, 2011) (citing *Palmquist v. Selvik*, 111 F.3d 1332, 1342 (7th Cir. 1997)). The court is not convinced that Paugh's decision to go to jail is strong evidence of a desire to die or lack of care for life. For example, Paugh may not have understood the seriousness of his condition. There are many reasons an individual could choose to go to jail that do not suggest a wish to die. While evidence of Paugh's decision to leave the hospital passes muster under Rule 401, its probative value is de minimis.

Even if this evidence is admissible under Rule 401, it is not admissible under Rule 403 because it is highly prejudicial. Evidence of Paugh's decision could mislead the jury into finding that Paugh's death was exclusively his own fault because he chose to subject himself to a facility lacking in medical resources rather than receiving better treatment at the hospital. Harping on Paugh's decision to go to jail could easily muddy the waters and improperly shift the focus of this case from the events that occurred in the Uintah County Jail to Paugh's choices prior to his incarceration. Thus, the court finds that the risk of prejudice introduced by evidence of Paugh's decision substantially outweighs its de minimis probative value. Plaintiff's motion is granted.

### 13. Motion to Permit Unrestricted Use of Defendants' Depositions

Plaintiff moves for leave to use Defendants' depositions in its opening statement, its closing argument, and in other instances as allowed or permitted by the Federal Rules of Evidence. *See* ECF No. 150.

As an initial matter, the court cannot grant this motion until Plaintiff identifies the deposition passages that it wishes to introduce. To grant this motion without more information would be to simply reiterate the existing text of Federal Rule of Civil Procedure 32, which sets out the circumstance under which a deposition may be admitted. This would do nothing to further clarify what specific evidence Plaintiff may present at trial.[15]

Additionally, the court notes that it will not allow deposition evidence to be used in opening statements for any reason. An opening statement may detail what a party expects the evidence will show at trial, but it may not present that evidence itself. *United States v. Valdez*, 723 F.3d 206, 209 (D.C. Cir. 2013).

Finally, Defendants argue that Plaintiff's deposition evidence should be excluded entirely because it made no designation that deposition testimony would be used at trial despite the fact that the court's trial order required that "[a]ny party desiring to present testimony of a witness by recorded means, whether video, audio or paper, must serve a designation of the testimony by June 29, 2023." ECF No. 135 at 4. The court takes its trial order seriously and thus will not allow Plaintiff to admit deposition evidence freely due to its failure to designate the deposition passages

---

[15] The court notes, however, that it plans to enforce the Federal Rules Evidence and adhere to the list of allowed uses set out by Rule 32(a)(2)-(8). This means that deposition testimony will generally not be permitted as a substitute for live testimony unless allowed by the Federal Rules.

it wishes to introduce.[16] But the court will allow deposition evidence in certain instance, such as when a witness is unexpectedly unable to testify, like Dr. Bradbury, or when a deposition is used to impeach a witness. But free use of depositions by Plaintiff will not be permitted.[17]

For these reasons, Plaintiff's motion is denied.

### 14. Motion to Limit Testimony Given by PA Logan Clark

Plaintiff moves for an order limiting PA Logan Clark from testifying about facts beyond the telephone call between him and Defendant Kyle Fuller on July 24, 2015. *See* ECF No. 151. Defendants agree that the court should enter this order. Therefore, this motion is granted.

## II.   DEFENDANTS' MOTIONS IN LIMINE

### 1.  Motion to Exclude or Limit the Testimony of Dr. Esmaeil Porsa

Defendants move to exclude or limit the testimony of Plaintiff's expert Dr. Esmaeil Porsa ("Dr. Porsa"). *See* ECF No. 162. They argue for exclusion because Dr. Porsa's expert report (ECF No. 80-2) allegedly makes findings on factual and legal issues that that are best determined by the

---

[16] Though Plaintiff listed the depositions it intends to introduce in its exhibit list, this is not enough. The trial order required that all designations "include specific citations to the testimony intended to be introduced." ECF No. 145 at 4.

[17] At hearing, Plaintiff developed a new variation of this motion that differed from what was included in its briefing. In sum, it asked the court to clarify that depositions by parties to this suit may be used for any reason. Federal Rule of Civil Procedure 32(a)(3) provides that "[a]n adverse party may use for any purpose the deposition of a party or anyone who, when deposed, was the party's officer, director, managing agent, or designee under Rule 30(b)(6) or 31(a)(4)." It is true that 32(a)(3) provides a "freestanding" hearsay exception for the use of opposing parties' depositions. *Est. of Thompson v. Kawasaki Heavy Indus., Ltd.*, 291 F.R.D. 297, 306 (N.D. Iowa 2013). But this does not mean that parties have free reign to use this evidence however they would like. As already explained, Plaintiffs will not be permitted to use deposition evidence that they did not designate prior to trial. Additionally, use of opposing parties' deposition testimony must always comply with the Federal Rules of Evidence. Fed. R. Civ. P. 32(a)(1)(B). For instance, hearsay within a deposition is still a basis for excluding portions of deposition testimony even if the deposition as a whole is admissible under Rule 32(a)(3). *Gonzalez Prod. Sys., Inc. v. Martinrea Int'l Inc.*, 310 F.R.D. 341, at *344 (E.D. Mich. 2015).

judge and jury respectively. The court addresses these contentions in turn, concluding that it should grant Defendants' motion in part and deny it in part.

As an initial matter, under the Federal Rules of Evidence, an expert "opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704. However, "[i]n no instance can a witness be permitted to define the law of the case." *Specht v. Jensen*, 853 F.2d 805, 809-10 (10th Cir. 1988) (en banc). This means that "an expert may not state his or her opinion as to legal standards nor may he or she state legal conclusions drawn by applying the law to the facts." *Christiansen v. City of Tulsa*, 332 F.3d 1270, 1283 (10th Cir. 2003) (citation omitted). Additionally, an expert may only render an opinion that "assists, rather than supplants, the jury's judgment." *United States v. Dazey*, 403 F.3d 1147, 1171-72 (10th Cir. 2005). Thus, courts must disregard expert testimony that "usurps the function of the jury in deciding the facts." *Id*. at 1171.

Defendants argue that Dr. Porsa's report attempts to establish facts that he had no personal knowledge of in usurpation of the jury's role as fact finder. They also state that the report's "recitation of the facts" is inadmissible because it will not assist the jury in determining constitutional liability. ECF No. 162 at 4. The particular statements Defendants find objectional are the report's first five opinions. They are:

> (1) during the time Coby Paugh was at Uintah County Jail on July 24 and 25, 2015, he had a serious medical need, namely severe alcohol withdrawal; (2) alcohol withdrawal caused Coby Paugh's death; (3) Uintah County Jail and its employees did not provide Coby Paugh Librium (a medication which had been ordered by ER Dr. Bradburry [sic] to treat Coby Paugh's alcohol withdrawal) while he was at Uintah County Jail on July 24 and 25, 2015; (4) Uintah County and its employees did not monitor Coby Paugh for alcohol withdrawal while he was at Uintah County Jail on July 24 and 25, 2015; (5) Coby Paugh would not have died if he had been provided Librium or monitored for alcohol withdrawal or returned to the hospital once he began exhibiting worsening symptoms of alcohol withdrawal as was clearly instructed by the local emergency room physician during his pre-detention evaluation.

ECF No. 80-2 at 2.

36

The court holds that none of these opinion statements warrant exclusion. While Dr. Porsa's report certainly presents facts to the jury, it does not purport to be the sole basis for this information. Instead, to support his opinions, Dr. Porsa cites to witnesses and exhibits that the parties will present at trial. For instance, evidence will be presented that a medical examiner's toxicology report did not find Librium in Paugh's body after his death. In opinion three, Dr. Porsa explains the implications of this fact by bringing to bear his medical expertise on the topic of autopsies. This analysis is a good example of the type of opinion that Rule 702 was intended to allow at trial in order to aid jurors.

Defendant's best example of a statement of fact that potentially usurps the jury's fact finding role is opinion four. Here, Dr. Porsa states that Uintah County's employees did not monitor Paugh for alcohol withdrawal. Defendants could argue that this opinion is outside of Dr. Porsa's zone of expertise as it relates to a Defendant performing a function of his job as a correctional officer rather than to Paugh's medical condition. But, ultimately, Dr. Porsa may provide his opinion on whether or not Defendants monitored Paugh because, as a doctor, Porsa has valuable knowledge to share about the medical profession's definition of "monitoring." Given the evidence presented at trial, Dr. Porsa may be able to shed light on whether or not Defendants monitoring practices met this standard. In sum, the court declines to exclude testimony related to opinions one through five of Dr. Porsa's report. These conclusions do not usurp the role of the jury as fact finder.

Second, Defendants argue that Dr. Porsa's report should be excluded because it attempts to establish the legal standard for this case and applies this standard to the facts to reach an ultimate conclusion concerning the Defendants' liability. Specifically, Defendants allege that opinions six, seven, and eight usurp the role of the judge in determining the law. These opinions provide that,

> (6) Uintah County Jail was deliberately indifferent in its custom, policy, decision and widespread practice to not have a medical professional available on site; (7)

Uintah County Jail was deliberately indifferent in failing to adequately train and supervise its officers about how to handle a situation where a detainee is at risk of severe alcohol withdrawal, like Coby Paugh; and (8) if it is assumed that Uintah County Jail did adequately train its officers, then those officers were deliberately indifferent to Coby Paugh in failing to monitor his severe alcohol withdrawal, properly communicate his condition with the responsible medical professionals, properly follow written physician orders from the local emergency room, and in failing to provide him Librium.

ECF No. 80-2 at 2.

In its order partially denying summary judgment, the court found that Dr. Porsa's report attempted "to apply the legal standard of 'deliberate indifference'—in both the individual and municipal liability contexts—to the facts of this case to reach an ultimate conclusion concerning the Defendants' liability." ECF No. 104 at 35. Referring to opinions six through eight, the court held that these statements "either interfere[d] with the court's role to define the legal parameters within which the jury must exercise its fact-finding function or the jury's role in making those findings." *Id*. As a result, it struck these conclusions from the record. The court now adopts its previous reasoning here. It will not permit Dr. Porsa to opine on the ultimate issues using the language of "deliberate indifference."

But there is nothing inherently objectionable about introducing opinions six through eight if Dr. Porsa makes no reference to the legal standard of "deliberate indifference." Indeed, at hearing, both parties seemed to recognize that rephrasing these conclusions without changing their substantive meaning would rectify Defendant's central complaint—essentially that experts should not be able to use the legal phrase "deliberate indifference." Thus, while the court will not allow Dr. Porsa, for instance, to testify that "Uintah County Jail was *deliberately indifferent* in failing to adequately train and supervise its officers," it will allow him to testify, simply, that Uintah County Jail failed to adequately train and supervise its officers. ECF No. 80-2 at 2.

In sum, the court denies Defendants' motion as it relates to opinions one through five of Dr. Porsa's report, but partially grants Defendants' motion as it relates to the use of the term "deliberate indifference" in opinions six through eight.

### 2. Motion to Exclude Detective Brandon Cottam's Internal Affairs Investigation and Detective Dela Rowley's Crime Report

Defendants move to exclude Detective Brandon Cottam's ("Cottam") internal affairs investigation and Detective Dela Rowley's ("Rowley") crime report. ECF No. 163 They argue that these documents are inadmissible under Rule 403 because their probative value is substantially outweighed by the risk of confusion they could create for the jury. Defendants also contend that the documents are inadmissible as hearsay under Rule 802.

The court will exclude Cottam's internal affairs investigation and Rowley's crime report under Rule 403 because both documents lack probative value and carry a significant risk of confusing jurors. In the Tenth Circuit, courts generally exclude reports or investigations showing that a law enforcement defendant violated department procedures in § 1983 cases because the fact "that a particular [law enforcement] action 'violated . . . department procedures does not make it more or less likely' that the action was unconstitutional." *Est. of Briones v. Ardrey*, No. 18-CV-00865-PAB-MEH, 2021 WL 4170460, at *1 (D. Colo. Sept. 14, 2021) (citing *Tanberg v. Sholtis*, 401 F.3d 1151, 1163-64 (10th Cir. 2005). Indeed, here, the probative value of each report is relatively low. Defendants do not identify any information contained in either document that it could not introduce through other means with the sole exception of the documents' ultimate conclusions that officers violated Uintah County Jail policies. The Tenth Circuit has also "determined that explaining internal procedures, and the relevant standards for those procedures, would be confusing and time consuming, particularly where those standards are nearly identical

to the constitutional standard." *Id*. (citing *Tanberg*, 401 F.3d at 1164-65). This alone is an additional reason to exclude evidence of both Detective's findings.

But Plaintiff argues that, regardless of the holdings in *Ardrey* and *Tanberg*, the court should admit the evidence at issue because, unlike in *Ardrey* and *Tanberg*, this case's Plaintiff has "brought claims against the County for violations of policy as well as training." ECF No. 171 at 3. The court disagrees. The analysis in *Ardrey* and *Tanberg* still applies to the matter at hand because while Plaintiff does attempt to establish its claims under a "failure to train" and "final policymaker" theory, this is not the same as attempting to establish a claim under the theory that Defendants are liable simply due to their violation of a county policy. Indeed, if a violation of County policy was the basis for Plaintiff's claim, its case would be a nonstarter because the Supreme Court has "rejected the use of local [law enforcement] regulations as a standard for evaluating constitutionality of [law enforcement] conduct, on the ground that such a 'basis of invalidation would not apply in jurisdictions that had a different practice.'" *Tanberg*, 401 F.3d at 1163 (citing *Whren v. United States*, 517 U.S. 806, 815 (1996)). To clarify, Plaintiffs' policymaking and training claims are the reason the parties will be allowed to introduce evidence of the Jail's policies and procedures. These claims are not, however, justification for admitting evidence indicating that Detectives found Jail officials violated these policies and procedures.

Ultimately, introducing evidence stating that Defendants violated County policy comes with a significant risk of creating confusion about the applicable legal standard. This risk substantially outweighs the evidence's probative value. Thus, both documents are inadmissible under Rule 403. Because of this finding, the court need not analyze whether Rule 802's prohibition on hearsay applies to the documents.

## CONCLUSION & ORDER

For the foregoing reasons, the court PARTIALLY GRANTS and PARTIALLY DENIES Defendants' first motion in limine, GRANTS Defendants' second motion in limine, PARTIALLY GRANTS and PARTIALLY DENIES Plaintiff's first, second, fifth, seventh, ninth, and tenth motions in limine, GRANTS Plaintiff's eighth, twelfth, and fourteenth motions in limine, and DENIES Plaintiff's third, fourth, sixth, eleventh, and thirteenth motions in limine.

DATED August 8, 2023

BY THE COURT

Jill N. Parrish
United States District Court Judge